# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JANICE NOWELL,

       Plaintiff,

vs.                                             No. CIV 17-1010 JB\SMV

MEDTRONIC INC.; COVIDIEN PLC;
COVIDEN LP, and MEDTRONIC PLC,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss, filed March 23, 2018 (Doc. 27)("MTD"). The Court held a hearing on August 10, 2018. The primary issues are: (i) whether the applicable statutes of limitations bar Plaintiff Janice Nowell's claims against Defendants Medtronic Inc., Covidien PLC, Covidien LP, and Medtronic PLC for negligence, strict liability -- design defect, manufacturing defect, and failure-to-warn -- breach of express warranty, and breach of implied warranty; and (ii) whether Nowell has alleged with specificity how the Defendants' product is defective and how that defect caused her injuries. The Court will grant the MTD. Nowell's warranty claims are untimely, because Nowell alleges that her physician used the Defendants' defective product to repair her hernia[1] on October 27, 2010,

---

[1]The Food and Drug Administration ("FDA") states: "A hernia occurs when an organ, intestine or fatty tissue squeezes through a hole or a weak spot in the surrounding muscle or connective tissue. Hernias often occur at the abdominal wall. Sometimes a hernia can be visible as an external bulge particularly when straining or bearing down." Hernia Surgical Mesh Implants, FDA, https://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/Implantsa ndProsthetics/HerniaSurgicalMesh/default.htm (last visited Feb. 4, 2019). The FDA notes six "most common" hernias: (i) inguinal, which "occurs in the inner groin"; (ii) femoral, which "occurs in the upper thigh/outer groin"; (iii) incisional, which "occurs through an incision or scar in the abdomen"; (iv) Ventral, which "occurs in the general abdominal/ventral wall"; (v) umbilical, which occurs at the belly button"; and (vi) hiatal, which "occurs inside the abdomen, along the

but Nowell did not file her original Complaint for Damages for Personal Injury Resulting From Negligence, Strict Liability and Breach of Warranties (Doc. 1)("Complaint"), until October 5, 2017, almost three years after the expiration of the four-year statute of limitations governing express and implied warranty claims. See N.M. Stat. Ann. § 55-2-725(1). Nowell's negligence and strict liability claims are untimely, because the Second Amended Complaint for Damages for Personal Injury Resulting from Negligence, Strict Liability and Breach of Warranties, filed January 19, 2018 (Doc. 24-1)("Amended Complaint"), indicates that Nowell was aware of cognizable tort injuries between April, 2011, and March, 2014, but did not file her original Complaint until October 5, 2017, after the three-year statute of limitations governing negligence and strict liability claims had expired. See N.M. Stat. Ann. § 37-1-8. Moreover, the Court concludes that Nowell's factual allegations lack specificity sufficient to satisfy the pleading standard that the Supreme Court of the United States of America articulated in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Nowell's negligence claim does not plead facts alleging causation. Her strict liability claims do not allege any specific defect -- in either design, manufacture, or warning -- that made the Defendants' product unreasonably dangerous and caused her injuries. Moreover, Nowell has not alleged that a feasible alternative design existed which lacked the alleged design defect and that therefore would have prevented her injuries. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1278, 1283 (D.N.M. 2005)(Browning, J.)("Thus, to the

---

upper stomach/diaphragm." Hernia Surgical Mesh Implants, supra. Surgical intervention is the only treatment available to repair a hernia. See FDA, supra. Hernia repair risks include: "pain, infection, hernia recurrence, scar-like tissue that sticks tissues together (adhesion), blockage of the large or small intestine (obstruction), bleeding, abnormal connection between organs, vessels, or intestines (fistula), fluid build-up at the surgical site (seroma), and a hole in neighboring tissues or organs (perforation)." Hernia Surgical Mesh Implants, supra.

extent that a plaintiff could come to court and merely criticize a product, the Court believes that the New Mexico law required the plaintiff to propose an alternative design."). Nowell does not allege an affirmation or representation that could support her express warranty claim. Furthermore, Nowell does not allege with sufficient specificity a defect that rendered the Defendants' product sufficiently unfit for its particular purpose or sufficiently unmerchantable to support her claim for breach of implied warranty. Finally, Nowell has not alleged facts sufficient to support a finding that the Defendants' conduct maliciously, intentionally, fraudulently, oppressively, recklessly, or wantonly offended Nowell's rights such that Nowell is entitled to punitive damages. Accordingly, the Court will grant the MTD and dismiss the case with prejudice.

## FACTUAL BACKGROUND

The Court takes the facts from the Amended Complaint. As this matter comes before the Court on a motion to dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes that all facts in the Complaint are true, see Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (stating that, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"), and "grants all reasonable inferences from the pleadings in that party's favor," Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012).

According to the Amended Complaint, on October 27, 2010, Nowell had an operation with Dr. William Pollard to repair a fifteen centimeter "superiorperiumbilical hernia." Amended Complaint ¶ 38, at 8. At the time, Dr. Pollard implanted a twenty centimeter "Parietex Mesh

Composite"[2] to repair Nowell's hernia.  Amended Complaint ¶ 38, at 8.  Subsequently, the mesh

began to "pull away from the actual edges," and on April 27, 2011, Nowell had a second surgery

wherein Dr. Pollard used additional sutures to reinforce the existing Parietex mesh.  Amended

Complaint ¶ 38, at 8.  Dr. Pollard did not inform Nowell of any problems with the mesh and, after

the surgery, noted that Nowell "was doing well."  Amended Complaint ¶ 38, at 8.  Between April

27, 2011, and March 1, 2014, Nowell "began experiencing symptoms including but not limited to

exhaustion and pain in the area of the mesh."  Amended Complaint ¶ 38, at 8.  During this period,

---

[2]The Defendants describe the "Parietex™ composite ventral patch" as a polyester textile mesh "specifically designed for small ventral hernia repair."  Parietex™ Composite Ventral Patch, Medtronic, https://www.medtronic.com/covidien/en-us/products/hernia-repair/parietex-composite-ventral-patch.html (last visited Feb. 2, 2019).  The FDA notes that "surgeons often use surgical mesh to strengthen the hernia repair and reduce the rate of recurrence," and that "[t]he majority of surgical mesh devices currently available for use are constructed from synthetic materials or animal tissue."  Hernia Surgical Mesh Implants, supra note 1.  Synthetic surgical mesh

> can be found in knitted mesh or non-knitted sheet forms.  The synthetic materials used can be absorbable, non-absorbable or a combination of absorbable and non-absorbable materials.
>
> . . . .
>
> Non-absorbable mesh will remain in the body indefinitely and is considered a permanent implant.  It is used to provide permanent reinforcement to the repaired hernia.  Absorbable mesh will degrade and lose strength over time.  It is not intended to provide long-term reinforcement to the repair site.  As the material degrades, new tissue growth is intended to provide strength to the repair.
>
> . . . .
>
> The most common adverse events following hernia repair with mesh are pain, infection, hernia recurrence, adhesion, and bowel obstruction.  Some other potential adverse events that can occur following hernia repair with mesh are mesh migration and mesh shrinkage (contraction).

Hernia Surgical Mesh Implants, supra note 1.

"Nowell was skeptical as to whether the mesh was causing these problems"; however, Dr. Pollard did not advise her that the mesh was causing these issues.  Amended Complaint ¶ 38, at 8.  On March 1, 2014, Nowell underwent a CT scan.[3]  See Amended Complaint ¶ 38, at 8.  The physicians who performed Nowell's CT scan neither concluded nor advised Nowell that the mesh was causing her issues.  See Amended Complaint ¶ 38, at 8.  The physicians were unable to diagnose the symptoms' cause, because Nowell "apparently had cysts in the area associated with the mesh." Amended Complaint ¶ 38, at 8.  On October 6, 2014, Nowell underwent another CT scan, which "revealed a large fluid collection associated with the mesh" and a corresponding staph infection.[4] Amended Complaint ¶ 38, at 8.  On October 8, 2014, "Dr. Powell"[5] informed Nowell that "there

---

[3]The letters "CT" refer to "computed tomography" or "computerized tomography," which the FDA describes as

> a noninvasive medical examination or procedure that uses specialized X-ray equipment to produce cross-sectional images of the body.  Each cross-sectional image represents a "slice" of the person being imaged, like the slices in a loaf of bread.  These cross-sectional images are used for a variety of diagnostic and therapeutic purposes.

Computed Tomography (CT), FDA, https://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/MedicalImaging/MedicalX-Rays/ucm115317.htm (last visited February 1, 2019).

[4]The Mayo Clinic states:

> Staph infections are caused by staphylococcus bacteria, types of germs commonly found on the skin or in the nose of even healthy individuals.  Most of the time, these bacteria cause no problems or result in relatively minor skin infections.  But staph infections can turn deadly if the bacteria invade deeper into your body, entering your bloodstream, joints, bones, lungs or heart.

Mayo Foundation for Medical Education and Research, Staph Infections, https://www.mayoclinic.org/diseases-conditions/staph-infections/symptoms-causes/syc-20356221 (last visited Feb. 19, 2019).

was no choice but to remove the Parietex mesh and replace it with a biological mesh," which he "memorialized . . . in his treatment notes." Amended Complaint ¶ 38, at 8. Moreover, during this discussion, Dr. Pollard told Nowell "that there was a problem with the mesh itself." Amended Complaint ¶ 38, at 8. "On or about October 20, 2014," Dr. Pollard removed the "infected and disintegrated (unincorporated)" Parietex mesh from Nowell's abdomen. Amended Complaint ¶ 38, at 8.

## PROCEDURAL BACKGROUND

On October 5, 2017, Nowell filed suit in the United States District Court for the District of New Mexico, alleging six causes of action: (i) negligence; (ii) strict liability -- design defect; (iii) strict liability -- manufacturing defect; (iv) strict liability -- failure-to-warn; (v) breach of express warranty; and (vi) breach of implied warranty. See Complaint ¶¶ 103-155, at 18-32, filed October 5, 2017 (Doc. 1)("Complaint"). Nowell subsequently amended the Complaint on October 6, 2017, see First Amended Complaint for Damages for Personal Injury Resulting from Negligence, Strict Liability and Breach of Warranties, filed October 6, 2017 (Doc. 4), and again on January 19, 2018, but alleges the same claims, see Amended Complaint ¶¶ 103-155, at 22-36.

Nowell contends that the Defendants were negligent in failing to use reasonable care and breached their duty to Nowell "in designing, manufacturing, marketing, labeling, packaging and selling" the mesh. Amended Complaint ¶ 104, at 22. Specifically, Nowell contends that the mesh's design "did not provide for sufficient resiliency which caused the Product to disintegrate in Plaintiff," and that the mesh's manufacturing process caused "an unreasonable risk of harm to

---

[5]This is the single reference to a "Dr. Powell" in the Amended Complaint and in Nowell's subsequent filings. The Court therefore believes that this reference is a typographical error and that this assertion refers to Dr. William Pollard. See Amended Complaint ¶ 38, at 8.

women in whom the Product was implanted, including the Plaintiff." Amended Complaint ¶ 105, at 23. Nowell further alleges that the Defendants did not use reasonable care in the mesh's testing and inspection, in instructing physicians in how to use the mesh, and in evaluating the mesh's safety "to determine the nature, magnitude, and frequency of serious, life threatening complications that were known or knowable." Amended Complaint ¶ 105, at 23. Nowell further alleges that the Defendants' mesh is unreasonably dangerous and defective, because the mesh material causes adverse reactions and injuries; the mesh design facilitated harmful bacteria growth, which caused "immune reactions and subsequent tissue breakdown and adverse reactions and injuries;" and the mesh has a propensity "to disintegrate inside the body," "to deform when subject to prolonged tension inside the body," to cause "adverse tissue reactions," and to create "a non-anatomic condition in the abdomen leading to chronic pain and functional disabilities when the mesh is implant[ed] according to the manufacturers instructions." Amended Complaint ¶ 106, at 23-24. Nowell adds that her "adverse tissue reactions . . . are causally related to infection, as the materials used to construct the Product are foreign." Amended Complaint ¶ 106, at 24.

Nowell also alleges that the Defendants "negligently failed to warn" her and/or her healthcare providers about the mesh's "propensities to deform inside the body," about "degradation, fragmentation and/or creep," about "the rate and manner of mesh erosion or extrusion," and about the mesh's risks, including "chronic infections" and "recurrent, intractable abdominal pain and other pain." Amended Complaint ¶ 107, at 24-25. The Defendants' duty to warn, asserts Nowell, extends to the "need for corrective or revision surgery to adjust or remove the Product," and treatment with the mesh exposes patients to greater risk than treatment with "feasible available alternatives," including risks attendant to multiple, debilitating surgeries.

Amended Complaint ¶ 108, at 25. Nowell asserts that the Defendants' negligence was the direct and proximate cause of her "significant mental and physical pain and suffering" to include "permanent injury, . . . medical treatment and . . . likely . . . further medical treatment and procedures, . . . financial or economic loss, . . . obligations for medical services and expenses, lost income, and other damages." Amended Complaint ¶ 109, at 25.

Nowell contends that the Defendants are strictly liable for the mesh's alleged design defects, but for which, according to Nowell, she would not have sustained her injuries. See Amended Complaint ¶ 121, at 27. Specifically, Nowell contends that the meshes' "inelasticity," which causes "them to be improperly mated to the delicate and sensitive areas of the abdomen where they are implanted, and causes pain upon normal daily activities that involve movement in the abdomen," and that the mesh has "[b]iomechanical issues . . . including, but not limited to, the propensity of the Product to disintegrate inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury." Amended Complaint ¶ 121, at 28. Nowell reasserts the same alleged injuries described in paragraph 109. See Amended Complaint ¶ 122, at 28-29. Nowell adds that the mesh was "inherently defective," because it "was not sturdy enough to prevent disintegration and malformation," which resulted in the mesh "breaking apart while in the Plaintiff's body. . . in turn caus[ing] . . . internal bleeding, infection and other serious injuries." Amended Complaint ¶ 123, at 29.

Nowell asserts that the Defendants are strictly liable for the mesh's alleged manufacturing defects, because the mesh "deviated materially from Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to the

Plaintiff." Amended Complaint ¶ 125, at 29. Nowell alleges that these manufacturing defects were the direct and proximate cause of her injuries. See Amended Complaint ¶ 126, at 29-31.

Nowell contends that the Defendants are strictly liable for not providing Nowell with "appropriate and necessary warnings" regarding the mesh's alleged defects. Amended Complaint ¶ 129, at 30. Nowell reasserts her arguments from paragraph 106, including that the Defendants had a duty to warn her about the mesh's propensity to disintegrate, fragment, degrade, and improperly "mate[] with the abdominal region," and to cause "chronic inflammation," "chronic infections," "scarring," and "recurrent, intractable pain." Amended Complaint ¶ 129, at 30-31. The Defendants' duty to warn, asserts Nowell, extends to the "need for corrective or revision surgery to adjust or remove the Product," and that treatment with the mesh exposes patients to greater risk than treatment with "feasible available alternatives" including risks attendant to multiple, debilitating surgeries. Amended Complaint ¶ 129, at 31. Nowell asserts that the Defendants' failure-to-warn was the direct and proximate cause of her "significant mental and physical pain and suffering" to include "permanent injury, . . . medical treatment and . . . likely . . . further medical treatment and procedures, . . . financial or economic loss, . . . obligations for medical services and expenses, lost income, and other damages." Amended Complaint ¶ 130, at 31-32.

Nowell asserts that the Defendants are liable for breach of express warranty based on assurances made "to the general public, hospitals and health care professionals that the Product was safe and reasonably fit for its intended purposes." Amended Complaint ¶ 141, at 34. Nowell contends that her physician chose the Defendants' mesh based on such warranties and representations. See Amended Complaint ¶ 142, at 34. The Defendants are liable, according to

Nowell, because the mesh "was unreasonably dangerous and defective . . . and not as Defendant[s] had represented," Amended Complaint ¶ 144, at 34, which resulted in Nowell's physician implanting the mesh in Nowell's body, see Amended Complaint ¶ 145 at 34, and thereby causing the injuries detailed in paragraph 109 and repeated in paragraph 146, see Amended Complaint ¶ 146, at 34.

Nowell asserts that the Defendants are liable for breach of implied warranty, because the mesh was neither merchantable nor fit for its intended purpose. See Amended Complaint ¶ 155, at 35-36. Nowell asserts that such a breach is evident, because the mesh "disintegrated and mishappened [sic] inside the Plaintiff's body, causing injuries." Amended Complaint ¶ 155, at 35-36. Nowell reasserts her injuries that paragraph 106 describes. See Amended Complaint ¶ 157, at 36. Nowell adds that "someone with knowledge in the trade would reject the mesh for failure to meet the contract description." Amended Complaint ¶ 159, at 36. Accordingly, Nowell requests compensatory, punitive, and special damages, as well as attorney's fees and costs, and any other relief that the Court deem appropriate. See Amended Complaint at 37.

### 1.    The MTD.

The Defendants argue in the MTD that, for two independent reasons, the Court should dismiss the Amended Complaint in its entirety pursuant to rule 12(b)(6): first, applicable statutes of limitations bar each claim, and, second, the Amended Complaint relies on "labels and conclusions," and "a formulaic recitation of the elements of" each claim without any well-pled facts alleging a specific defect with the Defendants' product and how that defect purportedly caused Nowell's injuries. MTD at 1-2 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555). The Defendants note that two other federal courts recently dismissed "similarly deficient"

complaints against the Defendants involving injuries allegedly related to Parietex mesh.  MTD at

2 (citing <u>Rincon v. Covidien</u>, No. 16-CV-10033, 2017 WL 2242969 (S.D.N.Y. May 22,

2017)(Furman, J.); <u>Black v. Covidien PLC</u>, No. 17-CV-6085-FPG, 2018 WL 573569 (W.D.N.Y.

Jan. 26, 2018)(Geraci, C.J.)).    The Defendants add that, because Nowell "has had ample

opportunity to plead her claims," the Court should order the case's dismissal "with prejudice."

MTD at 2.  The Defendants argue that dismissal under rule 12(b)(6) is appropriate when, as in this

case, "the 'uncontroverted facts' allege 'dates that appear, in the first instance, to fall outside the

statutory limitations period.'"  MTD at 6-7 (quoting <u>Anderson Living Tr. v. WPX Energy Prod.,</u>

<u>LLC</u>, Nos. CIV 12-0039 JB/SCY, 12-0040, 2015 WL 3543011, at *34 (D.N.M. May 26,

2015)(Browning, J.)).  According to the Defendants, New Mexico's Uniform Commercial Code,

N.M. Stat. Ann. § 55-2-725 ("UCC"), governs Nowell's breach-of-express and implied-warranty

claims, and subjects such claims to a four-year statute of limitations period.  <u>See</u> MTD at 7 (citing

N.M. Stat. Ann. § 55-2-725(1)).  Nowell's warranty claims are untimely, assert the Defendants,

because such claims accrue when a given product is delivered, <u>see</u> MTD at 7 (citing <u>AIG Aviation</u>

<u>Ins. v. Avco Corp.</u>, 709 F. Supp. 2d 1124, 1131-32 (D.N.M. 2010)(Black, J.)), and here Nowell

alleges that her physician used the Defendants' mesh to repair her hernia on October 27, 2010, but

did not file her original Complaint until October 5, 2017, which was almost three years after

Nowell's putative warranty claim expired, <u>see</u> MTD at 7 (citing Amended Complaint ¶ 38, at 8)).

Although the Defendants concede that plaintiffs may bring express warranty claims beyond

four years from purchase "if the warranty explicitly guarantees 'future performance,'" MTD at 7

(citing N.M. Stat. Ann. § 55-2-725(2)), the Defendants contend that the Amended Complaint does

not identify an express warranty, "let alone quote language that 'explicitly guarantees future

performance' beyond four years," MTD at 7 (internal quotation marks omitted)(quoting <u>Willis v. Smith</u>, No. 16 CV 167 JAP/LF, 2016 WL 9281447, at *4 (D.N.M. Dec. 14, 2016)(Parker, J.)). Nowell, instead, according to the Defendants, merely asserts that the "Defendant made assurances . . . that the product was safe and reasonably fit for its intended purposes." MTD at 7 (quoting Amended Complaint ¶ 141, at 34). The Defendants note, in a footnote, that the discovery rule, which tolls a cause of action until "the plaintiff discovers or with reasonable diligence should have discovered that a claim exists," MTD at 7 n.12 (quoting <u>Roberts v. Sw. Cmty. Health Servs.</u>, 1992-NMSC-042, ¶ 24, 837 P.2d 442, 449), does not apply to warranty claims, <u>see</u> MTD at 7 n.12 (citing <u>Porcell v. Lincoln Wood Prods., Inc.</u>, No. CIV 08-0617 MCA/LFG, 2010 WL 1541264, at *4 (D.N.M. March 31, 2010)(Armijo, J.)). The Defendants further note that implied warranties, "by their very nature," "do not explicitly guarantee future performance" and thus cannot be tolled pursuant to § 55-2-725(2). MTD at 7-8 (internal quotation marks omitted)(quoting <u>AIG Aviation Ins. v. Avco Corp.</u>, 709 F. Supp. 2d at 1132). Hence, the Defendants conclude, Nowell's breach-of-express and implied-warranty claims are untimely. <u>See</u> MTD at 8.

The Defendants assert that Nowell's negligence and strict-liability claims are likewise untimely, because such claims are subject to a three-year statute of limitations. <u>See</u> MTD at 8 (citing N.M. Stat. Ann. § 37-1-8). The Defendants assert that New Mexico follows "the traditional discovery rule," pursuant to which a tort claim accrues at "the time of the injury not the time of the negligent act." MTD at 8 (quoting <u>N.M. Elec. Serv. Co. v. Montanez</u>, 1976-NMSC-028, ¶ 13, 551 P.2d 634, 637). The Defendants assert that the discovery rule, however, does not apply in this case, because, according to the Defendants, the Amended Complaint alleges injuries that occurred more than three years before Nowell filed her original Complaint. <u>See</u> MTD at 8. The Defendants

note that "the few facts" in the Amended Complaint include the dates of Nowell's surgeries and alleged injuries. MTD at 8. On April 27, 2010, for example, exactly six months after Nowell alleges that her physician used the Defendants' mesh to repair her hernia, Nowell had a second surgery, because the mesh allegedly "began to pull away from the actual edges." MTD at 8 (quoting Amended Complaint ¶ 38, at 8). Thus, the Defendants argue, Nowell's Amended Complaint pleads that she was aware of a potential problem with the Defendants' mesh seven years before she filed her original Complaint. See MTD at 8. The Defendants add that Nowell, "at some point in the next three years, . . . alleges that she began to experience 'symptoms including but not limited to exhaustion and pain in the area of the mesh.'" MTD at 8 (quoting Amended Complaint ¶ 38, at 8). Furthermore, according to the Defendants, Nowell's symptoms were "sufficiently problematic" to compel her to undergo a CT scan on March 1, 2014, which revealed "cysts in the area associated with the mesh." MTD at 8. The Defendants assert that, because these events "are cognizable tort injuries that started the three-year limitations period," MTD at 9 (citing Lent v. Emp't Sec. Comm'n, 1982-NMCA-147, ¶ 27, 658 P.2d 1134, 1139 ("[K]nowledge of injury, not knowledge of the extent of the injury, is the basis for starting the running of the limitation period.")), Nowell's negligence and strict liability claims are untimely, see MTD at 9 (citing Bassham v. Owens-Corning Fiber Glass Corp., 327 F. Supp. 1007, 1009 (D.N.M. 1971)(Payne, C.J.)("[A]ny exposure which occurred more than three years before the filing of the action, would be barred by the statute of limitations.")).

The Defendants insist that tolling, "[t]he only basis for excusing this late filing," is unavailable to Nowell, because her Amended Complaint does not allege "reasonable diligence" sufficient "to 'establish[] a factual basis for tolling' pursuant to the discovery rule." MTD at 9

(alteration in MTD)(quoting Andrew v. Schlumberger Tech. Corp., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.)).  According to the Defendants, the discovery rule's applicability turns on whether Nowell "lacked knowledge of her cause of action and could not have discovered it by exercising reasonable diligence during the statutory period."  MTD at 9 (quoting Blea v. Fields, 2005-NMSC-029, ¶ 28, 120 P.3d 430, 440).  The Defendants contend that, once Nowell began to experience pain and discomfort following the April 27, 2010, surgery, either she knew that the Defendants' mesh caused those injuries, or she had a "duty to inquire into" the cause.  MTD at 9 (quoting Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶ 34, 140 P.3d 532, 540 ("[T]he awareness of an injury creates a duty to inquire into its causes.")).  The Defendants argues that the Amended Complaint is devoid, however, of allegations that, had Nowell "diligently investigated the problem[,] she would have been unable to discover the cause of her injury."  MTD at 9 (quoting Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 22, 964 P.2d 176, 180).  Instead, the Defendants insist, the "sole allegation" offered in support of tolling is that Nowell waited over four years for her physician "to allegedly inform her that 'there was a problem with the mesh and that it had to be removed.'"  MTD at 9-10 (quoting Amended Complaint ¶ 38, at 8).  The Defendants contend that Nowell's reliance on her physician's conclusion cannot support a reasonable-diligence finding, particularly in light of Nowell's factual assertions about her April, 2010, surgery and the "pain in the area of the mesh."  MTD at 10 (internal quotation marks omitted)(quoting Amended Complaint ¶ 38, at 8).  Hence, the Defendants conclude, Nowell's failure to allege "reasonable diligence" precludes the discovery rule's application, and warrants dismissal of Nowell's negligence and strict liability claims.  MTD at 10.

The Defendants next turn to their argument that Nowell's claims do not satisfy the pleading standard that <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), require, because, according to the Defendants, the Amended Complaint pleads mere "'labels and conclusions' instead of facts that raise a 'plausible' claim of relief." MTD at 10 (citing <u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1191 (10th Cir. 2012)). The Defendants assert that, although Nowell's six claims allege that the Defendants' mesh was defectively designed, labeled, and marketed, the Amended Complaint lacks "well-pleaded factual allegations pertaining to: (1) the nature of the alleged defect; (2) how the alleged defect caused Plaintiff's injury; and (3) the information that Plaintiff believes should have been included in the product labeling and warranty." MTD at 10.

Beginning with Nowell's negligence claim, the Defendants contend that, assuming they owed Nowell a duty, the Amended Complaint does not plead facts that allege a breach of that duty or proximate causation as New Mexico law requires to support such claims. <u>See</u> MTD at 10 (citing <u>Bellman v. NXP Semiconductors USA, Inc.</u>, 248 F. Supp. 3d 1081, 1122 (D.N.M. 2017)(Browning, J.)). The Defendants insist that Nowell's negligence claim overlaps significantly with her strict liability cause of actions and that, although negligence and strict liability are frequently asserted together, negligence is the more demanding test, and Nowell has not alleged negligence adequately. <u>See</u> MTD at 11 (citing <u>Trujillo v. Berry</u>, 1987-NMCA-072, ¶ 5, 738 P.2d 1331, 1333 ("The purpose behind the strict products liability doctrine is to allow an injured user or consumer to recover . . . without the requirement of proving negligence.")). Specifically, the Defendants contend that Nowell has not pled any plausible facts which show how the Defendants breached their duty of care or show specific acts or omissions which fall below the "ordinary care"

that "a reasonably prudent supplier would use . . . in formulating, designing, making, inspecting, testing, and packaging the product." MTD at 11 (internal quotation marks omitted)(quoting <u>Mims v. Davol, Inc.</u>, No. CIV 16 0136-MCA-GBW, 2017 WL 3405559, at *4 (D.N.M. March 22, 2017)(Armijo, J.)). Instead, the Defendants assert, Nowell "simply recites the cause of action," MTD at 11 (citing Amended Complaint ¶ 105, at 22), and asks the Court to infer a breach of duty from the fact that she allegedly suffered injuries, which, according to the Defendants, is a "*post hoc ergo prompter hoc* logical fallacy"[6] insufficient to maintain a negligence claim, MTD at 11-12 (citing <u>Pac. Indem. Co. v. Therm-O-Disc, Inc.</u>, 476 F. Supp. 2d 1216, 1231 (D.N.M. 2006)(Hansen, J.)("The mere fact that the contacts on the Therm-O-Disc control fused is not enough to demonstrate that Therm-O-Disc violated its duty to use ordinary care.")).

Turning to Nowell's three strict liability claims -- design defect, manufacturing defect, and warning defect -- the Defendants assert that the Amended Complaint does not allege any specific defects that made the Defendants' mesh "unreasonably dangerous" and that caused Nowell's injuries. MTD at 12 (internal quotation marks omitted)(quoting <u>Pac. Indem. Co. v. Therm-O-Disc, Inc.</u>, 476 F. Supp. 2d at 1228-29). Moreover, Nowell's design defect claim, according to the Defendants, requires Nowell to allege further that "a feasible design existed which lacked the alleged design defect and would have prevented her injuries." MTD at 12 (citing <u>Morales v. E.D. Etnyre & Co.</u>, 382 F. Supp. 2d at 1283 ("Thus, to the extent that a plaintiff could come to court and merely criticize a product, the Court believes that the New Mexico law required the plaintiff

---

[6]"The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. . . . It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." <u>McClaim v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1243 (11th Cir. 2005).

to propose an alternative design.")).  The Defendants assert that, instead of alleging a specific

design feature that rendered the Defendants' mesh defective, the Amended Complaint

> relies on a generalized list of alleged flaws that include: the mesh's material caused
> an "immune reaction"; the mesh was designed "to be inserted into and through an
> area of the body with high levels of bacteria that adhere to the mesh";
> "[b]iomechanical issues . . . including, but not limited to, the propensity of the
> Product to disintegrate"; and the mesh's "inelasticity."

MTD at 12-13 (quoting Amended Complaint ¶ 121, at 27-28).  Such "vague and conclusory

allegations," according to the Defendants, "could apply to all mesh products generally," and thus

cannot support a plausible claim for relief against the Defendants and their particular mesh.  MTD

at 13.  The Defendants ask, rhetorically: "What is the alleged immune reaction?  What 'inelasticity'

is supposedly present?" and assert that Nowell's failure to plead a specific defect "and/or to

conclude that each and every hernia mesh on the market is defective" cannot satisfy the requisite

pleading standard.  MTD at 13.

The Defendants maintain that the Southern and Western Districts of New York recently

dismissed claims based on similar allegations about the Defendants' Parietex Composite mesh,

because, although the plaintiffs in both cases cite the mesh's design aspects, for example, "'the

hydrophilic coating' and 'small pores and collagen,'" they do not specifically allege how the

design aspects were defective or how the purported defects caused the plaintiffs' specific injuries.

MTD at 13 (quoting Rincon v. Covidien, No. 16-CV-10033, 2017 WL 2242969, at *2; Black v.

Covidien, PLC, No. 17-CV-6085-FPG, 2018 WL 573569, at *2).  The Defendants insist that,

because the same problems are true of Nowell's claims here, the Court should dismiss her design

defect claim.  See MTD at 13 (citing Armijo v. Ex Cam, Inc., 656 F. Supp. 771, 773 (D.N.M.

1987)(Burciaga, J.)("Plaintiff's argument for strict liability fails on the first of these elements, that

the product must be 'defective.'"), aff'd, 843 F.2d 406 (10th Cir. 1988)).

Regarding the alleged alternative-design pleading requirement, the Defendants assert that the Amended Complaint merely alleges alternative surgical techniques to the use of hernia mesh but not alternative designs to the Defendants' mesh. See MTD at 14. Moreover, according to the Defendants, Nowell "seems to concede that a safer hernia mesh design is not possible," because, although Nowell states that "[s]afer and more effective alternatives to hernia mesh exist," she does not identify any such alternatives and instead refers to the "Shouldice Repair, McVay Repair, Bassini Repair, and Desarda Repair" as alternatives, which the Defendants insist are surgical procedures that do not involve surgical mesh. MTD at 14 (quoting Amended Complaint ¶ 26, at 6). The Defendants insist that "a safer alternative design cannot be . . . the decision not to use a product at all." MTD at 14 (citing S.F. v. Archer Daniels Midland Co., 594 F. App'x 11, 12-13 (2d Cir. 2014)). The plaintiff in S.F. v. Archer Daniels Midland Co., according to the Defendants, alleged strict liability and negligence claims against a manufacturer stemming from its sale of and the plaintiff's consumption of high fructose corn syrup, but the plaintiff did not allege a safer alternative design for that product, instead suggesting that "[it] should not be used at all." MTD at 14 (quoting S.F. v. Archer Daniels Midland Co., 594 F. App'x at 12). In affirming the district court's dismissal of the plaintiff's claims, the United States Court of Appeals for the Second Circuit explained: "A design-defect claim will not stand if the only alternative is an outright ban." MTD at 14 (quoting S.F. v. Archer Daniels Midland Co., 594 F. App'x at 12). The Defendants contend that, like the plaintiff's insufficient allegations in S.F. v. Archer Daniels Midland Co., Nowell's failure to allege a feasible design alternative is a further basis on which the Court should dismiss her design defect claim. See MTD at 14-15 (citing Reed v. Pfizer, Inc., 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012)(Vitaliano, J.)).

The Defendants dispute that the three scientific articles which Nowell cites in her Amended Complaint support her design defect claim or provide any support for her assertion "that the type of material that was used in Parietex mesh caused infection and disintegration which resulted in pain, exhaustion, and other injuries," or "that the type of surgical mesh as Parietex causes similar injuries as those sustained by [Nowell]." MTD at 15 (quoting Amended Complaint ¶ 39, at 9-10). The articles instead, according to the Defendants, merely highlight the underlying risks common to all hernia repair surgeries, risks that the Defendants contend are well-known in the medical community. See MTD at 15. In a footnote, the Defendants add that the first article -- "Central Failures of Monofilament Polyester Mesh Causing Hernia Recurrence: A Cautionary Note" -- examines "Parietex TCM," and its potential for tearing, which, the Defendants contend, is not causally connected to Nowell's main injury, that is, infection. MTD at 15 n.14 (citing C.C. Petro et. al., Central Failures of Lightweight Monofilament Polyester Mesh Causing Hernia Recurrence: A Cautionary Note, 19 Hernia 155 (2015)). Moreover, according to the Defendants, the second article -- "Postoperative Mesh Infection -- Still a Concern in Laparoscopic Era" -- summarizes published findings and mentions the Defendants' Parietex mesh only once; it says nothing about Parietex Composite. MTD at 15 n.14 (citing Rajvilas Narkhede et. al., Postoperative Mesh Infection -- Still a Concern in Laparoscopic Era, 77 Indian J. Surg. 322 (2015)). Finally, the Defendants aver, although the third article -- "Novel in Vitro Model for Assessing Susceptibility of Synthetic Hernia Repair Meshes to Staphylococcus aureus Infection" -- studies "Parietex Composite," it does not suggest a potential defect in the Defendants' mesh that could be causally linked to Nowell's injuries. See MTD at 15 n.14 (citing Ihab F. Halaweish et. al., Novel in Vitro Model for Assessing Susceptibility of Synthetic Hernia Repair Meshes to Staphylococcus aureus

Infection Using Green Fluorescent Protein-labeled Bacteria and Modern Imaging Techniques, 11

Surgical Infections 449 (2010)).  None of the articles, argue the Defendants, demonstrate or even

suggest that the Defendants' Parietex Composite Mesh caused Nowell's injury or provide any

factual support for Nowell's assertion that "[t]his article arguably proves that Parietex mesh causes

harmful bacterial infections."  MTD at 15 (citing Amended Complaint ¶ 39, at 10).

Turning to Nowell's manufacturing defect claim, the Defendants assert that New Mexico

law requires Nowell to prove that the Defendants' mesh came "'off the assembly line with a

manufacturing defect' that caused it to 'depart[] from its intended design,'" MTD at 15-16

(alteration in MTD)(quoting Parker v. St. Vincent Hosp., 1996-NMCA-070, ¶ 14, 919 P.2d 1104,

1108), and thus, in contrast to a design defect claim, Nowell must allege and prove that a deviation

from the intended design -- as opposed to a defect in the design itself -- caused her injuries, see

MTD at 16.  The Defendants maintain that Nowell's assertion, that the mesh "deviated materially

from the Defendants' design and manufacturing specifications," MTD at 16 (quoting Amended

Complaint ¶ 125, at 29), is merely a "'formulaic recitation of the elements of [the] cause of action'

without any corresponding factual support," MTD at 16 (alteration in MTD)(quoting Ashcroft v.

Iqbal, 556 U.S. at 678).  The Defendants urge the Court to dismiss Nowell's manufacturing defect

claim, because the Amended Complaint does not identify a specific defect imparted during the

manufacturing process that caused the mesh implanted in Nowell "to depart from its FDA-cleared

design and performance standards, or from other Parietex mesh products manufactured by

Defendants."  MTD at 16.

Nowell's third strict liability claim, her failure-to-warn claim, according to the Defendants,

requires her to prove not only that "(1) no warning was provided or the warning was inadequate;

and (2) the inadequacy or absence of the warning caused the plaintiff's injury," MTD at 16 (quoting Silva v. Smithkline Beecham Corp., No. 31,276, 2013 WL 4516160, at *3 (N.M. Ct. App. Feb. 7, 2013)), but also, pursuant to the learned-intermediary doctrine,[7] that a proper warning would have altered her physician's decision to use the Defendants' mesh, see MTD at 16-17 (citing Silva v. Smithkline Beecham Corp., No. 31,276, 2013 WL 4516160, at *3). In a footnote, the Defendants note that the Court previously declined to apply the learned-intermediary doctrine to a failure-to-warn claim, see MTD at 17 n.15 (citing Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1226 (D.N.M. 2008)(Browning, J.)), but suggest that, because the Court of Appeals of New Mexico has since applied the learned-intermediary doctrine to such a claim, and because the Supreme Court of New Mexico has not decided the issue, the intermediate court's decision may "prove helpful" in predicting how the state supreme court would decide the issue, MTD at 17 n.15 (quoting Am. Fire & Cas. Co. v. BCORP Canterbury at Riverwalk, LLC, 282 F. App'x 643, 648 (10th Cir. 2008)). The Defendants insist that the Amended Complaint does not allege facts pertaining to these elements; for example, instead of alleging specific statements, so that the Court could evaluate the statements' sufficiency, Nowell asserts a list of warnings that, in her opinion, the Defendants should have provided. See MTD at 17 (citing Amended Complaint ¶ 129, at 30-

---

[7]Black's Law Dictionary defines the "Learned-Intermediary Doctrine": "The principle that a prescription-drug manufacturer fulfills its duty to warn of a drug's potentially harmful effects by informing the prescribing physician, rather than the end-user, of those effects." Learned-Intermediary Doctrine, Black's Law Dictionary 1024 (10th ed. 2014). Black's Law Dictionary notes that another term for "learned intermediary" is "informed intermediary," which it defines as "[s]omeone who is in the chain of distribution from the manufacturer to the consumer and who knows the risks of the product." Intermediary, Black's Law Dictionary 938 (10th ed. 2014). See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1190 (D.N.M. 2008)(Browning, J.)("Pursuant to the learned-intermediary doctrine, the prescribing physician acts as a learned intermediary between a prescription drug manufacturer and the ultimate user, and the manufacturer satisfies its duty to warn by providing adequate warnings to the prescribing physician.").

31).  This list, according to Defendants, "could apply to any number of medical products," MTD at 17; it does not describe "a specific risk of harm" attendant to a defect known to the Defendants, MTD at 17 (quoting <u>Golden v. Brown</u>, No. 17CV30568, 2017 WL 3272368, at *5 (Colo. Dist. Ct. June 27, 2017)).  Moreover, the Defendants assert, Nowell has alleged merely that the "Defendants did not adequately warn the Plaintiff," MTD at 17 (quoting Amended Complaint ¶ 129, at 30), and not that a proper warning would have altered her physician's decision to use the Defendants' mesh and thereby prevented her injuries, <u>see</u> MTD at 17-18 (citing <u>Silva v. Smithkline Beecham Corp.</u>, No. 31,276, 2013 WL 4516160, at *3 ("Plaintiffs must show that adequate warnings would have altered Dr. Lopez-Colberg's decision to treat Patient with Paxil or its generic equivalent.")).  The Defendants add that the Amended Complaint does not include "[a]ny allegation that Plaintiff's physicians were not aware of the purported 'dangerous condition' and, more essentially, would not have utilized Defendants' product had they been adequately warned."  MTD at 18 (citing <u>Tapia v. Davol, Inc.</u>, 116 F. Supp. 3d 1149, 1158-59 (S.D. Cal. 2015)(Curiel, J.)("Plaintiff has failed to allege that Defendants failed to warn his prescribing physician and failed to allege that if his prescribing physician had been warned, then he would not have prescribed the [Defendants' hernia repair patch] to Plaintiff.")).  Furthermore, the Defendants contend, the pain-and-infection risks associated with hernia repair surgery, regardless whether mesh is used, "were well known in the medical community at the time of Plaintiff's surgery," MTD at 18, as the FDA's inclusion of "*pain*, *infection*, hernia recurrence, [and] scar-like tissue" in its list of inherent hernia surgery risks confirms.  MTD at 18 (emphasis in MTD)(internal quotation marks omitted)(quoting <u>Hernia Surgical Mesh Implants</u>, FDA, https://www.fda.gov/MedicalDevices/ProductsandMedicalProced ures/ImplantsandProsthetics/HerniaSurgicalMesh/default.htm (last visited Feb. 4, 2018)).  The

Defendants add that the scientific articles cited in the Amended Complaint discuss the general infection risks associated with all hernia surgery repair, which further evidences the medical community's general awareness of such risks.  MTD at 18.

Regarding Nowell's breach-of-express-warranty claim, the Defendants argue that New Mexico's UCC requires Nowell to prove that the Defendants' "(1) 'made an[] express affirmation or representation . . . regarding' the product; (2) the product deviated from the express warranty; and (3) that deviation caused plaintiff's injuries," and contend that Nowell's Amended Complaint neither alleges facts pertaining to these three elements nor identifies a specific warranty that is purportedly deficient, MTD at 17-18    (alteration in MTD)(quoting Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d at 1153).  Nowell's only allegations, according to the Defendants, are boilerplate recitations of the cause of action, such as "Defendant expressly warranted [the mesh] to be safe and effective for consumers like Plaintiff," MTD at 19 (internal quotation marks omitted)(quoting Amended Complaint ¶ 147, at 34-35), which courts "routinely dismiss" as insufficiently pled, MTD at 19 (citing Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d at 1153 ("Indeed, aside from perfunctorily alleging in the Complaint that Rinchem Co. 'expressly' warranted the chemicals that it supplied . . . Plaintiffs never explain the manner in which Rinchem Co. made such a warranty or identify the warranty's precise terms."); Hammonds v. Bos. Sci., Inc., No. CIV-11-0663-HE, 2011 WL 4978369, at *2 (W.D. Okla. Oct. 19, 2011)(Heaton, J.)("[H]er amended complaint still fails to identify what warranties and misrepresentations were made.")). Without alleging a specific warranty's contents, the Defendants contend, neither the Defendants nor the Court can evaluate its sufficiency.  See MTD at 19 (citing Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d at 1153 ("[T]he Court cannot

conclude . . . that [the defendant] made any express warranty, nor can it conclude, absent knowledge of the alleged warranty's terms, whether [defendant] breached those terms.")). The Defendants add that the Honorable Christina Armijo, United States District Judge for the District of New Mexico, "dismissed a nearly identical breach of express warranty claim" in <u>Mims v. Davol, Inc.</u>, MTD at 19 (citing <u>Mims v. Davol, Inc.</u>, 2017 WL 3405559, at *6), and thus the Court should likewise dismiss Nowell's breach-of-express-warranty claim against the Defendants.

Considering Nowell's breach-of-implied-warranty claim, the Defendants assert that the Amended Complaint neither alleges a claim for breach of implied warranty of fitness for a particular purpose nor facts pertaining to each element of Nowell's implied-warranty-of-merchantability claim, which are the only claims for breaches of implied warranties that New Mexico's UCC permits.  <u>See</u> MTD at 20 (citing N.M. Stat. Ann. §§ 55-2-314 to -315).  The Defendants note that the Amended Complaint does not mention the phrase "particular purpose" but instead alleges that the Defendants' mesh was not "merchantable," which the Defendants contend is a distinct and independent implied warranty.  MTD at 20 (citing Amended Complaint ¶¶ 152, at 35; 154, at 35; 155, at 35-36; 159, at 36; 162, at 36-37)).  The Defendants add, in a footnote, that, although the Amended Complaint also alleges that the mesh was not "fit for the ordinary purposes for which" it was sold, MTD at 20 n.17 (quoting Amended Complaint ¶ 152, at 35), that this phrase is included in the statutory definition of "merchantable,"  MTD at 20 n.17 (citing N.M. Stat. Ann. § 55-2-314(2)(c) ("Goods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used.")).

The Defendants contend that, to maintain a claim for breach of the implied warranty of merchantability, Nowell must prove that "the seller sold goods or products that fail to meet the

statutory definition of merchantable," MTD at 20 (internal quotation marks omitted)(quoting

Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d at 1126), which "resembles ordinary

products liability claims" in that the claimant must provide "proof of a defect," Bellman v. NXP

Semiconductors USA, Inc., 248 F. Supp. 3d at 1155 (internal quotation marks omitted)(quoting

Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d at 1225).  Hence, the Defendants conclude,

the Court should dismiss Nowell's claim for breach of the implied warranty of merchantability for

the same reasons as the Court should dismiss her strict-liability and negligence claims -- the

Amended Complaint does not sufficiently allege a defect that renders the Defendants' mesh

"unreasonably dangerous" and caused her injuries.  MTD at 20-21 (internal quotation marks

omitted)(quoting Perfetti v. McGhan Med., 1983-NMCA-032, ¶ 45, 662 P.2d 646, 654 ("In this

case the identical defect is relied on for both products liability and breach of the implied warranty

of merchantability.")).

     The Defendants insist that, as with Nowell's substantive causes of action, the Court should

deny her request for punitive damages, because the Amended Complaint does not allege the

requisite corresponding factual allegations to support a finding of the requisite scienter for punitive

damages.  See MTD at 21.  Instead, according to the Defendants, the Amended Complaint "simply

recites the standard for punitive damages," MTD at 21 (citing Amended Complaint ¶ 102, at 22

("Defendant's conduct as described herein shows willful misconduct, malice, fraud, wantonness,

oppression, or that entire want of care which raises the presumption of conscious indifference to

consequences, thereby justifying an award of punitive damages.")), which is the kind of

"unadorned, the-defendant-unlawfully-harmed-me accusation" that Bell Atlantic Corp. v.

Twombly and Ashcroft v. Iqbal foreclose, MTD at 21 (internal quotation marks omitted)(internal

quotation marks omitted)(quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678).

> ### 2.    <u>The MTD Response.</u>

Nowell responds to the Defendants' MTD. <u>See</u> Plaintiff's Response to Defendants Motion to Dismiss, filed April 16, 2018 (Doc. 30)("MTD Response"). Nowell argues that the Court either should deny the MTD or should treat the MTD as a motion for summary judgment pursuant to rule 12(d). <u>See</u> MTD Response at 2. Nowell begins by summarizing the pleading standard that the Supreme Court describes in <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, <u>see</u> MTD Response at 2 (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675; <u>Bell Atlantic Corp. v. Twombly</u> 550 U.S. at 570), and notes that this standard does not require complaints to include "all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law," MTD Response at 2-3 (quoting <u>Breidenbach v. Bolish</u>, 126 F.3d 1288, 1293 (10th Cir. 1997)). Nowell insists that, in <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001), the United States Court of Appeals for the Tenth Circuit concluded that the Supreme Court "superseded" such a requirement with its decision in <u>Crawford-El v. Britton</u>, 523 U.S. 574 (1998), MTD Response at 3 (citing <u>Currier v. Doran</u>, 242 F.3d at 916), and that <u>Bell Atlantic Corp. v. Twombly</u> articulates merely a "minimal standard of notice pleading." MTD Response at 3. Nowell adds, in a footnote, that this "general or 'notice' pleading, rather than detailed pleading" compels courts to construe liberally a plaintiff's allegations. MTD Response at 3 (citing <u>Johnson v. City of Shelby</u>, 135 S. Ct. 346, 347, (2014)).

Nowell next asserts that the Amended Complaint contains "good faith" causes of action "supported by a) Ms. Nowell's surgeon; b) the scientific literature; and c) common sense." MTD Response at 3 (footnotes omitted)(citing Amended Complaint ¶ 38-39, at 8-11). Nowell contends that her allegations sufficiently notify the Defendants that scientific arguments support her liability theories. <u>See</u> MTD Response at 3. According to Nowell, such arguments include that the mesh

material "was hazardous due to its incompatibility with human tissue" and "was dangerous because it was unreasonably susceptible to mechanical failure." MTD Response at 3. Nowell argues that "the hazardous materials" used to manufacture the Defendants' mesh caused the mesh's disintegration and Nowell's infection. MTD Response at 3-4. Nowell adds that she will develop her "scientific arguments" after discovery and expert witness evaluation. MTD Response at 4. Nowell has not retained an expert witness to develop her scientific arguments, she asserts, because the Amended Complaint provides adequate notice of her claims' plausibility. See MTD Response at 4. Nowell adds that the Defendants will have an opportunity to refute her "scientific claims," but that "such arguments are largely premature at this stage because the factual evidence has not been developed through discovery." MTD Response at 4.

Nowell asserts that New Mexico products liability law recognizes "claims sounding in common law negligence and in strict liability," and that the Amended Complaint includes claims that arise under these theories. MTD Response at 5 (citing Parker v. St. Vincent Hosp., 1996-NMCA-070, ¶ 14, 919 P.2d at 1108). She then recites a negligence claim's elements and asserts that she established the first element, "the existence of a duty owed to the Plaintiff," in paragraphs 11, 12, and 27; the second element, "a breach of that duty," in paragraphs 36, 38, and 41-45; the third element, "a causal connection between the Defendants' conduct and her injuries" in paragraphs 22, 23, 36, 38-40, 46, and 49-51; and the fourth element, "damages" resulting from the Defendants' conduct, in paragraphs 69, 85, 102, 109, 118-19, 122, 126, 130, 138, 146, 157, 162, and in the requested relief on page thirty-seven. MTD Response at 5-6 (citing Parker v. E.I. DuPont de Nemours & Co., 1995-NMCA-086, ¶ 35, 909 P.2d 1, 11).

According to Nowell, the Amended Complaint alleges in paragraph 86 that the condition

of the Defendants' mesh resulted in "an unreasonable risk of injury." MTD Response at 6 (internal

quotation marks omitted)(quoting <u>Smith ex rel. Smith v. Bryco Arms</u>, 2001-NMCA-090, ¶ 13, 33

P.3d 638, 644). Nowell maintains that, in paragraphs 11, 12, and 27, the Amended Complaint

establishes the Defendants as the mesh's manufacturer and distributor, and, in paragraphs 42, 68,

52(b), 71 73, 83, 86(2), 86(3), 87, 95, 104, 105, 106, 111, 116, 121, 123, 125, 127, and 131, that

the Defendants neither designed nor manufactured the mesh with "ordinary care." MTD Response

at 6.

Nowell asserts that she "placed the Defendants on notice of her general strict liability

claims," because her Amended Complaint alleges:

> (1) the product was defective (*See*, Amended Complaint ¶¶38, 41, 42, 47, 50, 52),
> (2) the product was defective when it left Defendants' hands (*See*, ¶60), and it was
> substantially unchanged when it reached the consumer (*See*, ¶60); (3) that because
> of the defect the product was unreasonably dangerous to the consumer (*See*, ¶86);
> (4) that the consumer was injured or damaged (*See*, ¶¶38, 40); and (5) the defective
> product was the proximate cause of the injury or damage (*See*, ¶¶22, 23, 39, 47, 49,
> 50, 51).

MTD Response at 7 (citing <u>Garner v. Raven Indus., Inc.</u>, 732 F.2d 112, 114 (10th Cir. 1984)).

Nowell avers that "[a]n unreasonable risk of injury is a risk a reasonably prudent person

having full knowledge of the risk would find unacceptable," MTD Response at 7 (internal

quotation marks omitted)(quoting <u>Smith ex rel. Smith v. Bryco Arms</u>, 2001-NMCA-090, ¶ 13, 33

P.3d at 644), and that the test for such risk "allows for proof and argument under any rational

theory of defect," MTD Response at 7 (quoting <u>Smith ex rel. Smith v. Bryco Arms</u>, 2001-NMCA-

090, ¶ 14, 33 P.3d at 644), of which New Mexico recognizes three: manufacture, design, and

failure-to-warn, <u>see</u> MTD Response at 7 (citing <u>Fernandez v. Ford Motor Co.</u>, 1994-NMCA-063,

¶ 26, 879 P.2d 101, 110). According to Nowell, the Amended Complaint sufficiently alleges her

strict-liability claims and any deficiency "results not from the fault of Ms. Nowell, but from her inability to gather information from the Defendants at this pre-discovery stage." MTD Response at 7-8.

Nowell quotes from New Mexico's Civil Uniform Jury Instructions ("Civ. UJI") to support her assertion that she may prove causation so long as the defective product contributes to the injury; "[i]t need not be the only explanation . . . nor the reason that is nearest in time or place." MTD Response at 8 (quoting Civ. UJI 13-1424). Moreover, Nowell avers, she may prove causation for her failure-to-warn claim by showing that "an adequate warning would have been noticed and acted upon to guard against the danger." MTD Response at 8 (quoting Civ. UJI 13-1425).

According to Nowell, the Amended Complaint alleges causation specifically in paragraph 38, wherein she states that the "Plaintiff underwent surgery during which the surgeon, Dr. William Pollard, removed an infected and disintegrated Parietex mesh in Plaintiff's abdomen." MTD Response at 8 (citing Amended Complaint ¶ 38, at 8). Nowell adds that paragraph 38 alleges that she "experienced pain in the area of the mesh and exhaustion," and that the mesh "also caused Plaintiff to undergo multiple surgical interventions." MTD Response at 8 (citing Amended Complaint ¶ 38, at 8). Moreover, adds Nowell, paragraph 46 alleges that the mesh "was made from material that is both biologically incompatible with human tissue and susceptible to mechanical failure," which, "when implanted in the human body, . . . promotes (and in Ms. Nowell['s] case it promoted) infection and disintegration." MTD Response at 8-9 (citing Amended Complaint ¶ 46, at 12). Nowell insists that paragraph 38 contains "scientific references" which show that "non-biologically compatible Paritex mesh" causes the type of injuries that

Nowell suffered, i.e., "disintegration and infection." MTD Response at 9 (citing Amended Complaint ¶ 38, at 8).

Regarding her failure-to-warn claim, Nowell maintains that the allegations in the Amended Complaint are sufficient, because paragraph 67 states that the "'Defendants failed to provide sufficient warnings' . . . to put Ms. Nowell 'on notice of the dangers and adverse effects caused by implantation of the Product'" and because paragraph 70 states that the Defendants marked the mesh "as safe" and as "free from the kinds of risks and hazards that the [Product] actually posed." MTD Response at 9 (alteration in MTD Response)(citing Amended Complaint ¶ 70, at 17). Further support for this claim, according to Nowell, is seen in paragraph 139, which states that "[b]ut for the Defendants' failure-to-warn, the Plaintiff would not have sustained [the alleged] injuries," MTD Response at 9 (citing Amended Complaint ¶ 139, at 33), paragraph 138, which states that Nowell's injuries "would not have occurred if adequate warning and instruction had been provided," MTD Response at 9 (citing Amended Complaint ¶ 138, at 33), and paragraph 129, which states that the Defendants' "failure to warn caused . . . Plaintiff not to be aware of the defects [that] cause her injury," MTD Response at 9 (alteration in MTD Response)(citing Amended Complaint ¶ 129, at 30)). According to Nowell, these allegations are sufficient for a reasonable jury to find that, had the Defendants warned Nowell of the mesh's "actual risks," "she would have declined to have it surgically implanted in her body." MTD Response at 9.

Nowell concedes that she has not obtained information regarding the mesh's "exact manufacturing process and specific warranty language," but insists that this information is within the Defendants' "exclusive control." MTD Response at 9. Hence, Nowell requests the Court's

permission to amend further the Amended Complaint "once this information becomes available through the discovery process." MTD Response at 10.

Nowell next responds to the Defendants' averment that "significant overlap" exists between Nowell's negligence and strict-liability claims, and asserts that "this overlap results from the similarity of elements between the two causes of action." MTD Response at 10 (citing MTD at 11). Nowell argues that the "breach" and "defect" elements in a strict liability claim, and in a negligence claim, respectively, are "closely related," because both elements "require an unreasonable departure from ordinary care." MTD Response at 10. Nowell adds that "causation" is another element that strict liability and negligence claims share, because "products liability law evolved from negligence law." MTD Response at 10 (citing MacPherson v. Buick Motor Co., 217 N.Y. 382, 382 (N.Y. 1916)(Cardozo, J.)). Nowell suggests that the Court should focus on whether the Amended Complaint adequately places the Defendants on notice of her claims and not whether such claims overlap. See MTD Response at 10.

Nowell disputes the Defendants' contention that she engaged in a "*post hoc ergo prompter hoc* logical fallacy*," because her causation theories are "based on scientific research." MTD Response at 10-11 (citing MTD at 11). Nowell further disputes the Defendants' contention that she "seems to concede that a safer hernia mesh design is not possible," because the Amended Complaint alleges that the Defendants should have made their mesh from "biologically compatible" material that "was not susceptible to mechanical failure" and that "it is allegedly possible to manufacture a product with these attributes." MTD Response at 11 (citing MTD at 14). Nowell asserts that her punitive damages request is not an allegation that the Court can dismiss for failure to state a claim upon which relief can be granted, because, according to Nowell,

the Tenth Circuit has concluded that a punitive damages claim is "part and parcel of a liability determination," and "does not have any independent being until a jury has decided, based on the preponderance of the evidence, that not only was a defendant's conduct negligent, but that it was gross, willful, wanton or malicious." MTD Response at 11 (internal quotation marks omitted)(quoting Mason v. Texaco, Inc., 948 F.2d 1546, 1554 (10th Cir. 1991)). Moreover, Nowell argues that the Amended Complaint alleges, in paragraphs 85, 91, 98, 102, 114, 119, 139, and 162, conduct that qualifies for punitive damages. MTD Response at 12.

Nowell next disputes the Defendants' allegations that she did not bring her claims within the applicable statutes of limitations, because, according to Nowell, the discovery rule tolls the limitations period and she did not discover that the Defendants' mesh was causing her injury until October 8, 2014, when Dr. Pollard advised her "for the first time that there was a problem with the mesh and that it had to be removed." MTD Response at 12-13 (citing Williams v. Stewart, 2005-NMCA-061, ¶ 10, 112 P.3d 281, 285). Nowell asserts that Martinez v. Showa Denko, K.K., 1998-NMCA-111, 964 P.2d 176, wherein the Court of Appeals of New Mexico stated that, under the discovery rule, the statute of limitations is triggered when the plaintiff "acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action," further supports her position. MTD Response at 13 (internal quotation marks omitted)(quoting Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 24, 964 P.2d at 182). Nowell adds that the October 6, 2014, CT scan, attached to the MTD Response as Exhibit B, and which Dr. Pollard memorialized in his clinic notes, attached to the MTD Response as Exhibit A, informed Dr. Pollard's decision to remove the mesh. See MTD Response at 13.

Nowell concedes that she was skeptical about the mesh's safety before October 8, 2014, but relied on Dr. Pollard's opinion that the mesh was not her symptoms' source. See MTD Response at 14. Hence, Nowell argues that it would have been unreasonable for her to assume that the mesh was the cause of her symptoms until October 8, 2014, which, according to Nowell, the Amended Complaint alleges in paragraph 38. See MTD Response at 13-14. Nowell adds that her April 16, 2018, declaration, attached to the MTD Response as Exhibit C, further alleges these facts. See MTD Response at 14. Nowell therefore maintains that, because she acquired "sufficient knowledge to pursue a cause of action" on October 8, 2014, and because she filed her original Complaint on October 5, 2017, she brought this action within the statute of limitations. MTD Response at 14. Nowell adds that, although she has "presented matters outside the pleadings in the form of three exhibits," MTD Response at 14, the exhibits rebut the Defendants' assertion that "uncontroverted facts" show that Nowell filed her claim outside the statute of limitations. MTD Response at 14 (quoting MTD at 6). Nowell requests that, should the Court consider her exhibits, the Court treat the MTD as a motion for summary judgment pursuant to rule 12(d) of the Federal Rules of Civil Procedure. See MTD Response at 15 (citing Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")).

### 3. **The MTD Reply.**

The Defendants reply to the MTD Response. See Reply in Support of Defendants' Motion to Dismiss, filed May 4, 2018 (Doc. 32)("MTD Reply"). In the MTD Reply, the Defendants assert that the Court should grant the MTD, because the MTD Response does not identify well-pled allegations which could support the elements necessary to prove Nowell's claims, and because it

confirms that the statutes of limitations bar Nowell's claims. <u>See</u> MTD Reply at 1. The Defendants repeat their argument that the "uncontroverted facts" establish that the applicable statutes of limitations bar Nowell's claims, which warrant dismissal pursuant to rule 12(b)(6). MTD Reply at 1 (quoting <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 2015 WL 3543011, at *34). The Defendants contend that the MTD Response does not address the Defendants' argument that Nowell's warranty claims are untimely, "and thus concedes the point." MTD Reply at 1 (citing MTD at 7; <u>Pennington v. Northrop Grumman Space & Mission Sys. Corp.</u>, 269 F. App'x 812, 820 (10th Cir. 2008)). Nowell's claims are untimely, argue the Defendants, because the discovery rule is inapplicable, <u>see</u> MTD Reply at 2 (citing N.M. Stat. Ann. § 55-2-725), and because Nowell filed suit on October 5, 2017, which is outside the statutorily permitted four-year period to bring a warranty claim arising from her October 27, 2010 surgery, <u>see</u> MTD Reply at 2 (citing <u>Porcell v. Lincoln Wood Prods., Inc.</u>, 2010 WL 1541264, at *4).

The Defendants reassert that Nowell's negligence and strict liability claims are also untimely, because such claims carry a three-year statute of limitations period, and because Nowell did not file suit "until almost seven years" after her October 27, 2010, surgery. MTD Reply at 2. Defendants dispute that Nowell can salvage her claims "by contending that she 'did not reasonably discover that the Parietex was causing her injuries until October 8, 2014,'" MTD Reply at 2 (quoting MTD Response at 13), because she acknowledges that she underwent a second surgery on April 27, 2011, after the Defendants' mesh "allegedly '*began to pull away from the actual edges*,'" MTD Reply at 2 (emphasis in MTD Reply)(quoting Amended Complaint ¶ 38, at 8). The Defendants aver, in a footnote, that, although the MTD Response alleges that Nowell's physician "affirmatively told her that there was not a problem with the mesh" and specifically advised her

that the mesh "was not causing her symptoms," MTD Reply at 2 n.1 (quoting MTD Response at 14), the Amended Complaint alleges only that, following her April 27, 2011, surgery, "she was '**not informed** by the doctor that there was any problem with the mesh itself,' . . . and that '[b]etween April 27, 2011 and March 1, 2014,' she was '**not advised** that [her symptoms] were caused by the mesh,'" MTD Reply at 2 n.1 (emphasis and alterations in MTD Reply)(quoting Amended Complaint ¶ 38, at 8). The Defendants contend that, if Nowell's "new claims" about her physician's statements are true, they "raise serious questions" about Nowell's ability to establish causation. MTD Reply at 2 n.1. The Defendants contend that Nowell had the "knowledge of facts, conditions, or circumstances" to cause a "reasonable person to make an inquiry" whether the mesh caused her injuries more than six years before she filed suit. MTD Reply at 2-3 (internal quotation marks omitted)(quoting Butler v. Deutsche Morgan Grenfell, Inc., 2006-NMCA-084, ¶ 34, 140 P.3d at 540).

Nowell's duty to inquire "only intensified," the Defendants insist, because, "[b]etween April 27, 2011 and March 1, 2014, [Nowell] began experiencing symptoms including but not limited to exhaustion and pain *in the area of the mesh*." MTD Reply at 3 (emphasis in MTD Reply)(internal quotation marks omitted)(quoting Amended Complaint ¶ 38, at 8). The Defendants assert that the Amended Complaint does not allege why Nowell did not ensure whether the mesh was sufficiently defective to file suit at the time of her April 27, 2011, surgery or in the three years between that surgery and her March, 2014, CT scan, i.e., allegations "that if she had diligently investigated the problem she would have been unable to discover the cause of her injury." MTD Response at 3 (internal quotation marks omitted)(quoting Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 22, 964 P.2d at 180). Hence, the Defendants conclude that the

Amended Complaint does not allege facts that could toll Nowell's negligence and strict liability claims. See MTD Reply at 3.

The Defendants argue that the three exhibits which Nowell attaches to the MTD Response "show a lack of respect for the pleadings requirements of the federal rules," given that Nowell has had three opportunities -- "an initial complaint and two amended pleadings" -- to raise the fact issues that Nowell's exhibits address. MTD Reply at 3. Nonetheless, the Defendants assert, the first two exhibits, the CT scan and physician's notes, are irrelevant, because they relate to Nowell's 2014 surgery, which occurred after the statute of limitations had run. See MTD Reply at 3. The Defendants contend that the Court cannot consider Nowell's exhibits, see MTD Reply at 3 (citing Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500 at *21 (D.N.M. Aug. 23, 2012)(Browning, J.)(citing Casanova v. Ulibarri, 595 F. 3d 1120, 1125 (10th Cir. 2010)), but even if it could, "they do not address the fact that she was on discovery notice prior to the expiration of the statute of limitations in October 2013," MTD Reply at 4. The Defendants add that the Court likewise cannot consider the Declaration of Janice Nowell, filed April 16, 2018 (Doc. 30-3)("Nowell Affidavit"), in which she alleges that her physician told her that the pain in the area around her mesh did not relate to the mesh itself. See MTD Reply at 4 (citing Anderson Living Tr. v. WPX Energy Prod., LLC, 2015 WL 3543011, at *13; Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1261 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)). Even if the Court could consider the Nowell Affidavit, according to the Defendants, the Nowell Affidavit does not save Nowell's time-barred claims, because Dr. Pollard's diagnosis either was true, which would negative Nowell's claims, or was a misdiagnosis, which would not relieve Nowell of her responsibility to pursue her symptom's cause. See MTD Reply at 4 (citing Robinson

v. BNSF Ry. Co., No. 11-2464-JWL, 2012 WL 4747155, at *4 (D. Kan. Oct. 4, 2012)(Lungstrum, J.)("[A] misdiagnosis does not relieve a patient of all responsibility in pursuing the cause of her symptoms, and continued reliance on a misdiagnosis in the face of contrary evidence may be unreasonable."), aff'd sub nom. Robinson v. BNSF Ry. Co., 553 F. App'x 792 (10th Cir. 2014)). Here, according to the Defendants, Nowell cannot rely on her physician's alleged misdiagnosis to toll her claims, because she "affirmatively alleges" that she had surgery to repair the mesh within a year of its implantation and that she continued to suffer pain in the area around the mesh for three additional years.  MTD Reply at 4-5.

The Defendants contend that Nowell's request that the Court exercise its discretion to accept her exibits and to treat the MTD as a motion for summary judgment pursuant to rule 12(d) is moot, because, "even if considered, they do not save her claims."  MTD Reply at 5.  Moreover, the Defendants insist, rule 12(d) permits the conversion that Nowell requests "only if 'all parties [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'"  MTD Reply at 5 (quoting Fed. R. Civ. P 12(d)).  In contrast to Nowell's "repeated opportunities to include all necessary and relevant information" in the Amended Complaint, the Defendants assert that they have not had the opportunity to discover material germane to a rule 56 motion, and that, for this reason, the Court should deny Nowell's request for a rule 12(d) conversion.  See MTD Reply at 5.  Should the Court convert the MTD into a motion for summary judgment, the Defendants request the opportunity to obtain discovery "*limited to the statute of limitations issue*, before the Court considers the motion."  MTD Reply at 5 (emphasis in MTD Reply).

Turning to Nowell's negligence claim, the Defendants argue that the MTD Response does not identify any well-pled facts in the Amended Complaint which allege that the Defendants breached a duty that caused Nowell's injuries.  <u>See</u> MTD Reply at 6.  The Defendants dispute that <u>Breidenbach v. Bolish</u> and <u>Currier v. Doran</u> support Nowell's pleading standards assertions, because those cases, according to the Defendants, discuss pleading requirements only in the qualified-immunity context, "which obviously has no bearing in this case."  MTD Reply at 6 n.3 (citing MTD Response at 3).  The Defendants add that none of Nowell's pleadings refer to "any *specific* acts or omissions" which suggest that the Defendants breached their duty of care to Nowell but instead provide "general allegations" that the Defendants did not properly inspect, test or package the mesh "without specifying how the inspections, testing, or packaging failed to satisfy a manufacturer's duty to exercise ordinary care."  MTD Reply at 6 (emphasis in MTD Reply)(citing <u>Mims v. Davol, Inc.</u>, 2017 WL 3405559, at *4).  The Defendants insist that, because the FDA has never recalled any of their mesh products, the Amended Complaint's lack of allegations as to how the Defendants breached their duty is "especially problematic."  MTD Reply at 7.

The Defendants reassert their dispute that the three scientific articles which the Amended Complaint cites support Nowell's causation theories, because these articles do not suggest that the Defendants' mesh caused Nowell's injuries.  <u>See</u> MTD Reply at 7.  According to the Defendants, each article focuses on well-known risks attendant to all hernia surgeries.  <u>See</u> MTD Reply at 7.  The Defendants assert that Nowell "misses the point" when she contends that the overlap between her negligence and strict liability claims "arises from the 'similarity of elements between the two causes of action,'" because the Defendants' argument is that pleading negligence requires more

than pleading strict liability, and it therefore follows that, because Nowell has inadequately pled strict liability, the Court should dismiss her negligence claims. MTD Reply at 8 (quoting MTD Response at 10).

According to the Defendants, Nowell's strict liability claims for design defect and for failure-to-warn both require pleading that the mesh was "'defective' and 'unreasonably dangerous,'" but Nowell has neither pled a specific defect in the Defendants' mesh design, nor a feasible design alternative that lacked the defect and that would have prevented her injuries. MTD Reply at 8 (citing Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1283 ("Thus, to the extent that a plaintiff could come to court and merely criticize a product, the Court believes that the New Mexico law required the plaintiff to propose an alternative design.")). The Defendants note that the MTD Response proposes a design alternative "made from a material that a) was biologically compatible; and b) was not susceptible to mechanical failure," and assert that, even if Nowell includes this allegation in her Amended Complaint, which the Defendants contend she does not, the inclusion does not answer what alternative design is allegedly compatible with Nowell's specific biology and not susceptible to mechanical failure. MTD Reply at 9 (internal quotation marks omitted)(quoting MTD Response at 11). The Defendants repeat their argument that Nowell has not pled facts sufficient to satisfy the elements of a failure-to-warn claim, because her allegations do not "disclose the nature and extent of the danger" about which the Defendants should have warned. MTD Reply at 10 (quoting Jones v. Minnesota Min. & Mfg. Co., 1983-NMCA-106, ¶ 32, 669 P.2d 744, 750 ("A warning, to be adequate, must disclose the nature and extent of the danger.")). Furthermore, the Defendants continue, Nowell has not pled facts to indicate that "proper warnings" would have altered her physician's treatment decisions. MTD

Reply at 10 (citing Silva v. Smithkline Beecham Corp., 2013 WL 4516160, at *3 ("Plaintiffs must show that adequate warnings would have altered Dr. Lopez-Colberg's decision to treat Patient with Paxil or its generic equivalent."); Black v. Covidien PLC, No. 17-CV-6085-FPG, 2018 WL 573569, at *4)).

The Defendants insist that Nowell concedes that she has insufficiently pled her manufacturing defect and warranty claims when she states that "despite due diligence she has been unable to obtain information pertaining to the exact manufacturing process and specific warranty language." MTD Reply at 10 (quoting MTD Response at 9). In response to Nowell's assertion that the information necessary to plead her claims is within the Defendants' exclusive control, and "will be developed after discovery is complete and an expert witness evaluates the information," MTD Reply at 10-11 (quoting MTD Response at 4), the Defendants assert that Nowell cannot rely on "vague allegations and the hope that discovery eventually will reveal some basis" for Nowell's claim, MTD Reply at 11 (citing DM Research v. Coll. of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999)("[C]onclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.")).

The Defendants maintain that Nowell is not entitled to punitive damages, and contend that she "misses the point" when she asserts that "punitive damages is not an allegation that can be dismissed for failure to states a claim," MTD Reply at 11 (internal quotation marks omitted)(quoting MTD Response at 11), because, according to the Defendants, Nowell's punitive damages request "**requires**" an allegation that the Defendants engaged in conduct that was "maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to the plaintiffs' rights," MTD Reply at 11 (emphasis in MTD Reply)(internal quotation

marks omitted)(quoting <u>Loucks v. Albuquerque Nat. Bank</u>, 1966-NMSC-176, ¶ 48, 418 P.2d 191, 199).  Hence, punitive damages should not arise, the Defendants conclude, because the Amended Complaint pleads no facts that could support this claim.  <u>See</u> MTD Reply at 11-12.

       **4.**        **The Hearing.**

       At the hearing on August 10, 2018, the Defendants began by asking the Court to grant their MTD, because, according to the Defendants, Nowell's Amended Complaint fails to state claims upon which relief can be granted, and because the applicable statutes of limitations bar her inadequately pled claims.  <u>See</u> Transcript of Hearing at 4:24-5:4 (taken August 10, 2014), filed August 22, 2018 (Doc. 43)(Reyes)("Tr.").  The Defendants note that the Amended Complaint is Nowell's second amended complaint after seeing the Defendants' initial motion to dismiss, which indicates to the Defendants that Nowell is unable to cure the Amended Complaint's deficiencies.  <u>See</u> Tr. at 5:5-9 (Reyes).  The Defendants further note that the three exhibits which Nowell attached to the MTD Response are improper on a 12(b)(6) motion and that any allegations therein "should have, of course, been made in any one of her three complaints."  Tr. at 5:14-18 (Reyes).

       The Court then asked Nowell whether, after considering the briefing and her reply, she is willing to concede any of her claims.  <u>See</u> Tr. at 6:9-12 (Court).   Nowell responded that she concedes that the applicable statute of limitations bars her express warranty claim.  <u>See</u> Tr. at 6:14-17 (Montclare).  The Court next asked Nowell to describe what she sees as the defect in the Defendants' mesh.  <u>See</u> Tr. at 7:1-3 (Court).  Nowell responded that the defect, as she sees it, has two elements: first, that the mesh "was made from a material that was unreasonable, . . . and that the propensity of the material used to promote infection, as evidenced by the scientific literature, would make it an unreasonable product and unsafe product"; and second, that "the way that it was manufactured, the physical integrity of the mesh itself was not sturdy enough to withstand the

forces of [Nowell's] body and therefore, it did not -- it caused physical injury due to the fact that the mesh was mechanically unfit."  Tr. at 7:7-22 (Montclare).

The Court confirmed that Nowell is asserting a manufacturing defect claim and a design defect claim.  <u>See</u> Tr. at 7:23-8:1 (Court, Montclare).  The Court then asked Nowell whether she has proposed an alternative material that the Defendants should have used to design their mesh. <u>See</u> Tr. at 8:2-9 (Court).  Nowell responded that she does not have alternatives "at this time."  Tr. at 8:10-15 (Montclare).  The Court asked whether Nowell has retained an expert that has advised her that the Defendants could have manufactured their mesh using alternative materials.  <u>See</u> Tr. at 8:18-22 (Court).  Nowell responded that, although she has not retained such an expert and cannot "argue the weight of the evidence in that regard at this time," "the types of surgical mesh that are being used now are improvements on the older manufacturing methods employed by defendants," and that she is "confident" that she can show this to the Court's satisfaction.  Tr. at 8:23-9:5 (Montclare).

The Court confirmed that Nowell does not have an alternative material, <u>see</u> Tr. at 9:6-13 (Court, Montclare), and asked Nowell to make an opening statement, <u>see</u> Tr. at 9:14-16 (Court). In response, Nowell stated that she is not here to weigh the evidence, but merely to determine whether the Amended Complaint is plausible on its face.  <u>See</u> Tr. at 9:17-21 (Montclare).  Nowell added that she "has articulated, almost element by element, factual assertions that are plausible as to each and every claim," which, according to Nowell, is unnecessary "at this early stage."  Tr. at 9:24-10:2 (Montclare).  Nowell added that the Court should not expect her "to give complex scientific arguments on how she could improve the product at this time," evidence which Nowell contends will "be forthcoming as the case progresses."  Tr. at 11:1-5 (Montclare).  Turning to the

statute of limitations, Nowell asserted that the Court should not deem her to have discovered the injury until her physician diagnosed it and that cases, in particular <u>Robinson v. BNSF Railway Co.</u>, "investigate the relationship between a misdiagnosis and the discovery of an injury." Tr. at 11:9-14 (Montclare). Nowell asserted that, because the question when the cause of action occurred is a factual issue, the Court should analyze it in the summary judgment context, after the Court affords Nowell the ability to depose witnesses. <u>See</u> Tr. at 11:14-21 (Montclare). Nowell summarized her response to the Court's concern regarding an alternate material by asserting that "a better alternative product would be one that didn't cause her injury." Tr. at 12:2-4 (Montclare).

> The Defendants asserted that Nowell's implied breach of warranty claim
>
> carries the same four-year statute of limitations as the express warranty claim, and that there is no discovery tolling with respect to any warranty claim, including an implied breach of warranty claim. And because plaintiff did not file her complaint until seven years after the mesh was implanted, both of the warranty claims are barred by the statute of limitations.

Tr. at 12:13-22 (Reyes). The Defendants added that Nowell has not set out either warranty claim's elements sufficient to withstand rule 12(b)(6). <u>See</u> Tr. at 12:23-13:2 (Reyes).

The Court then asked Nowell why she is conceding that her express-warranty claim is time-barred, but arguing that her implied warranty claim is timely. <u>See</u> Tr. at 13:3-7 (Court). Nowell responded that a New Mexico statute makes clear that the discovery rule cannot toll an express warranty claim, but that "New Mexico law . . . has not made a decision anywhere in the case law or in statutory law that would either apply or not apply the discovery rule to implied warranty claims such as that for a particular fitness of purpose or merchantability." Tr. at 13:14-19 (Montclare).

The Court then asked why a federal court should predict that the Supreme Court of New Mexico would apply the discovery rule to an implied warranty claim and whether other courts

have done so, see Tr. at 13:22-14:6 (Court), to which Nowell responded that she has observed a

trend in New Mexico appellate jurisprudence which indicates that the Court of Appeals of New

Mexico or the Supreme Court of New Mexico would apply the discovery rule to implied warranty

claims "because this particular type of claim is very tort-related, whereas most express warranty

claims are more sales-related," Tr. at 14:7-19 (Montclare).

The Defendants then directed the Court to AIG Aviation Insurance v. Avco Corp., 709 F.

Supp. 2d 1124 (D.N.M. 2010)(Black, J.), wherein the Honorable Bruce Black, former United

States District Judge for the District of New Mexico, concluded that implied warranties "by their

very nature 'do not explicitly guarantee future performance'" and therefore cannot be tolled

pursuant to the applicable statute.  Tr. at 15:4-16 (Reyes)(quoting AIG Aviation Ins. v. Avco Corp.,

709 F. Supp. 2d at 1132).  The Defendants add that no reason exists to distinguish between an

implied-warranty claim and an express-warranty claim in the discovery rule context, because

"[t]he question is: What is the product being guaranteed for?"  Tr. at 15:20-25 (Reyes).  The Court

asked the Defendants whether any court has held or suggested that the discovery rule applies to an

implied-warranty claim.  See Tr. at 16:2-6 (Court).  The Defendants responded that they "have not

seen that in our research to date" and that Nowell apparently also has not seen it, Tr. at 16:9-11

(Reyes), to which Nowell replied that she believes that federal courts in the United States District

Court for the District of Kansas have interpreted State of Kansas law to hold that the discovery

rule does apply to implied warranties, see Tr. at 16:12-17 (Montclare).  The Defendants responded

that they "are trying really hard not to make a We're-not-in-Kansas joke."  Tr. at 16:22-23 (Reyes).

The Defendants turned next to their argument that the Amended Complaint fails to state a

claim for the breach of implied warranty, and asserted that Nowell "does not set out what the

warranty was, what the implied warranty was, or what the breach of that was with respect to that." Tr. at 17:10-15 (Reyes). The Court asked Nowell what the implied warranty is in this case. See. Tr. at 17:16-17 (Court). Nowell responded: "merchantability, . . . due to the fact that . . . the particular type of mesh that was used was causing injuries, . . . and that an implied warranty would extend from the discovery of that injury." Tr. at 17:18-25 (Montclare). The Defendants rejoined: "[I]f an implied warranty could be tolled under the discovery rule, it would gut the express warranty rule with respect to the statute of limitations." Tr. at 18:6-9 (Reyes).

The Defendants insisted that the parties agree that Nowell did not file her claims until seven years after her initial surgery involving the Defendants' mesh, and, thus, "because the face of the complaint establishes that the statute of limitations bar the claim without some form of tolling," Nowell now bears the burden to make allegations that, if proven at trial, could convince a reasonable jury to reject the limitations. Tr. at 18:20-19:4 (Reyes). The Defendants insisted further that Nowell has not carried this burden and that she misconstrues the discovery rule when she states that it became reasonable to assume that the Defendants' mesh was causing her symptoms only on October 8, 2014, i.e., after her physician diagnosed the mesh as her injury's cause despite its implantation nearly four years before, in October, 2010. See Tr at 19:5-19 (Reyes). The Defendants continued:

> The question under the discovery rule is not when a plaintiff gets a definitive diagnosis of the injury and its cause. The question is when the plaintiff, quote, "experiences physical symptoms that would cause an ordinary person to make an inquiry about the discovery of the cause of the symptoms. That is the point at which the statute of limitations begins to accrue."

Tr. at 19:20-20:2 (Reyes)(quoting Gerke v. Romero, 2010-NMCA-60, ¶ 14, 237 P. 3d. 111, 116). The Defendants added that Gerke v. Romero is a case which Nowell herself directed the Court in the MTD Response. See Tr. at 20:3-6 (Reyes). The Defendants maintained that, "as a matter of

law," Nowell's cause of action accrued "no later than April 27, 2011," because, on that date, Nowell underwent a second hernia mesh surgery, which "was necessitated because the mesh had begun to, quote, 'pull away from the edges,' end quote." Tr. at 20:8-15 (Reyes)(quoting Amended Complaint, ¶ 38, at 8). The Defendants insisted that Nowell was "on inquiry notice that there may have been an issue with the mesh," not only because of the second surgery but also because, from April 27, 2011, to March 1, 2014, "she continued to experience exhaustion and pain, quote, 'in the area of the mesh,' end quote." Tr. at 20:16-22 (Reyes)(quoting Amended Complaint ¶ 38, at 8). The Defendants added that the statutes of limitation on Nowell's remaining claims are three years and therefore are timed-barred even if tolled until April 27, 2011. See Tr. at 21:8-11 (Reyes).

Nowell responded that the parties and the Court are "not here to weigh the evidence of . . . the specific facts that went to when this cause of action ensued" and that the cases which the Defendants cite are "summary judgment cases where the few facts have been . . . fully developed through the discovery process including the depositions of all the witnesses." Tr. at 21:15-22:1 (Montclare). Nowell added that even the Defendants' "most powerful case," Robinson v. BNSF Railway Company, "which investigated the relationship between the misdiagnosis and the discovery of an injury" is a summary judgment case that is distinguishable from the facts here, because the patient in Robinson v. BNSF Railway Company was not under a physician's constant care, unlike Nowell, and because the patient's physician did not discuss potential other causes for the patient's injury, whereas here Nowell's physician "discussed the possibility that the staph infection could have been normal." Tr. at 22:5-18 (Montclare). Nowell added that, in Robinson v. BNSF Railway Co., the Honorable John Lungstrum, United States District Judge for the District of Kansas, "discussed [Mest v. Cabot Corp., 449 F.3d 502, 514 (3d Cir. 2006)], which indicates

affirmatively that a negative diagnosis on the part of the doctor would toll the statute of limitations." Tr. at 22:15-18 (Montclare). Nowell contended that Mest v. Cabot Corp. is relevant here, because here her physician, "up until October 8, [2014,] had affirmatively said that the mesh did not cause the injury." Tr. at 22:19-25 (Montclare). Nowell maintained that her claims are plausible and that, "at the very least, there is a material issue of fact . . . as to when the statute of limitations accrued," which, according to Nowell, is a summary judgment standard that the Court need not consider on a motion pursuant to rule 12(b)(6). Tr. at 23:2-8 (Montclare).

The Court asked Nowell whether she has anything further to say regarding the discovery issue, i.e., any facts to add that are not already in the Nowell Affidavit or in her Amended Complaint, because, in the Court's experience, plaintiffs avoid addressing statutes-of-limitations questions at the motion-to-dismiss stage by omitting dates, which the Court previously has permitted, but here the Amended Complaint and the Nowell Affidavit include dates and facts such that the issue arguably is ripe for decision. See Tr. at 23:10-24:6 (Court). Nowell responded in the affirmative and argued that the case has not ripened to the point where the Court can make a final decision, because Nowell, for example, has not deposed her physician "so that he can explain in detail how he had indicated that he affirmatively said that the mesh was not involved." Tr. at 24:7-14 (Montclare). "So we have not even scratched the surface as far as our ability to marshal the evidence in support of the claim, because we simply don't believe that that's our burden at this juncture." Tr. at 24:14-18 (Montclare). The Court asked whether Nowell is suggesting that a split exists among jurisdictions or whether, among New Mexico cases, "there were some cases that read a certain way which suggest your facts would be time-barred, that the discovery rule -- the discovery would have occurred earlier; and then there are some cases that you're saying it would

- 47 -

not satisfy the discovery rule[.]" Tr. at 24:22-25:4 (Court). In response, Nowell asserted that the cases to which she directs the Court explain how a physician's misdiagnosis could toll the statute of limitations when the misdiagnosis prevents the plaintiff from discovering the issue, and that such cases might help the defense to build arguments "during summary judgment" whether Nowell's cause of action accrued before the misdiagnosis. Tr. at 25:8-19 (Montclare). The Court asked what about Robinson v. BNSF Railway Co. tells Nowell that her case is not appropriate either to decide on a motion to dismiss or to decide that the discovery rule does not apply. See Tr. at 25:22-26:5 (Court). Nowell responded that Robinson v. BNSF Railway Co. cites Mest v. Cabot Corp., which "basically says that if the doctor gives a misdiagnosis to the plaintiff, as he did in this case, the statute of limitations tolls. Because . . . the plaintiff did not know that there was an injury, because the doctor told the plaintiff that that was not a cause of the injury." Tr. at 26:12-22 (Montclare). The Court then asked whether Nowell is alleging that her physician committed malpractice. See Tr. at 26:24-27:1 (Court). Nowell responded that her physician's statement -- that the Defendants' mesh was not the cause of Nowell's injury until October 8, 2014, when he changed his opinion -- "may very well be malpractice," but that she has not developed that argument and therefore considers it a misdiagnosis. Tr. at 27:3-8 (Montclare).

The Defendants conceded that Robinson v. BNSF Railway Co. "does indicate that a misdiagnosis is not a basis not to toll the discovery rule," but asserted that the issue here is "[w]hen the individual was on inquiry notice and should have taken reasonable action, reasonable actions would have uncovered the injury." Tr. at 27:25-28:5 (Reyes). The Defendants emphasized that Mest v. Cabot Corp. is a United States Court of Appeals for the Third Circuit case and called the Court's attention to Martinez v. Showa Denko, K.K., which is a Court of Appeals of New Mexico

- 48 -

case.  See Tr. at 28:7-11 (Reyes).  The Defendants contended that, in <u>Martinez v. Showa Denko,</u>

<u>K.K.</u>, the Court of Appeals of New Mexico addresses the interplay between a misdiagnosis and

the discovery rule:

> "This case involves contrary diagnoses in which the overwhelming diagnosis was
> that the individual had not suffered a particular injury that was caused by a
> product."  It later turned out that she had, and the Court wrote, "Although we are
> sympathetic to plaintiff's situation, nothing in the discovery rule serves to suspend
> the running of the statute of limitations merely because there are divergent medical
> opinions concerning the nature or cause of the illness or injuries.  As observed by
> another court" -- they cite another court in Texas -- "because of the discovery rule's
> requirement of reasonable diligence, the tolling of the applicable statute of
> limitations by the rule ends when the person claiming the benefit of the rule
> acquires knowledge of facts, conditions, or circumstances which would cause a
> reasonable person to make an inquiry leading to the discovery of the concealed
> cause of action. This is so because the knowledge of such matters is, in the law,
> equivalent to knowledge of the cause of action itself for limitation purposes."

Tr. at 28:13-29:9 (Reyes)(quoting <u>Martinez v. Showa Denko, K.K.</u>, 1998-NMCA-111, ¶ 24, 964

P.2d 176, 182).

The Defendants noted that, although the Court cannot take the Nowell Affidavit into

consideration if the case proceeds to discovery, the Defendants assume that Nowell will testify

consistent with the Nowell Affidavit, and that the Nowell Affidavit's statements, specifically,

> "I was concerned that there was a problem with the surgical mesh that was
> implanted on October 27, 2010.  I talked about my concerns with my physician. He
> advised me that he did not think that my symptoms were caused by the mesh. Since
> he is my doctor, I accepted his advice that the mesh was not causing my symptoms.
> However, I still had my suspicions."

indicate as a matter of law that Nowell's claims are time-barred.  Tr. at 29:10-24 (Reyes)(quoting

Nowell Affidavit at 1)).  The Defendants reasserted that the statute of limitations began to run after

Nowell's second surgery put Nowell on inquiry notice and expired well before Nowell filed her

initial Complaint.  <u>See</u> Tr. at 29:25-30:5 (Reyes).  Because Nowell was on inquiry notice as of the

day of her second surgery, in April, 2011, the Defendants argued, discovery will not change the

facts in the Amended Complaint and in the Nowell Affidavit, and will confirm only that the statutes of limitations bar Nowell's claims. See Tr. at 30:614 (Reyes).

Turning to Nowell's strict-liability claims, the Defendants asserted that Nowell conceded in the MTD Response that she did not plead facts sufficient to state a manufacturing-defect claim. See Tr. at 30:22-31:10 (Reyes)(quoting MTD Response at 9 ("In regard to the manufacturing and warranty defects, Ms. Nowell concedes that despite due diligence, she has been unable to obtain information pertaining to the exact manufacturing process and specific warranty [language].")). The Defendants urged the Court to take Nowell's assessment to its logical conclusion and dismiss her manufacturing-defect claim, because she does not "state in any way, shape, or form how this particular mesh was defective when it came out of the plant with respect to the manufacturing." Tr. at 31:11-17 (Reyes). The Court asked the Defendants whether this argument applies to all three of Nowell's strict-liability theories -- design, manufacture, and failure-to-warn. See Tr. at 31:18-24 (Court). The Defendants responded that their understanding is that Nowell's concession is limited to her manufacturing-defect claim. See Tr. at 31:25-32:5 (Reyes). Nowell replied that her inability to articulate plausible facts regarding the manufacturing defect is because that information is available to her only through the discovery process: "The nuances of the manufacturing process are not known and cannot be known by my client until further discovery." Tr. at 32:8-15 (Montclare). She therefore asked the Court to dismiss that count without prejudice. See Tr. at 32:16-17 (Montclare).

The Defendants turned next to Nowell's design-defect claim and disputed Nowell's assertion that, because the mesh material did not prevent accumulation of infection, it was therefore unreasonable. See Tr. at 33:11-20 (Reyes). Instead, the Defendants argued that all hernia repair

surgeries carry a well-known infection risk, and, thus Nowell's infection allegation is insufficient to indicate that the Defendants' mesh is unreasonably dangerous.  <u>See</u> Tr. at 33:20-34:2 (Reyes). The Defendants provided the Court with three grounds to dismiss Nowell's claim:

> [F]irst, the claim must be dismissed because they haven't alleged an actual design defect.  Secondly, the claim should be dismissed because there's nothing in her allegation that makes it plausible as opposed to just consistent with or possible that her injury was caused by a defect in the mesh as opposed to it just being a known side effect of a well-functioning mesh and would have happened regardless of what mesh was used. And third . . . , Your Honor, you had another good question . . . , which is: What safer alternative design is she proposing with respect to the mesh?  And . . . they don't have one.  And . . . they don't have one because all meshes carry this potential risk of infection that Ms. Nowell was injured by.

Tr. at 34:3-20 (Reyes).

The Defendants reminded the Court of its opinion in <u>Morales v. E.D. Etnyre & Co.</u> wherein, the Defendants argued, the Court "rightfully said that we should be concerned with the plaintiff coming to court 'merely to criticize a product' without proposing any alternative."  Tr. at 34:21-25 (Reyes)(quoting <u>Morales v. E.D. Etnyre & Co.</u>, 382 F. Supp. 2d at 1283 ("Thus, to the extent that a plaintiff could come to court and merely criticize a product, the Court believes that the New Mexico law required the plaintiff to propose an alternative design.").  The Defendants disputed Nowell's position that she can later obtain an expert to deduce a safer alternative: "We don't put parties to the expense of litigation in the hopes that someone will be able to manufacture a claim with further discovery.  The very purpose of [<u>Ashcroft v.</u>] Iqbal and [<u>Bell Atlantic Corp. v.</u>] Twombly is that we use the complaint process as a gatekeeping function."  Tr. at 35:5-10 (Reyes).

An alternative theory for Nowell's infection, the Defendants contended, is that, because "it's clear from her complaint that for four years, she didn't seem to have an infection in her abdomen," Nowell developed a staph infection, "which began at the skin, at the drainage site, [and] migrated down to her body[,] to include the mesh."  Tr. at 35:14-36:1 (Reyes).  The Defendants

insist that this theory is consistent with the Amended Complaint's allegations and with the physician's notes that Nowell attaches to the MTD Response.  See Tr. at 36:2-9 (Reyes).

The Court stated that it has dealt with competing designs at trial, "so it's clear to the jury what they're being asked to compare the current design with," but questioned whether state or federal pleading law requires the plaintiff in a products liability case "to put their competing designs on the table at the time they file the case."  Tr. at 36:21-37:5 (Court).  In response, Nowell asserted that the Court in Morales v. E.D. Etnyre & Co. made clear to the parties that it would not permit that case to go to trial unless the plaintiff proposed a safer alternative.  See Tr. at 37:8-12 (Reyes).  The Defendants added that Nowell has not alleged that a safer hernia mesh product design exists which could reduce the risk of infection, because "the very injury that she's complaining of is an injury that's inherent in every single mesh product."  Tr. at 37:13-24 (Reyes).  The Defendants insisted that the Court should require Nowell to propose a safer alternative design before allowing Nowell to proceed with discovery.  See Tr. at 38:3-8 (Reyes).  The Defendants informed the Court that, after its decision in Morales v. E.D. Etnyre & Co., the Court of Appeals of New Mexico issued a decision in Bustos v. Hyundai Motor Co., 2010-NMCA-090, 243 P.3d 440, which distinguished Morales v. E.D. Etnyre & Co., because the Court of Appeals of New Mexico discussed whether a safer alternative design was an element with respect to enhanced injuries, and it concluded that the jury should consider the safer alternative as a factor but not as a requirement. See Tr. at 38:9-22 (Reyes)(citing Bustos v. Hyundai Motor Co., 2010-NMCA-090, ¶ 57, 243 P.3d at 453).  The Defendants noted, however, that the Court of Appeals of New Mexico in Bustos v. Hyundai Motor Co. quoted the Court favorably regarding whether a plaintiff can come to court merely to criticize a product.  See Tr. at 38:23-39:2 (Reyes).  The Defendants added that, after the

Supreme Court's decisions in <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, Nowell must present the Court with a hernia mesh alternative that does not carry a risk of infection, which, the Defendants maintain, is a product that does not exist. <u>See</u> Tr. at 39:2-9 (Reyes).

In response, Nowell argued that an alternative design better than the Defendants' mesh is not an element of her claims, and she therefore does not need to articulate one at this time. <u>See</u> Tr. at 39:13-18 (Reyes). Nevertheless, Nowell asserted, the Amended Complaint cites three scientific articles which indicate how the Defendants' "actual, specific mesh" is dangerous. Tr. at 39:23-40:2 (Montclare). "Central Failures of Monofiliment Polyester Mesh Causing Hernia Recurrence: A Cautionary Note," Nowell averred, describes how a mesh type similar to the Defendants' "was deemed to have had a high incidence of mechanical failure." Tr. at 40:2-7 (Montclare). Further evidence, alleged Nowell, is in "Postoperative Mesh Infection -- Still A Concern in Laparoscopic Era," which "states that this type of synthetic mesh was . . . dangerous," and in "Novel in Vitro Model for Assessing Susceptibility of Synthetic Hernia Meshes," which "state[s] that this type of mesh is a major cause of patient morbidity and results in substantial health care expenditures." Tr. at 40:8-18 (Montclare). Because these articles indicate that the Defendants' mesh is "extremely dangerous," Nowell concluded, the question is not whether Nowell can present the Court with a better mesh but whether the Defendants' mesh "should be used in the first place." Tr. at 40:21-24 (Montclare).

The Defendants disputed that the three scientific articles support Nowell's allegation that the Defendants' mesh is dangerous, beginning with the first article, which "discusses a potential for a central mesh fracture, which is not an injury complained of here, not something that happened with the mesh here. It also discussed a different mesh." Tr. at 41:7-14 (Reyes). Moreover, the

Defendants continued, the second and third articles support the Defendants' position that infection is a known risk in all hernia repair surgeries and, therefore, Nowell cannot allege causation, because the Amended Complaint does not assert facts to suggest that Nowell's injury resulted from a design defect as opposed to a side effect associated with all surgical hernia repairs. See Tr. at 41:15-25 (Reyes).

The Defendants next turned to Nowell's failure-to-warn claim and asserted that all hernia repair meshes, including their mesh, carry a warning that infection is a known side effect; "[s]o the physician was warned of the risk of the infection, and the duty here runs from the manufacturer to the physician." Tr. at 42:7-14 (Reyes). The Defendants noted that the Amended Complaint does not allege that the Defendants did not warn Nowell's physician or that her physician would have made a decision not to use the Defendants' mesh had he had a different warning. See Tr. at 42:14-17 (Reyes).

The Defendants acknowledged their familiarity with the Court's decision in Rimbert v. Eli Lilly & Co., wherein the Court concluded that the Supreme Court of New Mexico would not adopt the learned-intermediary doctrine, but asserted that the rationale underlying that decision does not apply here, because Rimbert v. Eli Lilly & Co. involved direct manufacturer-to-consumer advertising and the Defendants do not advertise their hernia mesh products to the consumer directly. See Tr. at 42:18-43:8 (Reyes). A patient's physician, the Defendants argued, makes the decision as to which hernia mesh to use, and this decision is based often on the physician's idiosyncratic preferences for one mesh over another or, once the surgery has commenced, after the physician can evaluate a given hernia's nature and extent. See Tr. at 43:11-17 (Reyes). Hence, the Defendants concluded, unlike the defendant in Rimbert v. Eli Lilly & Co., they do not have a

duty to warn the ultimate consumer of the risks associated with their hernia mesh products; "[h]ere the duty does and must run to the physician." Tr. at 43:18-22 (Reyes). The Defendants added that Nowell alleges neither the specific mesh-type that her physician used on her, nor the allegedly inadequate warnings associated with the specific mesh-type used, which, the Defendants argued, clouds the question what specific, adequate warning the Defendants could have provided. See Tr. at 44:5-11 (Reyes).

Nowell replied by identifying two distinct issues: first, whether the Defendants should have given a warning in the first place, and second, whether any warning was sufficient or reasonable. See Tr. at 44:14-18 (Montclare). Regarding the first issue, Nowell asserted: "[W]e don't have any evidence that an actual warning was given." Tr. at 44:19-20 (Montclare). Nowell asserted that the Defendants are liable for failing to warn her of the mesh's potential to cause injury but conceded that, "as far as any type of express warranties, we are not in a position to have that information yet," and therefore seeks discovery. Tr. at 44:23-45:7 (Montclare).

The Court asked Nowell whether the Defendants accurately described her failure-to-warn claim. See Tr. at 45:8-10 (Court). Nowell responded that, although the Defendants did "a reasonable job" describing it, they did not address the "material issue of fact as to whether or not . . . a specific warning should have been given, given the dangerous propensity of this mesh." Tr. at 45:11-17 (Montclare). Nowell added that, if the Defendants did not give a required warning, they violated their duty to warn. See Tr. at 45:18-20 (Montclare). The Defendants responded that the question is whether the Defendants should have warned Nowell's physician and then asserted that Nowell does not know whether the Defendants did so, which is a basis for dismissal, according

to the Defendants, given that "we're far down the road and that we do have pleading standards." Tr. at 45:23-46:9 (Reyes).

The Defendants argued that the Court should dismiss Nowell's negligence claim for the same reason that it should dismiss her design-defect and failure-to-warn claims, i.e., because the Amended Complaint does not include factual allegations "with respect to a duty or respect to a breach of the duty." Tr. at 46:15-23 (Reyes). Without an alleged design defect or an alleged failure-to-warn, the Defendants continued, Nowell cannot allege a breach and the Court, therefore, should dismiss her negligence claim. See Tr. at 46:23-47:2 (Reyes). Nowell responded that the MTD Response discusses "every element of negligence and what would have to be proven should this case go to trial," and includes citations to the relevant paragraphs in the Amended Complaint, which "provide a plausible claim for negligence." Tr. at 48:6-20 (Montclare)(citing MTD Response at 5). The Defendants replied that the citations to which Nowell directs the Court in the MTD Response "are just conclusory allegations that are plainly not sufficient under Iqbal and Twombly." Tr. at 48:25-49:4 (Reyes). The Defendants added that they have also asked the Court to dismiss Nowell's punitive damages claim. See Tr. at 49:5-6 (Reyes). In response, Nowell asserted that she is not "under the burden to discuss each element," but has nevertheless done so, and that, "as far as punitive damages are concerned," the MTD Response "cite[s] numerous paragraphs that support why punitive damages would be appropriate according to the elements of New Mexico Law." Tr. at 49:14-25 (Montclare). The Defendants reasserted their position that the Amended Complaint does not "allege the type of egregious conduct that would warrant punitive damages." Tr. at 50:4-7 (Reyes).

The Court stated that, although it needs to consider further the implied-warranty issue, the Court nonetheless thinks that Nowell is "kind of pushing the envelope to try to get the discovery rule to apply to the implied warranty claim" and that the Court, therefore, is "inclined to think that it's just overwhelming that th[e] discovery rule shouldn't apply." Tr. at 50:10-18 (Court). Turning to the facts that the Amended Complaint alleges, the Court stated that plaintiffs sometimes want bad news early, and that, "by putting all these facts and all these detailed allegations in the complaint, that there's a lot to work with here to decide whether the negligence and strict liability claims have been tolled." Tr. at 51:1-7 (Court). The Court added that it looks to the Court like Nowell "was on notice that she had some problems outside the statute of limitations period," although the Court expressed its intention to review Robinson v. BNSF Railway Co. alongside Nowell's other cases and arguments. Tr. at 51:8-13 (Court). The Court stated that it needs to consider further the Defendants' remaining 12(b)(6) arguments and that it wants to review the Court of Appeals of New Mexico's decision in Bustos v. Hyundai Motor Co., but that it seems to the Court that "to embark on a case like this without some alternatives to the product that's being challenged here may just not get us anywhere." Tr. at 51:14-52:3 (Court). The Court nonetheless expressed that it would review the three scientific articles attached to the Amended Complaint to "see if there's a design defect here that should go forward." Tr. at 52:6-10 (Court). The Court declined to express any inclination regarding Nowell's failure-to-warn claim, because the Court desired to consider whether its decision in Rimbert v. Eli Lilly & Co. applies to the facts as Nowell alleges them. See Tr. at 52:11-15 (Court). The Court stated its inclination to dismiss Nowell's punitive damages claim, because "it doesn't look like . . . there's anything that's pled or even known by the plaintiff at the present time that would support punitive damages," but would permit

Nowell to reassert it "[i]f something comes up down the road." Tr. at 52:16-22 (Court). The Court similarly dismissed Nowell's manufacturing-defect claim, because it agreed with the Defendants that "we shouldn't have discovery going to the manufacturing defect" unless "something shows up in the discovery of the other claims," in which case Nowell "may be able to move to reinsert the manufacturing defect claim." Tr. at 52:22-4 (Court). The Court dissuaded the parties from continuing to work on this case until the Court issues an opinion, "because I think some claims are going to be dismissed, if not the case." Tr. at 53:6-10 (Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(internal citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint. See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.). The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the

motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604, 605 (7th Cir. 1954)(holding that, once a plaintiff

has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar

to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments

to it, facts establishing an exception to the affirmative defense).  It appears, from caselaw in several

Courts of Appeals, that the plaintiff may avoid this problem altogether -- at least at the motion-to-

dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v.

Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1

(7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell,

2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not

squarely addressed this practice, the Court has permitted it, see Anderson Living Tr. v. WPX

Energy Prod., LLC, 27 F. Supp. 3d at 1235-36.

### LAW REGARDING JUDICIAL NOTICE OF DOCUMENTS WHEN RULING ON A MOTION TO DISMISS

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding,

take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally

known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate

and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Fed. R. Evid. 201(b), (f).  "Adjudicative facts are simply the facts of the particular case."  United

States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Fed. R. Evid. 201 advisory

committee's notes).  A court has discretion to take judicial notice of such facts, regardless whether

requested.  See Fed. R. Evid. 201(c).  On the other hand, if a party requests that the court take

judicial notice of certain facts, and supplies the necessary information to the court, judicial notice

is mandatory.  See Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be

heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e). That judicial notice may be taken during any stage of the judicial proceeding includes the motion-to-dismiss stage. See 21B C. Wright & K. Graham, Jr., Federal Practice & Procedure: Evidence § 5110, at 294 & n.17 (2d ed. 2005). Moreover, while ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1193 (D.N.M. 2009)(Browning, J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)). Also, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001). The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein. See Tal v. Hogan, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). The Court has previously judicially noticed news publications and public filings with the Securities and Exchange Commission. See SEC v. Goldstone, 952 F. Supp. 2d at 1219-20; In re Thornburg Mortg., Inc. Securities Litig., 2009 WL 5851089, at *3-4. See also Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, __ F. Supp. 3d __, 2017 WL 4402422, at *18-19 (D.N.M. 2017)(Browning, J.)(ruling that the Court may take judicial notice of state court orders); A.M. ex rel. Youngers v. N.M. Dep't of Health, 117 F. Supp. 3d 1220, 1232 n.6 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING THE USE OF DOCUMENTS OUTSIDE THE PLEADINGS
## IN A RULE 12(b)(6) MOTION

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v.

Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th

Cir. 2005)(unpublished)[8]("In ruling on a motion to dismiss, the district court is limited to the facts

pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F.

App'x 83, 85 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the

district court must examine only the plaintiff's complaint.  The district court must determine if the

complaint alone is sufficient to state a claim; the district court cannot review matters outside of the

complaint."  91 F. App'x at 85.  There are three limited exceptions to this  general principle: (i)

documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the

documents are central to the plaintiff's claim and the parties do not dispute the documents'

authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters

---

[8]Gossett v. Barnhart is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Gossett v. Barnhart, Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), Nard v. City of Oklahoma City, 153 F. App'x 529 (10th Cir. 2005), and Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

of which a court may take judicial notice," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322.

If a district court intends to rely on other evidence, it must convert the rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties. <u>See</u> Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); <u>GFF Corp. v. Associated Wholesale Grocers, Inc.</u>, 130 F.3d 1381, 1384 (10th Cir. 1997). <u>See also</u> <u>Swoboda v. Dubach</u>, 992 F.2d 286, 290 (10th Cir. 1993)("In determining whether a plaintiff has stated a claim, the district court may not look to the *Martinez*[v. Aaron, 570 F.2d 317 (10th Cir. 1978)("<u>Martinez</u>")] report,[9] or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."); <u>Janke v. Price</u>, 43 F.3d 1390, 1392 (10th Cir. 1994)(holding that district court erred in using <u>Martinez</u> hearing to resolve disputed factual issues); <u>Northington v. Jackson</u>, 973 F.2d 1518, 1521 (10th Cir. 1992)("[The <u>Martinez</u>] process is designed to aid the court in fleshing out possible legal bases of relief from unartfully drawn pro se prisoner complaints, not to resolve material factual issues.").

---

[9]According to the Tenth Circuit, <u>Martinez</u> Reports

> are intended to provide information for the district court which will enable it to decide preliminary matters, including jurisdiction and definition of the issues, especially in § 1983 actions. *Martinez v. Aaron,* 570 F.2d 317, 319 (10th Cir. 1978); *El'Amin v. Pearce,* 750 F.2d 829, 832 (10th Cir. 1984). *Martinez* reports have been used in this circuit almost exclusively to provide the court preliminary information, furnished by prison administration personnel, in pro se cases brought by prisoners against prison officials.

<u>Ketchum v. Cruz</u>, 961 F.2d 916, 920 n.3 (10th Cir. 1992).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission, and the Tenth Circuit analogized the deadline to a statute of limitations. 167 F. App'x at 704. The Tenth Circuit concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05. Nevertheless, "[t]he failure to convert a 12(b)(6) motion to one for summary judgment where a court does not exclude outside materials is [not] reversible error [if] the dismissal can be justified without considering the outside materials." GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d at 1384.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents which the defendants attach to a motion to dismiss which contain

their un-redacted statements.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court in Mocek v. City of Albuquerque reasoned that the statements did not incorporate by reference nor were the statements central to the plaintiff's allegations in the complaint because the plaintiff cited the statements only to attack their reliability and truthfulness.  See 2013 WL 312881, at *50-51.  Additionally, the Court has ruled that, when determining whether a statute of limitations has run in an action alleging fraud and seeking subrogation from a defendant, it may not use interviews and letters attached to a motion to dismiss which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Ins. Co. v. Crabtree, 2012 WL 3656500, at *3, *22-23.   The Court in Great American Insurance Co. v. Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.   Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).     See also SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18

(D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING AMENDMENT OF PLEADINGS

A party may amend its pleadings once as a "matter of course" within twenty-one days of serving the pleading or twenty-one days after a service of a motion under rules 12(b), (e), or (f) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 15(a)(1). Rule 15(a)(2) provides: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. Under rule 15(a), the court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., 2005 WL 3664299, at *1-2 (D.N.M. 2005)(Browning, J.). The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. Fomen v. Davis, 371 U.S. at 182. Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim. See Curley v. Perry, 246 F.3d 1278, 1284 (10th

Cir. 2001). <u>See also</u> <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579-80. "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" <u>B.T. ex rel. G.T. v. Santa Fe Pub. Schs.</u>, No. CIV-05-1165 JB/RLP, 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting <u>Minter v. Prime Equip. Co.</u>, 451 F.3d 1196, 1204 (10th Cir. 2006)).

A court should deny leave to amend under rule 15(a), however, if the proposed "amendment would be futile." <u>Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv.</u>, 175 F.3d 848, 859 (10th Cir. 1999). <u>See</u> <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579-80. An amendment is "futile" if the pleading "as amended, would be subject to dismissal." <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579-80 (citing <u>TV Commc'ns Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1028 (10th Cir. 1992)). A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed." <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579 (quoting <u>Frank v. U.S.W., Inc.</u>, 3 F.3d 1357, 1365-66 (10th Cir. 1993)). The Tenth Circuit has also stressed that "untimeliness alone is a sufficient reason to deny leave to amend, especially when the party filing the motion has no adequate explanation for the delay." <u>Eckert v. Dougherty</u>, 658 F. App'x 401, 410 (10th Cir. 2016)(unpublished)(quoting <u>Frank v. U.S.W., Inc.</u>, 3 F.3d at 1365-66). Moreover, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is

subject to denial." Eckert v. Dougherty, 658 F. App'x at 410-11 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405, 416 (10th Cir. 1984)).

Undue delay is demonstrated where the proposed amendment comes after the deadline to amend pleadings and the amending party has no adequate explanation for the delay. See Minter v. Prime Equip. Co., 451 F.3d at 1206 ("[The Tenth] Circuit . . . focuses primarily on the reasons for the delay. We have held that denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'" (quoting Frank v. U.S.W. Inc., 3 F.3d at 1363-66)). It is not the delay itself that warrants denial for leave to amend, but when such delay becomes undue: "The longer the delay, 'the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend.'" Minter v. Prime Equip. Co., 451 F.3d at 1205 (quoting Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)). See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1130 (10th Cir. 1998)(finding that a plaintiff had unduly delayed in filing a pleading where it appeared that the "plaintiff was aware of all the information on which his proposed amended complaint was based prior to filing the original complaint" and the motion to amend was filed "five months after discovery cut off"). Courts have found undue delay when a party moved to amend the pleading to include information the party should have known earlier or had an earlier opportunity to include in the pleading:

> A court may thus deny the motion for leave to amend because of untimeliness, especially when the party seeking an amendment knows, should have known, or has reason to know of the facts supporting the claim in the proposed amendment, but fails to include it when the original complaint was filed.

Street v. Curry Bd. of Cnty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *5 (D.N.M. 2008)(Browning, J.). See also Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th

Cir. 1994)(noting that a motion to amend "was not based on new evidence unavailable at the time of the original filing" and denying the motion on that basis).

When a scheduling order governs the case, the Tenth Circuit has interpreted rule 16 of the Federal Rules of Civil Procedure to impose a "good cause" standard on untimely motions to amend, which "requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay." Minter v. Prime Equip. Co., 451 F.3d at 1205 n.4. Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Rule 16 only allows such amendments for 'good cause,' an arguably more stringent standard than the standards for amending a pleading under Rule 15." Bylin v. Billings, 568 F.3d 1224, 1230 (10th Cir. 2009)(quoting Fed. R. Civ. P. 16(b)(4)). The Tenth Circuit has noted that there is a "'rough similarity' between the 'undue delay' standard of Rule 15 and the 'good cause' standard of Rule 16." Bylin v. Billings, 568 F.3d at 1231.

> [R]ule 16(b) of the Federal Rules of Civil Procedure provides that a court shall enter a scheduling order limiting the time to amend pleadings. . . . Courts have held that, when a party files a motion to amend after the scheduling order's deadline has passed, (i) '[the] movant must first demonstrate to the court that it has a "good cause" for seeking modification of the scheduling deadline under Rule 16(b)"; and (ii) "[i]f the movant satisfies Rule 16(b)'s 'good cause' standard, it must then pass the requirements for amendment under Rule 15(a)."

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., Nos. CIV 02-1146 JB/LFG, CIV 03-1185 JB/LFG, 2007 WL 2296955, at *3 (D.N.M. 2007)(Browning, J.)(quoting Colo. Visionary Acad. v. Medtronic, Inc., 194 F.R.D. 684, 687 (D. Colo. 2000)). The Tenth Circuit has recognized that there is still an open issue about applying rule 16 to pleading amendments when the time for seeking leave to amend a pleading has passed under a scheduling order. See Bylin v. Billings, 568

F.3d at 1232 n.10 ("Because we decline to consider the Bylins' Rule 16 argument, we leave for another day the question of whether this circuit should apply Rule 16 when a party seeks to amend a pleading after a court-imposed deadline."). In <u>Minter v. Prime Equipment Co.</u>, the Tenth Circuit noted that "[n]either party raises the question, and given the rough similarity between the 'good cause' standard of Rule 16(b) and our 'undue delay' analysis under Rule 15, it would not affect the outcome of this case." 451 F.3d at 1205 n.4 (quoting <u>SIL-FLO, Inc. v. SFHC, Inc.</u>, 917 F.2d 1507, 1518-19 (10th Cir. 1990)). Rule 16 "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. . . . Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." <u>Advanced Optics Elecs., Inc. v. Robins</u>, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.). <u>See</u> <u>Gerald v. Locksley</u>, 849 F. Supp. 2d 1190, 1237-49 (D.N.M. 2011)(Browning, J.)(finding good cause for granting leave to amend when a plaintiff filed for leave to amend after the deadline in the scheduling order).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)). <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's

case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[10] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court confronted a situation in which the movant did not offer evidence disproving the nonmovant's allegations, but, rather, argued, under the second option in Celotex, that the nonmovant lacked evidence to establish an element of its claim. See 184 F. Supp. 3d at 1075. The Court granted summary judgment for the movant, because the nonmovant -- the plaintiff -- did not offer expert evidence supporting causation or proximate causation for its breach-of-contract or breach-of-the-implied-warranty-of-

---

[10]Although the Honorable William J. Brennan, Jr., former Associate Justice of the Supreme Court of the United States, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

merchantability claims as New Mexico law required for those elements.  184 F. Supp. 3d at 1075.

The Court concluded that Celotex applied to the situation, and that, without the requisite evidence, the nonmovant failed to prove "an essential element of the . . . case."  184 F. Supp. 3d at 1075 (quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)(quoting Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d at 1241)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine

factual issue to be tried." (internal quotation marks omitted)(quoting <u>Coleman v. Darden</u>, 595 F.2d, 533, 536 (10th Cir. 1979)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." <u>Colony Nat'l Ins. v. Omer</u>, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" <u>Colony Nat'l Ins. v. Omer</u>, 2008 WL 2309005, at *1 (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539 (citing <u>Liberty Lobby</u>, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See <u>Liberty Lobby</u>, 477 U.S. at 251 (citing <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539; <u>Schuylkill & Dauphin Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)). "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." <u>Liberty Lobby</u>, 477 U.S. at 249 (citations omitted)(citing <u>First Nat. Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968); <u>Dombrowski v. Eastland</u>, 387 U.S. 82, 87 (1967)). Where a rational trier of fact, considering the record as a

whole, cannot find for the nonmoving party, there is no genuine issue for trial.  See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S.

at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind

the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S.

at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's

favor, and construe all evidence in the light most favorable to the nonmoving party.  See Liberty

Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Fourth,

the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .
> Where the record taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.
> Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not
defeat an otherwise properly supported motion for summary judgment; the
requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different
stories, one of which is blatantly contradicted by the record, so that no reasonable
jury could believe it, a court should not adopt that version of the facts for purposes
of ruling on a motion for summary judgment.

    That was the case here with regard to the factual issue whether respondent
was driving in such fashion as to endanger human life.  Respondent's version of
events is so utterly discredited by the record that no reasonable jury could have
believed him.  The Court of Appeals should not have relied on such visible fiction;
it should have viewed the facts in the light depicted by the videotape.

<u>Scott v. Harris</u>, 550 U.S. at 380-81 (emphasis in original).

   The Tenth Circuit applied this doctrine in <u>Thomson v. Salt Lake County</u>, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation,
a plaintiff's version of the facts must find support in the record: more specifically,
"[a]s with any motion for summary judgment, when opposing parties tell two
different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the facts."
<u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting <u>Scott</u>[
<u>v. Harris</u>], 550 U.S. at 380); <u>see also</u> <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, 511
F.3d 1255, 1258 (10th Cir. 2008).

<u>Thomson v. Salt Lake Cty.</u>, 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in <u>Rhoads</u>

<u>v. Miller</u>, 352 F. App'x 289 [, 291] (10th Cir. 2009) . . . [(unpublished),] explained that the blatant

contradictions of the record must be supported by more than other witnesses'

testimony[.]" <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d 1222, 1249 (D.N.M.

2010)(Browning, J.), <u>aff'd</u>, 499 F. App'x 771 (10th Cir. 2012).

## <u>LAW REGARDING CHOICE-OF-LAW AND STATUTES OF LIMITATIONS</u>

   The Supreme Court has held that a federal court sitting in diversity should apply the same

statute of limitations that a state court of the forum state would apply.  <u>See</u> <u>Guar. Tr. Co. v. York</u>,

326 U.S. 99 (1945). The district court must, therefore, look to the forum state's choice-of-law rules to determine which state's law to apply -- both to control the substance of the dispute and the limitations period in which the suit can be brought. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).

New Mexico courts have held that "the law of the forum governs matters of procedure." Estate of Gilmore, 1997-NMCA-103, ¶ 10, 946 P.2d 1130, 1133[11] (internal quotation marks omitted)(quoting Sierra Life Ins. Co. v. First Nat'l Life Ins. Co., 1973-NMSC-079, ¶ 14, 512 P.2d 1245, 1249. See Restatement of Conflict of Laws § 585 (1934)("First Restatement")("All matters of procedure are governed by the law of the forum."). "The line between substance and procedure, [however], is not always clear, and the judgment where to draw the line in a particular case may depend on the reasons for drawing the line." Estate of Gilmore, 1997-NMCA-103, ¶ 11, 946 P.2d at 1133-34 (citing Ammerman v. Hubbard Broad., Inc., 1976-NMSC-031, ¶ 6, 551 P.2d 1354, 1357 (1976)). See Sun Oil Co. v. Wortman, 486 U.S. 717, 726 (1988)(stating that, "[e]xcept at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn."). "A court usually applies its own local law rules prescribing how

---

[11]The Court predicts that the Supreme Court of New Mexico would agree with Estate of Gilmore's law-of-the-forum analysis, based on the Court's read of the Supreme Court of New Mexico's opinion in Sierra Life Insurance Co. v. First National Life Insurance Co., 1973-NMSC-079, 512 P.2d 1245, stating that "the law of the forum governs matters of procedure." Sierra Life Ins. Co. v. First Nat. Life Ins. Co., 1973-NMSC-079, ¶ 14, 512 P.2d 1245, 1249. Moreover, the Supreme Court of New Mexico has adopted the Restatement of Conflict of Laws approach to choice-of-law analyses, see United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶9, 775 P.2d 233, 235 ("New Mexico adheres to a traditional conflicts of law analysis contained in Restatement (First) of Conflicts of Law (1934).").

litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case." Estate of Gilmore, 1997-NMCA-103, ¶ 12, 946 P.2d at 1134 (citing Restatement (Second) of Conflict of Laws § 122 (1971)("Second Restatement")). Similarly, "procedure [is] the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." Sibbach v. Wilson & Co., 312 U.S. 1, 14 (1941). The Court of Appeals of New Mexico has acknowledged that, when determining whether something is "procedural or substantive," it is important to "keep in mind the rationale for applying the forum's 'procedural' rules." Estate of Gilmore, 1997-NMCA-103, ¶ 13, 946 P.2d at 1134. The Court of Appeals of New Mexico has stated:

> Each state has local law rules prescribing the procedure by which controversies are brought into its courts and by which the trial of these controversies is conducted. These rules for conducting lawsuits and administering the courts' processes vary from state to state. The forum has compelling reasons for applying its own rules to decide such issues even if the case has foreign contacts and even if many issues in the case will be decided by reference to the local law of another state. The forum is more concerned with how its judicial machinery functions and how its court processes are administered than is any other state. Also, in matters of judicial administration, it would often be disruptive or difficult for the forum to apply the local law rules of another state. The difficulties involved in doing so would not be repaid by a furtherance of the values that the application of another state's local law is designed to promote.

Estate of Gilmore, 1997-NMCA-103, ¶ 13, 946 P.2d at 1134 (citing Second Restatement § 122 cmt. a.). Furthermore, the Court of Appeals of New Mexico has stated that, because parties to a lawsuit do not usually think about matters of judicial administration before entering into legal transactions, they do not usually place reliance on the applicability of specific state rules. See Estate of Gilmore, 1997-NMCA-103, ¶ 13, 946 P.2d at 1134 (citing Second Restatement § 122 cmt. a.). For these reasons, there is no danger in applying the forum state's rules in such procedural matters. See Estate of Gilmore, 1997-NMCA-103, ¶ 13, 946 P.2d at 1134 (citing Second

Restatement § 122 cmt. a.).  Furthermore, "[e]normous burdens are avoided when a court applies its own rules, rather than the rules of another state, to issues relating to judicial administration, such as the proper form of action, service of process, pleading, rules of discovery, mode of trial and execution and costs."  1997-NMCA-103, ¶ 13, 946 P.2d at 1134 (citing Second Restatement § 122 cmt. a.).

The Supreme Court of New Mexico has adopted the First Restatement approach to choice-of-law analyses, see United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶9, 775 P.2d 233, 235 ("New Mexico adheres to a traditional conflicts of law analysis contained in Restatement (First) of Conflicts of Law (1934)."), but for the purposes of determining the applicable statute of limitation, the First Restatement and Second Restatement come out the same way.  The First Restatement states that, in the absence of a "borrowing statute" enacted by the forum state that adopts foreign states' statutes of limitations when applying their substantive law, the statute of limitations of the forum state governs all disputes even when another state supplies the substantive law:

> If action is barred by the statute of limitations of the forum, no action can be maintained though action is not barred in the state where the cause of action arose. . . .  If action is not barred by the statute of limitations of the forum, an action can be maintained, though action is barred in the state where the cause of action arose,

First Restatement §§ 603-04, and the Second Restatement is nearly identical in substance:

> (1) An action will not be maintained if it is barred by the statute of limitations of the forum, including a provision borrowing the statute of limitations of another state.  (2) An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state, except as stated in § 143,

Second Restatement § 142.  The only exception is if the forum state's statute of limitations "bars the right and not merely the remedy," in which case the action is barred regardless of the forum

chosen. <u>Second Restatement</u> § 143 ("An action will not be entertained in another state if it is barred in the state of the otherwise applicable law by a statute of limitations which bars the right and not merely the remedy."). <u>Accord</u> <u>First Restatement</u> § 605 ("If by the law of the state which has created a right of action, it is made a condition of the right that it shall expire after a certain period of limitation has elapsed, no action begun after the period has elapsed can be maintained in any state.").

## LAW REGARDING NEW MEXICO STATUTES OF LIMITATIONS AND THE DISCOVERY RULE

"Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'" <u>Torrez v. Eley</u>, No. CIV 09-1464, 2010 WL 1948679 (10th Cir. May 17, 2010)(quoting <u>Aldrich v. McCulloch Props., Inc.</u>, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)). <u>Accord</u> <u>Lee v. Rocky Mountain UFCW Unions & Emp's Trust Pension Plan</u>, No. 92-1308, 1993 WL 482951 (10th Cir. Nov. 23, 1993)("Because the critical dates appeared plainly on the face of [plaintiff's] complaint, we conclude that the statute of limitations defense was properly raised and resolved in the Rule 12(b) context."). When a party has asserted a statute of limitations issue in a rule 12(b)(6) motion, a court accepts all well-pled factual allegations in the complaint as true and views them in the light most favorable to the plaintiff to determine whether the statute of limitations has run. <u>See</u> <u>Sunrise Valley, LLC v. Kempthorne</u>, 528 F.3d 1251, 1254 (10th Cir. 2008).

In New Mexico, tort claims are generally subject to a three-year statute of limitations, <u>see</u> N.M. Stat. Ann. § 37-1-8, while claims for breach of warranty under the UCC are generally subject to a four-year statute of limitations, <u>see</u> § 55-2-725(1). <u>See</u> <u>also</u> <u>Badilla v. Wal-Mart Stores E.</u>

Inc., 2015-NMSC-029, ¶ 47, 357 P.3d 936, 948.  As the Court has previously noted: "The Supreme

Court of New Mexico has concluded that the UCC's four-year statute of limitations 'governs

actions for breach of warranty seeking personal injury damages.'"[12]    Bellman v. NXP

_____

[12]In Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, 357 P.3d 936, the Supreme
Court of New Mexico answered the question which statute of limitations should apply to breaches
of warranty suits based on products that cause personal injury.  The plaintiff in Badilla v. Wal-
Mart Stores East, Inc. bought a pair of work boots at a Wal-Mart store.  See Badilla v. Wal-Mart
Stores E. Inc., 2015-NMSC-029, ¶ 2, 357 P.3d at 937.  More than three years after he was injured
while wearing the boots, the plaintiff filed a personal injury suit alleging that the soles of the boots
became unglued and caused him to trip on debris.  See Badilla v. Wal-Mart Stores E. Inc., 2015-
NMSC-029, ¶ 2, 357 P.3d at 937.  The plaintiff based his claim on breaches of an express warranty
and the implied warranties of merchantability and fitness for a particular purpose.  See Badilla v.
Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 2, 357 P.3d at 937.  The trial court and the Court of
Appeals of New Mexico concluded that the three-year statute of limitations for tort claims barred
the claims.  See Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 2, 357 P.3d at 937.  On
appeal, the Supreme Court of New Mexico noted that courts in other states have reached different
conclusions as to which statute of limitations should apply.  See Badilla v. Wal-Mart Stores E.
Inc., 2015-NMSC-029, ¶ 18, 357 P.3d at 940 (citing Wieser v. Firestone Tire & Rubber Co., 596
F. Supp. 1473, 1475 (D. Colo. 1984)(Weinshienk, J.)).  The Supreme Court of New Mexico
outlined the two approaches that other Court have taken:

> To start with, "[t]he majority [approach holds] that the UCC limitations
> period applies to all actions for breach of warranties, regardless of whether the
> plaintiff seeks personal injury damages or economic and contractual damages." Id.
> This approach essentially looks to the nature of the right asserted; if the right is
> based in contract, it is subject to the UCC.  The minority approach "holds that the
> type of damages sought in an action determines whether the statute of limitations
> in [UCC] § 2-725 applies," thus, "[a]ctions for personal injury damages or tortious
> injury to personal property are governed by general, non-[UCC] limitations periods,
> while actions for economic or breach of contract damages are governed by § 2-
> 725." Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc., 794 P.2d 11, 16 (Utah
> 1990).  The minority approach focuses upon the remedy sought: if the remedy
> sought is economic damages, the claim is subject to the UCC; if the remedy sought
> is personal injury damages, the claim is not subject to the UCC.

Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 19, 357 P.3d at 940-41 (alterations in
original).  The Supreme Court of New Mexico thus concluded that New Mexico's four-year UCC
statute of limitations applied, because: (i) a seller's breach of express or implied warranties creates
in the buyer a cause of action; (ii) consequential damages, including those for personal injuries,
are available pursuant to such cause of action; and (iii) the statute of limitations applicable to that
cause of action is four years.  See 2015-NMSC-029, ¶ 25, 357 P.3d at 942.  "The four-year deadline

Semiconductors USA, Inc., 248 F. Supp. 3d at 1156 (quoting Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 47, 357 P.3d at 948)). New Mexico's personal-injury statute provides that "[a]ctions must be brought . . . for an injury to the person or reputation of any person, within three years." N.M. Stat. Ann. § 37-1-8. Under § 41-4-5 of the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-2 through 41-4-30 ("NMTCA"), "actions against a . . . public employee for torts shall be forever barred unless such action is commenced within two years after the date of occurrence resulting in loss, injury or death." N.M. Stat. Ann. § 41-4-15A. "The New Mexico Tort Claims Act expresses a clear public policy that tort claims against negligent New Mexico governmental entities should be allowed, but only if brought within two years of the date of the alleged tort." Sam v. Estate of Benny Sam, 2006-NMSC-022, ¶ 23, 134 P.3d 761, 767. "[A] cause of action brought under Section 41-4-15(A) will accrue regardless of whether or not the plaintiff is aware of the full extent of his or her injury." Maestas v. Zager, 2007-NMSC-003, ¶ 22, 152 P.3d 141, 148. "Once a plaintiff has discovered his or her injury and the cause of that injury, the statute of limitations begins to run." 2007-NMSC-003, ¶ 22, 152 P.3d at 148. "A plaintiff's cause of action accrues when he or she understands the nature of his or her injury; that is, when the plaintiff knows or with reasonable diligence should have known of the injury and its cause." 2007-

---

for filing suit under the UCC for breach of warranty of goods sold in New Mexico is clearly and unambiguously set forth in the statute." Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 25, 357 P.3d at 942.

Buttressing its opinion, the Supreme Court of New Mexico adopted the reasoning of the United States Court of Appeals for the Sixth Circuit in Reid v. Volkswagen of America, Inc., 512 F.2d 1294 (6th Cir. 1975), noting that courts generally favor application of the longer of two statutes of limitations. See Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 32, 357 P.3d at 944. The Supreme Court of New Mexico also agreed with the Court of Appeals of Kansas' reasoning in Golden v. Den-Mat Corp., 276 P.3d 773 (Kan. Ct. App. 2012), which rejected the minority approach. See Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 36, 357 P.3d at 945.

NMSC-003, ¶ 22, 152 P.3d at 148.  "It is not required that all the damages resulting from the negligent act be known before the statute of limitations begins to run.  Once plaintiff suffers loss or injury, the statute begins to run."  Bolden v. Village of Corrales, 1990-NMCA-096, ¶ 6, 809 P.2d 635, 636 (citing Aragon & McCoy v. Albuquerque Nat'l. Bank, 1983-NMSC-020, ¶ 17, 659 P.2d 306, 310).

New Mexico applies the "discovery rule," which means that the statute of limitations period "begins to run when the claimant has knowledge of sufficient facts to constitute a cause of action." Gerke v. Romero, 2010-NMCA-060, ¶ 10, 237 P.3d 111, 115 (citing Martinez-Sandoval v. Kirsch, 1994-NMCA-115, ¶ 26, 884 P.2d 507, 513).[13]  "The discovery rule provides that 'the cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists.'"  Williams v. Stewart, 2005-NMCA-061, ¶ 12, 112 P.3d 281, 285 (quoting Roberts v. Sw. Cmty. Health Servs., 1992-NMSC-042, ¶ 24, 837 P.2d 442, 449).  Accord Eoff v. N.M. Corr. Dep't, Nos. CIV 10-0598, 10-0599, 10-0600, 2010 WL 5477679, at *18 (D.N.M. Dec. 20, 2010)(Browning, J.)("The Court believes that, in breach-of-contract actions involving an employee's termination, the statute of limitations should not begin to run until the employee is aware of the allegedly wrongful decision, because an employee would not be aware of the possible need to file suit until that time."); Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley, 727 F. Supp. 2d 1256, 1264 (D.N.M. 2010)(Browning, J.)("Specifically, [the] statute

---

[13]The Court predicts that the Supreme Court of New Mexico would agree with Gerke v. Romero's statute-of-limitations-commencement analysis based on the Court's read of the Supreme Court of New Mexico's opinion in Maestas v. Zager, 2007-NMSC-003, 152 P.3d 141, stating that "our courts have consistently held that the limitations period runs not from the act of medical malpractice, but from the time when the resulting injury manifests itself in a physically objective manner and is ascertainable." Maestas v. Zager, 2007-NMSC-003, ¶ 13, 152 P.3d at 145.

of limitations commences when an 'injury manifests itself and is ascertainable, rather than when the wrongful or negligent act occurs.'" (quoting Maestas v. Zager, 2007-NMSC-003, ¶ 13, 152 P.3d at 145); Gerke v. Romero, 2010-NMCA-060, ¶ 12, 237 P.3d at 115 ("Under the discovery rule, the statute of limitations begins to run when the plaintiff knows or, with reasonable diligence should know, of his injury and its cause." (citing Roberts v. Sw. Cmty. Health Servs., 1992-NMSC-042, ¶ 24, 837 P.2d 442, 449-50)).

## LAW REGARDING BREACH OF WARRANTIES

Under the UCC, a seller can make an express warranty and at least two implied warranties: (i) the implied warranty of fitness for a particular purpose; and (ii) the implied warranty of merchantability. See Perfetti v. McGhan Med., 1983-NMCA-032, ¶¶ 45-47, 662 P.2d 646, 653.[14] In Perfetti v. McGhan Medical, the Court of Appeals of New Mexico, in considering the claim of an express warranty, stated: "Any express warranty made with respect to the surgeon would inure to plaintiff's benefit on the basis that the surgeon was acting as plaintiff's agent in the use of the prosthesis." 1983-NMCA-032, ¶ 26, 662 P.2d at 652. The Court of Appeals of New Mexico concluded that there was no evidence that defendants breached an express warranty. See 1983-NMCA-032, ¶ 35, 662 P.2d at 653. In discussing the plaintiff's implied warranty claim, the Court of Appeals of New Mexico explained that the defendant was "incorrect in urging a congruence between products liability and the implied warranty of fitness for a particular purpose. Products

---

[14]The Court is confident that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico's assertion in Perfetti v. McGhan Medical, based on Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, 357 P.3d 936, in which the Supreme Court of New Mexico stated the same proposition. See Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 45, 357 P.3d at 947 ("New Mexico law explicitly provides that both products liability and breach of warranty causes of action are available to plaintiffs.").

liability requires a defect . . . . [T]he implied warranty of fitness for a particular purpose does not require a defect." 1983-NMCA-032, ¶ 44, 662 P.2d at 653.

## 1. **Breach of Express Warranty.**

UCC § 2-313, which New Mexico has adopted, <u>see</u> N.M. Stat. Ann. § 55-2-313, provides that a seller can make an express warranty in three ways:

> (a)      Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b)      Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

> (c)      Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

UCC § 2-313(1)(a)-(c). An express warranty does not need to include "formal words such as warrant or guarantee," and the seller does not need to have "a specific intention to make a warranty." UCC § 2-313(2).

Under New Mexico law, a seller expressly warrants goods in a commercial transaction when it (i) makes an affirmation of fact or promise to the buyer "which relates to the goods and becomes part of the basis of the bargain"; (ii) describes the goods in a way that "is made part of the basis of the bargain"; or (iii) provides a "sample or model which is made part of the basis of the bargain." N.M. Stat. Ann. § 55-2-313. "If the goods provided are not as warranted, the goods are in breach of warranty." <u>Badilla v. Wal-Mart Stores E. Inc.</u>, 2015-NMSC-029, ¶ 21, 357 P.3d at 941. "A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description." <u>Badilla v. Wal-Mart Stores E. Inc.</u>, 2015-NMSC-029, ¶ 23,

357 P.3d at 941 (internal quotation marks omitted)(quoting <u>Jaramillo v. Gonzales</u>, 2002-NMCA-072, ¶ 13, 50 P.3d 554.).  "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  <u>Badilla v. Wal-Mart Stores E. Inc.</u>, 2015-NMSC-029, ¶ 21, 357 P.3d at 941.

In <u>Bellman v. NXP Semiconductors USA, Inc.</u>, for example, the Court considered whether, under New Mexico's express warranty standard, the defendants had made any express affirmations or representations to the plaintiffs concerning chemical supplies purchased.  <u>See</u> 248 F. Supp. 3d at 1153.  The Court noted that, "aside from perfunctorily alleging in the Complaint that Rinchem Co. 'expressly' warranted the chemicals that it supplied," the plaintiffs did not explain the warranty or even identify "the warranty's precise terms."  248 F. Supp. 3d at 1153.  The Court, accordingly, dismissed the plaintiffs' breach-of-express-warranty claim, because the Court could not conclude from the plaintiffs' conclusory allegations that the defendant had "made any express warranty."  248 F. Supp. 3d at 1153.  <u>See</u> <u>Two Old Hippies, LLC v. Catch the Bus, LLC</u>, 784 F. Supp. 2d 1200, 1210-11 (D.N.M. 2011)(Browning, J.)(ruling that the plaintiffs had plausibly alleged an express warranty where the plaintiffs contended that the defendants had promised that two restored Volkswagen buses purchased would be "ready to go whether for daily driver or for cross-country trips," and "guaranteed . . . 100% satisfaction with the buses").

**2.  <u>Breach of the Implied Warranty of Fitness for a Particular Purpose</u>.**

Under the UCC, it is the sale of goods that brings the implied-warranty provisions into operation.  <u>See</u> <u>Ortiz v. Gas Co.</u>, 1981-NMCA-128, ¶ 13, 636 P.2d 900, 903.[15]  A "sale" is defined

---

[15]The Court predicts that the Supreme Court of New Mexico would agree with <u>Ortiz v. Gas Co.</u>'s implied-warranty-of-fitness analysis based on the Court's read of the Supreme Court of New Mexico's opinion in <u>International Paper Co. v. Farrar</u>, discussing "the implied warranty of fitness for a particular purpose, NMSA 1978, Section 55-2-315," which is the same statute that <u>Ortiz v.</u>

as "the passing of title from the seller to the buyer for a price." N.M. Stat. Ann. § 55-2-106(1).

To succeed on a breach of the implied warranty of fitness for a particular purpose, the plaintiff

must prove: (i) a sale; (ii) that the seller had knowledge of the particular use for which a good was

purchased; (iii) that the buyer relied on the seller's skill or judgment regarding the selection of

goods; and (iv) that the buyer purchased a product with a particular purpose for that product in

mind. See Daniell v. Ford Motor Co., Inc., 581 F. Supp 728, 731 (D.N.M. 1984)(Baldock,

J.)(citing N.M. Stat. Ann. § 55-2-314(2)(c)); Spectron Dev. Lab. v. Am. Hollow Boring Co., 1997-

NMCA-025, ¶ 40, 936 P.2d 852, 861 (quoting N.M. Stat. Ann. § 55-2-314). N.M. Stat. Ann. §

55-2-315 provides:

> Where the seller at the time of contracting has reason to know any particular
> purpose for which the goods are required and that the buyer is relying on the seller's
> skill or judgment to select or furnish suitable goods, there is unless excluded or
> modified under the next section an implied warranty that the goods shall be fit for
> such purpose.

N.M. Stat. Ann. § 55-2-315. The Court of Appeals of New Mexico has stated that, under the

implied warranty of fitness for a particular purpose, a plaintiff must prove: (i) that, at the time of

contracting, the seller had reason to know the buyer's particular purpose for which the item was

being ordered; (ii) that the buyer relied on the seller's skill or judgment; and (iii) that the item was

not fit for that purpose. See Lieb v. Milne, 1980-NMCA-125, ¶ 13, 625 P.2d at 1237 (quoting

N.M. Stat. Ann. §§ 55-2-315 to -316).[16]

---

Gas Co. considers for the above proposition. See Int'l Paper Co. v. Farrar, 1985-NMSC-046, ¶
13, 102 N.M. 739, 742, 700 P.2d 642, 645.

    [16]The Court predicts that the Supreme Court of New Mexico would agree with Lieb v.
Milne's implied-warranty-of-fitness analysis based on the Court's read of the Supreme Court of
New Mexico's opinion in Salazar v. D.W.B.H., Inc., 2008-NMSC-054, 192 P.3d 1205, stating
"[u]nder the UCC, for goods to be merchantable, they must at least be 'fit for the ordinary purposes
for which such goods are used.' Section 55-2-314(2)(c)," which is a quotation from the same

- 87 -

### 3. **Breach of the Implied Warranty of Merchantability.**

New Mexico recognizes that the law implies the warranty of merchantability and that the implied warranty is independent of express warranties. See Int'l Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13, 700 P.2d at 645. To establish a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller sold goods or products that fail to meet the statutory definition of "merchantable." N.M. Stat. Ann. § 55-2-314; Civ. UJI 13-1430. N.M. Stat. Ann. § 55-2-314 defines "merchantable":

(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as:

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

---

statute that Lieb v. Milne considers for the above proposition. Salazar v. D.W.B.H., Inc., 2008-NMSC-054, ¶ 19, 192 P.3d at 1211.

> (3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

N.M. Stat. Ann. § 55-2-314.

"[A] supplier breaches this warranty if the product is defective and is not fit for the ordinary purposes for which such product is used." Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d at 1225 ("A manufacturer must use ordinary care in the designing, making, inspecting, and packaging of the product. Civ. UJI 13-1410. Ordinary care is that care which a reasonably prudent supplier would use in the conduct of its business." (citing Civ. UJI 13-1404)). A breach-of-the-implied-warranty-of-merchantability claim "thus requires proof of a defect." Pacific Indem Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d at 1225 (citing Perfetti v. McGhan Med., 1983-NMCA-032, ¶ 44, 662 P.2d at 654). Moreover, a breach-of-the-implied-warranty-of-merchantability claim also requires proof of proximate cause. See N.M. Stat. Ann. § 55-2-314 cmt. 13. Comment 13 to § 55-2-314 states: "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." N.M. Stat. Ann. § 55-2-314 cmt. 13. New Mexico Uniform Civil Jury Instruction No. 130-1430 provides:

> A supplier breaches the implied warranty of merchantability:
>
> [1. If the goods sold would be rejected by someone knowledgeable in the trade for failure to meet the contract description]; [or]
>
> [2. If goods sold in bulk are not of fair average quality for the type of goods described by the contract. The goods need not be the best quality but they must pass without objection in the trade]; [or]
>
> [3. If the [goods] [products] are defective and are not fit for the ordinary purposes for which such [goods] [products] are used]; [or]

[4. If the goods do not run within variations permitted by the contract for the reason that there are wide differences in type, quality and quantity within delivered units and among all units involved]; [or]

[5. If the [goods] [products] are not adequately contained, packaged and labeled as required by the contract]; [or]

[6. If the [goods] [products] do not conform to the promises or statements made by the seller on the container or label]; [or]

[7. If the food or drink is unwholesome or unfit for human consumption].

Civ. UJI 13-1430.  The directions for use of this instruction state: "Select the bracketed material which fits the actual issues and evidence involved in the case.  With this instruction, UJI 13-1429 must also be used.  This list of items is not exclusive.  Reference should be made to the Uniform Commercial Code 55-2-314 N.M. Stat. Ann. 1978 for further specifications."  Civ. UJI 13-1430.

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause[17] of the plaintiff's damages.  See Coffey v. United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86).  "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of Cty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d

---

[17]The 2004 amendments to Civ. UJI 13-305 eliminate the word "proximate" within the instruction.  Use Note, Civ. UJI 13-305.  The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause."  Editor's Notes, Civ. UJI 13-305 (alteration added).

728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Schear v. Bd. of Cty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." Schear v. Bd. of Cty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186. New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187. To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm." Edward C. v. City of Albuquerque, 2010-NMSC-043, ¶ 16, 241 P.3d 1086, 1090 (quoting Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84 (citing Restatement (Second) of Torts, § 315 (1965))).[18]

---

[18]The Court predicts that the Supreme Court of New Mexico would agree with Grover v. Stechel's negligence analysis based on the Court's read of the Supreme Court of New Mexico's opinion in Solon v. WEK Drilling Co., 1992-NMSC-023, 829 P.2d 645, stating "[i]n New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care *toward that person*," which implies that one does not have a general duty to protect another from harm. Solon v. WEK Drilling Co., 1992-NMSC-023, ¶ 9, 829 P.2d 645, 648. Moreover, Grover v. Stechel draws from the Restatement (Second) of Torts for the above proposition, and

"[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84 (citing Restatement (Second) of Torts, § 314(A) (1965)). "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382 (quoting Restatement (Second) of Torts, § 449 (1964)).

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It

---

the Supreme Court of New Mexico cites to the Restatement (Second) of Torts to support its negligence analysis in Solon v. WEK Drilling Co., 1992-NMSC-023, ¶ 11, 829 P.2d 645, 649.

need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING STRICT LIABILITY

New Mexico has adopted the basis for products liability found in Restatement (Second) of Torts § 402A (1965). See Stang v. Hertz Corp., 1972-NMSC-031, 497 P.2d 732.

> The policy underpinnings supporting imposition of strict liability on product manufacturers and suppliers include (1) ensuring that the risk of loss for injury resulting from defective products is borne by the suppliers, principally because they are in a position to absorb the loss by distributing it as a cost of doing business; (2) encouraging suppliers to select reputable and responsible manufacturers who generally design and construct safe products and who generally accept financial responsibility for injuries caused by their defective products; and (3) promoting fairness by ensuring that plaintiffs injured by an unreasonably dangerous product are compensated for their injuries.

Smith ex rel. Smith v. Bryco Arms, 2001-NMCA-090, ¶¶ 12, 33 P.3d 638, 644 (citing Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶¶ 11-17, 902 P.2d 54, 57-58).[19] The Supreme Court of New Mexico explained in Brooks v. Beech Aircraft Corp., 1995-NMSC-043, 902 P.2d 54:

> The policy of risk- or cost-distribution continues to serve as a primary basis for imposing strict products liability. . . . In addition to the cost-distribution rationale . . . other courts have approved specifically the rationale that imposing strict liability relieves plaintiffs of the burden of proving ordinary negligence under circumstances in which such negligence is likely to be present but difficult to prove. . . . The third policy cited for the imposition of strict liability is that suppliers who otherwise might not be liable because of a passive role in the chain of supply should be encouraged to select reputable and responsible manufacturers

---

[19]The Court is confident that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico's summary of New Mexico's strict-liability policy justifications in Smith ex rel. Smith v. Bryco Arms, based on Brooks v. Beech Aircraft Corp., in which the Supreme Court of New Mexico describes in greater detail the same policy justifications. See Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶¶ 11-17, 902 P.2d 54, 57-58.

who generally design and construct safe products and who generally accept financial responsibility for injuries caused by their defective products. . . . Fourth and finally, imposing strict products liability serves the interests of fairness. . . . The fairness rationale embodies a normative judgment that plaintiffs injured by an unreasonably dangerous product should be compensated for their injuries. At the heart of this judgment lies the conclusion that although the manufacturer has provided a valuable service by supplying the public with a product that it wants or needs, it is more fair that the cost of an unreasonable risk of harm lie with the product and its possibly innocent manufacturer than it is to visit the entire loss upon the often unsuspecting consumer who has relied upon the expertise of the manufacturer when selecting the injury-producing product.

1995-NMSC-043, ¶ 15-18, 902 P.2d at 57-58 (internal citations omitted).

To succeed on a cause of action brought under a theory of strict products liability, a plaintiff must prove five elements: (i) the product was defective; (ii) the product was defective when it left the hands of the defendant and was substantially unchanged when it reached the use or consumer; (iii) the product, because of the defect, was unreasonably dangerous to the use or consumer; (iv) the consumer was injured or was damaged; and (v) the product's defective condition was the proximate cause of the injury or damage. See Armeanu v. Bridgestone/Firestone North Am. Tires, L.L.C., No. CIV-05-619 JB/DJS, 2006 WL 4060666, at *3 (D.N.M. Sept. 26, 2006)(Browning, J.). Proximate cause is a required element in a strict liability cause of action. See 2006 WL 4060666, at *7.

Proof of a defect is required to succeed on a strict products liability claim under New Mexico law. See Perfetti v. McGhan Med., 1983-NMCA-032, ¶45, 662 P.2d at 654. The Court of Appeals of New Mexico explained in Perfetti v. McGhan Medical that, pursuant to comment h to § 402A of the Restatement (Second) of Torts, where the seller "has reason to anticipate the danger that may result from a particular use . . . he may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition." 1983-NMCA-032, ¶7, 662 P.2d at 649 (internal quotation marks omitted)(quoting Restatement (Second) of Torts

§ 402A). The defendant contended that the prosthesis fell within the category of "unavoidably unsafe products" discussed in comment k to § 402A of the Restatement (Second). 1983-NMCA-032, ¶7, 662 P.2d at 649 (internal quotation marks omitted)(quoting Restatement (Second) of Torts § 402A). The Court of Appeals of New Mexico explained that these category of products are those "which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." 1983-NMCA-032, ¶9, 662 P.2d at 649 (internal quotation marks omitted)(quoting Restatement (Second) of Torts § 402A).

New Mexico courts have recognized that the theory of products liability is applicable to three defects: design, manufacturing, and marketing (warnings). See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1264 (citing Smith v. Bryco Arms, 2001-NMCA-090, ¶ 8, 33 P.3d at 643; Fernandez v. Ford Motor Co., 1994-NMCA-063, ¶ 27, 879 P.2d 101, 110). To recover under the strict-liability theory, a plaintiff must prove that a defect in the product as manufactured, designed, or marketed created an unreasonably dangerous risk of injury. See Perfetti v. McGhan Med., 1983-NMCA-032, ¶ 9, 662 P.2d at 649-50 (internal quotation marks omitted)(quoting Restatement (Second) of Torts § 402A). In the context of pharmaceutical cases, New Mexico courts have adopted comment k to § 402A of the Restatement (Second) of Torts. See Hines v. St. Joseph's Hosp., 1974-NMCA-110, ¶ 2, 764, 527 P.2d 1075, 1076. "An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable." Smith ex rel. Smith v. Bryco Arms, 2001-NMCA-090, ¶ 13, 33 P.3d at 644. "Determining whether a product design poses an unreasonable risk of injury also involves considering whether the risk can be eliminated without seriously impairing the usefulness of the product or making it unduly expensive." 2001-NMCA-090, ¶ 13, 33 P.3d at 644. "Whether a product is unreasonably

dangerous, and therefore defective, is ordinarily a question for the jury." Smith ex rel. Smith v.

Bryco Arms, 2001-NMCA-090, ¶ 14, 33 P.3d at 644.

> The jury instructions covering strict products liability are designed to encourage a risk-benefit calculation by defining "unreasonable risk of injury" in a way which requires the jury to balance meritorious choices for safety made by the manufacturer while minimizing the risk that the public will be deprived needlessly of beneficial products.

Smith ex rel. Smith v. Bryco Arms, 2001-NMCA-090, ¶ 13, 33 P.3d at 644 (citing Civ. UJI 13-

1407; Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶ 27, 902 P.2d 54, 60-61).

Pursuant to the learned-intermediary doctrine, the prescribing physician acts as a learned

intermediary between a prescription drug manufacturer and the ultimate user, and the manufacturer

satisfies its duty to warn by providing adequate warnings to the prescribing physician. See, e.g.,

Hill v. Searle Labs, 884 F.2d 1064, 1070 (8th Cir. 1989)(noting that the learned-intermediary

doctrine is justified, because it is virtually impossible for a manufacturer to directly warn each

patient and that imposing a duty on manufacturers to warn patients directly would interfere with

the relationship between the doctor and patient); Reyes v. Wyeth Labs., 498 F.2d 1264, 1276 (5th

Cir. 1974)("Prescription drugs are likely to be complex medicines, esoteric in formula and varied

in effect. As a medical expert, the prescribing physician can take into account the propensities of

the drug, as well as the susceptibilities of his patient."). In Wright v. Abbott Laboratories, Inc.,

259 F.3d 1226 (10th Cir. 2001), the Tenth Circuit affirmed dismissal of failure-to-warn claim

pursuant to learned-intermediary doctrine under Kansas law. See 259 F.3d at 1233-34. The Tenth

Circuit noted:

> The learned intermediary doctrine states that once a manufacturer warns a doctor about a drug's inherent dangers, it has fulfilled its legal duty to provide a warning. See Hall v. Merck, Sharp & Dohme, 774 F. Supp. 604, 605-06 (D. Kan.1991) (granting summary judgment to a drug manufacturer because it discharged its legal duty to plaintiff by warning prescribing physician of drug's inherent risks); Phelps

v. Sherwood Med. Indus., 836 F.2d 296, 301-03 (7th Cir. 1987). Under Kansas law, a plaintiff cannot prevail against a prescription drug manufacturer in a failure to warn case where the manufacturer warned the "learned intermediary" of the drug's inherent risks.

Wright v. Abbott Labs., Inc., 259 F.3d at 1233.

"The overwhelming majority of jurisdictions to address this issue apply the learned intermediary doctrine to define a pharmaceutical company's duty to warn of risks associated with the use of a prescription drug." In re Norplant Contraceptive Prod. Liab. Litig., 215 F. Supp. 2d 795, 806 (E.D. Tex. 2002)(Schell, J.)(citing Serna v. Roche Labs., 1984-NMCA-078, ¶ 9, 684 P.2d 1187, 1189; Hines v. St. Joseph's Hosp., 1974-NMCA-110, ¶ 6, 527 P.2d 1075, 1077.)[20]

In Hines v. St. Joseph's Hospital, the plaintiff received a blood transfusion and later began treatment for what her doctor diagnosed as most likely a serum hepatitis. See 1974-NMCA-110, ¶ 1, 527 P.2d at 1076. The Court of Appeals noted that New Mexico has adopted the rule of strict liability stated in Restatement (Second) of Torts. See Hines v. St. Joseph's Hosp., 1974-NMCA-110, ¶ 2, 527 P.2d at 1076. The Court of Appeals of New Mexico explained that, in comment k, there is an exception to the rule for unavoidably unsafe products. See Hines v. St. Joseph's Hospital, 1974-NMCA-110, ¶ 2, 527 P.2d at 1076. The Court of Appeals of New Mexico quoted the Restatement (Second) of Torts:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully

_____

[20]For the Court's prediction whether and to what extent the Supreme Court of New Mexico would recognize the learned-intermediary doctrine as the Court of Appeals of New Mexico applies it in Serna v. Roche Laboratories; Jones v. Minnesota Mining & Manufacturing Co., 1983-NMCA-106, 669 P.2d 744; Perfetti v. McGahn Medical; Richards v. Upjohn Co, 1980-NMCA-062, 625 P.2d 1192; and Hines v. St. Joseph's Hospital, see infra. n.25.

justified, notwithstanding the unavoidable high degree to risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Hines v. St. Joseph's Hosp., 1974-NMCA-110, ¶ 2, 527 P.2d at 1076 (quoting Restatement (Second) of Torts cmt. k). The Court of Appeals of New Mexico explained that, at the time of the plaintiff's transfusion, no test could adequately detect the hepatitis virus in blood. See Hines v. St. Joseph's Hosp., 1974-NMCA-110, ¶ 3, 527 P.2d at 1076. The Court of Appeals of New Mexico further explained that no process could destroy the virus without damaging the blood, and thus, the blood was a product incapable of being made safe for its intended and ordinary use. See 1974-NMCA-110, ¶ 3, 527 P.2d at 1076. The Court of Appeals of New Mexico nonetheless stated that the risk of the blood being infected is outweighed by the public benefit of saving life and, thus, is a reasonable risk. See 1974-NMCA-110, ¶ 4, 527 P.2d at 1076. The Court of Appeals of New Mexico noted that "[o]rdinarily the manufacturer's duty to warn of the dangers of prescription drugs is to the attending physician, not the patient." 1974-NMCA-110, ¶ 6, 527 P.2d at 1076. The Court of Appeals of New Mexico concluded that summary judgment was appropriate for the blood-provider defendant, because "Blood Services placed a warning on the blood container and also 'constantly distributed' an 'Official Circular of Instructions for Use' to the hospital staff. [The doctor] . . . who gave the transfusion, stated he knew of the danger of hepatitis transmission in

blood transfusions.  Blood Services' warning was adequate."  1974-NMCA-110, ¶ 6, 527 P.2d at 1076.

In Jones v. Minnesota Mining & Manufacturing Co., 1983-NMCA-106, 669 P.2d 744, the Court of Appeals of New Mexico observed:

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect.  As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient.  His is the task of weighing the benefits of any medication against its potential dangers.  The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.  Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a learned intermediary between manufacturer and consumer.

1983-NMCA-106, ¶ 95, 669 P.2d at 760-61 (quoting Reyes v. Wyeth Labs., 498 F.2d 1264, 1276 (5th Cir. 1974)).  The Court of Appeals of New Mexico explained: "A warning, to be adequate, must disclose the nature and extent of the danger. . . .  The knowledge that equates to this warning must be knowledge of the nature and extent of the danger."  1983-NMCA-106, ¶ 32, 669 P.2d at 750 (internal citation omitted).  The Court of Appeals of New Mexico observed:

> Comment k thus provides what could serve either as a door leading to escape from strict liability or a trap door leading to the downfall of the unwary manufacturer.  The key to the door which [the defendant] should have taken and which would have prevented the damage suffered by these plaintiffs is in the form of warnings.  The assertion of liability in this case hinges on the warning which the manufacturer who wishes to avoid liability for an unavoidably unsafe product must provide and which [the defendant] chose to avoid.

1983-NMCA-106, ¶ 90, 669 P.2d at 760.  See Graham by Graham v. Wyeth Labs, 906 F.2d 1399, 1405 (10th Cir. 1990)(stating that comment k to § 402A of the Restatement (Second) of Torts immunity is viewed as a defense).

In Perfetti v. McGhan Medical, 1983-NMCA-032, 662 P.2d 646, a surgeon inserted a mammary prosthesis into the plaintiff. See 1983-NMCA-032, ¶ 1, 662 P.2d at 647. Approximately twenty-five months after the prosthesis was implanted, it deflated. See 1983-NMCA-032, ¶ 1, 662 P.2d at 647. When the surgeon removed the prosthesis, which the defendant had manufactured, he discovered a split about a half an inch on the front and half an inch on the back. See 1983-NMCA-032, ¶ 1, 662 P.2d at 647. The Court of Appeals of New Mexico stated that "[a] manufacturer of a product . . . which is obtainable only through the services of a physician, fulfills its duty if it warns the physician of the dangers attendant upon its use, and need not warn the patient as well." 1983-NMCA-032, ¶ 15, 662 P.2d at 649 (internal quotation marks omitted). The Court of Appeals of New Mexico stated:

> In this case the trial court could have ruled that there was no factual issue as to the adequacy or properness of defendant's warning as to the nature and extent of the danger, and that the warning was deficient as a matter of law. Although the surgeon knew generally of the danger of deflation, he had only minimum knowledge of delayed deflation at the time the prosthesis was implanted. The surgeon expected the prosthesis to last from 10-to-15 years and would not have used the prosthesis if he had been aware of the danger resulting from wear due to a fold in the prosthesis. A witness for defendant testified there is a 20-to-30 percent incidence of capsular contracture where there has been a subcutaneous mastectomy, that the manufacturer was aware that folding and rubbing of the prosthesis was foreseeable as a result of capsular contracture and that no warning was given as to this problem. Defendant got more than the evidence supported when the issue of the sufficiency of the warning was submitted to the jury.

1983-NMCA-032, ¶ 19, 662 P.2d at 649-50.

In Serna v. Roche Labs., the plaintiff contended that he contracted Stevens-Johnson syndrome as a reaction to a medication that his physician prescribed. See 1984-NMCA-078, ¶ 6, 684 P.2d at 1188. The plaintiff alleged that he received no warnings about the medication's possible dangers. See 1984-NMCA-078, ¶ 9, 684 P.2d at 1189. The Court of Appeals of New Mexico stated: "This allegation states a theory of liability because, where dangers from use can be

anticipated, the manufacturer must provide adequate warnings or the product is defective." 1984-NMCA-078, ¶ 9, 684 P.2d at 1189 (citing Restatement (Second) of Torts § 402A cmt. h). The Court of Appeals of New Mexico explained that, "[w]here the product is a prescription drug, the manufacturer's duty to warn is fulfilled if it warns the physician, not the patient." Serna v. Roche Labs., 1984-NMCA-078, ¶ 9, 684 P.2d at 1189. The Court of Appeals of New Mexico stated that the following criteria determines the adequacy of a warning to a physician:

> 1. the warning must adequately indicate the scope of the danger; 2. the warning must reasonably communicate the extent or seriousness of the harm that could result from misuse of the drug; 3. the physical aspects of the warning must be adequate to alert a reasonably prudent person to the danger; 4. a simple directive warning may be inadequate when it fails to indicate the consequences that might result from failure to follow it and, most importantly, in the context of the present case; 5. the means to convey the warning must be adequate.

1984-NMCA-078, ¶ 9, 684 P.2d at 1189. The Court of Appeals of New Mexico concluded that the package insert for the medication and the Physician's Desk Reference listing of "Stevens-Johnson Syndrome" in the section on allergic reactions was a prima-facie showing of adequacy. 1984-NMCA-078, ¶ 16, 684 P.2d at 1190. The plaintiff in Serna v. Roche Laboratories did not introduce "evidence which would support a factual question as to the adequacy of the warnings." 1984-NMCA-078, ¶ 16, 684 P.2d at 1190. The Court of Appeals of New Mexico stated that, if the nonmovant presents evidence of the warning's inadequacy, however, "it is improper for the court to grant summary judgment for the drug manufacturer. Here, plaintiff presented no evidence of the inadequacy of the warnings and summary judgment [wa]s proper." 1984-NMCA-078, ¶ 17, 684 P.2d at 1190. See Ackermann v. Wyeth Pharm., No. 06-41774, 2008 WL 1821379 at *3 n.5 (5th Cir. April 24, 2008)("[T]he learned-intermediary doctrine is not an affirmative defense. Under Texas law, it delineates to whom a defendant -- usually a prescription drug manufacturer -- owes the duty to warn, but it is not used to show that the plaintiff has no valid case.").

In Richards v. Upjohn Co., 1980-NMCA-062, 625 P.2d 1192, the Court of Appeals of New Mexico reversed summary judgment granted for the defendant drug company in a suit arising out of the plaintiff's personal injuries, which allegedly resulted from medical treatment by a medication that the defendant manufactured. See 1980-NMCA-062, ¶ 1, 625 P.2d at 1193. The Court of Appeals of New Mexico noted that "[p]roximate cause is a factual issue, unless all facts regarding causation are undisputed or, as a matter of law, there is an independent intervening cause." 1980-NMCA-062, ¶ 11, 625 P.2d at 1195. It further noted: "Consequently, unless, as a matter of law, 1) [the defendant]'s warnings are adequate, or 2) [the prescribing doctor]'s failure to consult the appropriate literature before prescribing the [medication] constitutes an independent intervening cause, a genuine issue of material fact exists and that precludes summary judgment." 1980-NMCA-062, ¶ 11, 625 P.2d at 1195. The Court of Appeals of New Mexico held that the plaintiff produced circumstantial evidence regarding the cause of the injury he suffered where the defendant had publicly acknowledged that the medication could cause deafness that was published in the PDR and the plaintiff demonstrated that he had a dramatic loss of hearing during the period of time he was taking the medication. See 1980-NMCA-062, ¶ 8, 625 P.2d at 1195. The Court of Appeals of New Mexico stated that "[i]t is improper for a court on summary judgment proceedings to decide that the warnings of a manufacturer of a drug that is dangerous if misused are adequate as a matter of law if evidence of inadequacy is presented." 1980-NMCA-062, ¶ 14, 625 P.2d at 1196. The Court of Appeals of New Mexico also held that "[a] doctor's negligence is not, as a matter of law, an intervening cause exonerating the drug company, if the doctor's act is reasonably foreseeable." 1980-NMCA-062, ¶ 16, 625 P.2d at 1196. The Court of Appeals of New Mexico further stated: "Although some courts have held that the inadequacy of a drug company's warnings

cannot be the proximate cause of the patient's injury when the physician failed to consult the literature or observe the warnings concerning the drug he used, . . . the better reasoned cases do not reach this result." 1980-NMCA-062, ¶ 17, 625 P.2d at 1197. In summary, the Court of Appeals of New Mexico concluded:

> The issue, is still the foreseeability of the doctors' actions. If it was foreseeable that doctors might not consult the PDR or package inserts before using [the medication], a doctor's failure to do so does not constitute an independent intervening cause relieving a drug company, whose warnings were inadequate, from liability.

1980-NMCA-062, ¶ 17, 625 P.2d at 1198.

In Thom v. Bristol-Myers Squibb Co., 353 F.3d 848 (10th Cir. 2003), the Tenth Circuit discussed the learned-intermediary doctrine in Wyoming. See 353 F.3d at 851. The Tenth Circuit noted that "[f]orty-four other jurisdictions have adopted the learned intermediary doctrine in prescription medicine cases." 353 F.3d at 852 (citing Vitanza v. Upjohn Co., 275 Conn. 365, 778 A.2d 829, 838 n.11 (2001)). The Tenth Circuit noted that it "ha[d] implied in an analogous case that Wyoming would adopt the doctrine." Thom v. Bristol-Myers Squibb Co., 353 F.3d at 852. The Tenth Circuit rejected the plaintiffs' argument that the court should not apply the learned-intermediary doctrine, because the Supreme Court of Wyoming and the Wyoming Legislature had not specifically adopted it, "despite a Wyoming district court's prediction fourteen years ago that [they] would." Thom v. Bristol-Myers Squibb Co., 353 F.3d at 852. The Tenth Circuit explained: "[S]ilence on the part of the state means only that it has not had occasion to review the matter, not that it disagrees with the federal court's interpretation of state law," Thom v. Bristol-Myers Squibb Co., 353 F.3d at 852, and stated:

> Although the Wyoming Supreme Court has not to date acknowledged the learned intermediary doctrine, neither has it denied the doctrine; it simply has not ruled on the issue. We can and must safely assume that the delay, in the grandest traditions

of all common-law courts, is due to the absence of a well presented and soundly argued case, rather than indicative of some invented implication that the doctrine does not exist.

353 F.3d at 852 (internal bracket and quotation marks omitted).

Under New Mexico law, "[i]f, in light of all the circumstances of this case, [an adequate warning] [adequate directions for use] would have been noticed and acted upon to guard against the danger, a failure to give [an adequate warning] [adequate directions for use] is a cause of injury." Civ. UJI 13-1425 (brackets in original). Civ. UJI No. 13-1424 instructs that, "[w]ith the exception of proximate cause in warning cases, treated separately under UJI 13-1425, the general tort law definition of proximate cause is applicable in products liability cases. The first paragraph of this instruction is UJI 13-308 and the comment to that instruction is applicable." Civ. UJI 13-1424, cmt. See Weitz v. Lovelace, Health Sys., Inc., 214 F.3d 1175, 1182 (10th Cir. 2000)("In the products liability context, New Mexico has evidenced its agreement with the common-sense proposition that a duty to warn does not arise where the danger is known." (citing Perfetti v. McGhan Med., 1983-NMCA-032, ¶ 20, 662 P.2d at 651 ("In this case there would be no duty to warn the [victim] if he actually knew of the danger.")))

Under New Mexico law, the adequacy of warnings are usually a question of fact. See, e.g., Wilchinsky v. Medina, 1989-NMSC-047, ¶ 18, 775 P.2d 713, 718 ("The timing and adequacy of any warnings, if given, are fact questions for the jury to decide in order to determine the proportionate fault, if any, of the physician."); Michael v. Warner/Chilcott, 1978-NMCA-043, ¶ 31, 579 P.2d 183, 187 ("In reversing the case, we held that adequacy of the warning given by a manufacturer in a negligence action presents an issue of fact for the jury. In making this determination, we said: 'The warning must adequately indicate the scope of the danger.'" (quoting

First Nat'l Bank in Albuquerque v. Nor-Am Agr. Products, Inc., 1975-NMCA-052, ¶ 51, 537 P.2d 682, 691)). The Court of Appeals of New Mexico stated in Perfetti v. McGhan Medical:

> Defendant's claim is based on the surgeon's general knowledge of the danger of deflation and that deflation could occur at any time. This mistakes the danger involved and, thus, the warning that was required. Defendant's duty was to warn of the nature and extent of the danger of a leak developing because of wear of the prosthesis at a fold resulting from capsular contracture. There was a factual question for the jury as to the surgeon's knowledge of this danger; the trial court could not have properly ruled on the surgeon's knowledge as a matter of law.

1983-NMCA-032, ¶ 22, 662 P.2d at 650.

The Tenth Circuit has granted summary judgment under similar circumstances in which the plaintiff could not prove that an alleged failure-to-warn proximately caused the injury. See, e.g., Eck v. Parke, Davis & Co., 256 F.3d 1013, 1025 (10th Cir. 2001)("The [plaintiffs] are, in turn, unable to establish that the alleged failure-to-warn of the possible adverse reactions between the drugs was the proximate cause of [plaintiff's] injuries. Accordingly, we affirm the district court's grant of summary judgment to defendants."). Courts in other jurisdictions have held that, in the context of prescription-drug-failure-to-warn cases, a manufacturer's alleged failure-to-warn cannot be said to be the proximate cause of injury if the prescribing physician had independent knowledge of the risk at issue. See, e.g., Odom v. G.D. Searle & Co., 979 F.2d 1001, 1003 (4th Cir. 1992)("Even viewing the facts most favorably to [the plaintiff], we cannot escape the district court's conclusion that [the physician] would have prescribed the [medication] no matter how carefully [the defendant] refined the phrasing of its warning."); Plummer v. Lederle Lab., 819 F.2d 349, 351, 358-59 (2d Cir. 1987)(holding that, as a matter of law, there could be no proximate cause when the physician testified that, at the time he vaccinated plaintiff's granddaughter, he knew of the information about the risks of contact polio that plaintiff claimed should have been included in the vaccine's package insert); Kirsch v. Picker Intern., Inc., 753 F.2d 670, 674 (8th Cir.

1985)(noting that, even if the manufacturer failed to warn the physician of risks associated with use of x-ray equipment, that failure could not be the cause of the patient's injuries where the physician already was aware of the risks); Stanback v. Parke Davis & Co., 657 F.2d 642, 645 (4th Cir. 1981)(upholding summary judgment on plaintiff's failure-to-warn claim where the treating physician testified that he knew of the risk of Guillain-Barre Syndrome associated with the flu vaccine, Fluogen, at the time he vaccinated the plaintiff, but that he had not found it necessary, and did not make it his practice, to advise patients about the risks associated with flu vaccinations); Hall v. Merck, Sharp & Dohme, 774 F. Supp. 604, 607 (D. Kan. 1991)(Van Bebber, J.)(explaining that, "[w]here it is uncontroverted that the prescribing physician is aware of the risks associated with a drug, courts have consistently held that a drug manufacturer is entitled to summary judgment."); Wash. St. Physicians' Ins. v. Fisons Corp., 858 P.2d 1054, 1062 (Wash. 1993)(noting that the manufacturer's failure-to-warn cannot be the proximate cause of the patient's injury if the physician was already aware of the risk involved in the use of the drug); Mowery v. Crittenton Hosp., 400 N.W.2d 633, 638 (Mich. App. 1986)(stating that the manufacturer was entitled to summary judgment because, although the prescribing physician testified that she was aware of the risk of retinal detachment from having read the medical literature, she "stated that it was worth taking the 'risks' to avoid repeated intraocular lens dislocation, endangering plaintiff's cornea. Thus, it appears that even if [the doctor] had been given additional warnings by defendants of the risk of retinal detachment, she would have chosen to prescribe [the medication] for plaintiff. There is no evidence that she would have done otherwise.").

Courts have also held that a prescription-drug manufacturer's alleged failure-to-warn a prescribing physician cannot be the proximate cause of injury unless the plaintiff can establish that

a different warning would have changed the physician's decision to prescribe the drug, i.e., that, but for the alleged inadequate warning, the physician would not have prescribed the product. See, e.g., Wheat v. Pfizer, Inc., 31 F.3d 340, 343 (5th Cir. 1994)(holding that the "[p]laintiffs must demonstrate that 'a proper warning would have changed the decision of the treating physician, i.e., that but for the inadequate warning, the treating physician would not have used or prescribed the product'" (quoting Willett v. Baxter Int'l, Inc., 929 F.2d 1094, 1099 (5th Cir. 1991))); Odom v. G.D. Searle & Co., 979 F.2d at 1003-04 (upholding summary judgment where the prescribing physician testified that a different warning would not have changed his decision to prescribe an intrauterine device); Plummer v. Lederele Labs., 819 F.2d at 358 (holding that there was no proximate cause in absence of evidence that different warning would have caused physician to act differently); Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365, 370 (N.D. Ill. 1998)(Aspen, C.J.)("In a prescription drug failure-to-warn case, the plaintiff must establish that an adequate warning would have convinced the treating physician not to prescribe the product for the plaintiff.")(internal quotation marks omitted); In re Norplant Contraceptive Prods. Liab. Litig., 955 F. Supp. at 710 (stating that the plaintiffs have the burden of proving that a different warning would have changed the decision of the prescribing physician); Krasnopolsky v. Warner-Lambert Co. 799 F. Supp. 1342, 1347 (E.D.N.Y. 1992)(noting that any alleged inadequacy of the manufacturer's warning was not, as a matter of law, the proximate cause of the plaintiff's injuries where the physician testified he would have prescribed the drug even if the warnings had been different); Windham v. Wyeth Lab., Inc., 786 F. Supp. 607, 612 (S.D. Miss. 1992)(Pickering, J.)(granting summary judgment on failure-to-warn claim where the prescribing physician testified that he still would have prescribed a medication even if he had received additional information);

Thomas v. Hoffman-La Roche, Inc., 731 F. Supp. 224, 229 (N.D. Miss. 1989)(Davidson, J.)("A plaintiff in a prescription drug products liability case has the burden of proving that an adequate warning to the prescribing physician would have altered the physician's conduct."); Mascarenas v. Union Carbide Corp., 492 N.W.2d 512, 517 (Mich. App. 1992)("To establish a prima facie case that a manufacturer's breach of its duty to warn was a proximate cause of an injury sustained, a plaintiff must present evidence that the product would have been used differently had the warnings been given."); Vaughn v. G.D. Searle and Co., 536 P.2d 1247, 1250-51 (Or. 1975)(holding that, where a different warning would not have changed doctor's behavior, the plaintiff could not establish proximate cause).

There are exceptions to the learned-intermediary doctrine, even in jurisdictions that recognize it. Restatement (Third) of Torts § 6(d) provides:

> (d) A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to:
>
> > (1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings; or
> >
> > (2) the patient when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings.

Restatement (Third) of Torts § 6(d)(1)-(2). The Supreme Court of New Mexico has cited favorably to the Restatement (Third) of Torts. See, e.g., Baldonado v. El Paso Nat'l Gas Co., 2008-NMSC-005, ¶ 14, 176 P.3d 277, 281; Payne v. Hall, 2006-NMSC-029, ¶ 14, 137 P.3d 599, 604; Berlangieri v. Running Elk Corp., 2003-NMSC-024, ¶ 18, 76 P.3d 1098, 1104. Comment e to § 6 of the Restatement (Third) of Torts provides:

Warnings and instructions with regard to drugs or medical devices that can be sold legally only pursuant to a prescription are, under the "learned intermediary" rule, directed to health-care providers. Subsection (d)(2) recognizes that direct warnings and instructions to patients are warranted for drugs that are dispensed or administered to patients without the personal intervention or evaluation of a health-care provider. An example is the administration of a vaccine in clinics where mass inoculations are performed. In many such programs, health-care providers are not in a position to evaluate the risks attendant upon use of the drug or device or to relate them to patients. When a manufacturer supplies prescription drugs for distribution to patients in this type of unsupervised environment, if a direct warning to patients is feasible and can be effective, the law requires measures to that effect.

Although the learned intermediary rule is generally accepted and a drug manufacturer fulfills its legal obligation to warn by providing adequate warnings to the health-care provider, arguments have been advanced that in two other areas courts should consider imposing tort liability on drug manufacturers that fail to provide direct warnings to consumers. In the first, governmental regulatory agencies have mandated that patients be informed of risks attendant to the use of a drug. A noted example is the FDA requirement that birth control pills be sold to patients accompanied by a patient package insert. In the second, manufacturers have advertised a prescription drug and its indicated use in the mass media. Governmental regulations require that, when drugs are so advertised, they must be accompanied by appropriate information concerning risk so as to provide balanced advertising. The question in both instances is whether adequate warnings to the appropriate health-care provider should insulate the manufacturer from tort liability.

Those who assert the need for adequate warnings directly to consumers contend that manufacturers that communicate directly with consumers should not escape liability simply because the decision to prescribe the drug was made by the health-care provider. Proponents of the learned intermediary rule argue that, notwithstanding direct communications to the consumer, drugs cannot be dispensed unless a health-care provider makes an individualized decision that a drug is appropriate for a particular patient, and that it is for the health-care provider to decide which risks are relevant to the particular patient. The Institute leaves to developing case law whether exceptions to the learned intermediary rule in these or other situations should be recognized.

When the content of the warnings is mandated or approved by a governmental agency regulation and a court finds that compliance with such regulation federally preempts tort liability, then no liability under this Section can attach.

Restatement (Third) of Torts § 6 cmt. e.

## NEW MEXICO LAW REGARDING PUNITIVE DAMAGES

"Punitive damages 'are not compensation for injury.'" Gonzales v. Surgidev Corp., 1995-NMSC-047, ¶ 12, 899 P.2d 594, 597 (quoting State v. Powell, 1992-NMCA-086, ¶ 13, 839 P.2d 139, 144). "Punitive damages do not measure a loss to the plaintiff, but rather punish the tortfeasor for wrongdoing and serve as a deterrent." Sanchez v. Clayton, 1994-NMSC-064, ¶ 11, 877 P.2d 567, 572. "Punitive damages may not be awarded unless there is an underlying award of compensation for damages." Gonzales v. Surgidev Corp., 1995-NMSC-047, ¶ 12, 899 P.2d at 597 (citing NMRA, Rule 13-1827). "Punitive damages serve two important policy objectives under our state common law: to punish reprehensible conduct and to deter similar conduct in the future." Akins v. United Steel Workers of Am. Local 187, 2010-NMSC-031, ¶ 20, 237 P.3d 744, 749 (citing Bogle v. Summit Inv. Co., 2005-NMCA-024, ¶ 34, 107 P.3d 520, 531). "[T]he award of punitive damages requires a culpable mental state because such damages aim to punish and deter 'culpable conduct beyond that necessary to establish the underlying cause of action.'" Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d 1136, 1152 (quoting Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 56, 40 P.3d 449, 461). "New Mexico recognizes that, although punitive damages are not normally available for a breach of contract, a plaintiff may recover punitive damages when a defendant's breach was 'malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights.'" Anderson Living Tr. v. ConocoPhillips Co., 952 F. Supp. 2d at 1046 (citing Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d 992, 998).

In determining punitive-damage awards, New Mexico courts apply a preponderance-of-the-evidence standard. See Jessen v. Nat'l Excess Ins., 1989-NMSC-040, ¶ 15, 776 P.2d 1244, 1247-48 (citing United Nuclear Corp. v. Allendale Mut. Ins., 1985-NMSC-090, ¶¶ 14, 89, 709 P.2d 649, 653, 666). "To be liable for punitive damages, a wrongdoer must have some culpable mental state and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d at 14 (citations omitted)(citing McGinnis v. Honeywell, Inc., 1990-NMSC-043, ¶ 31, 791 P.2d 452, 460; Loucks v. Albuquerque Nat'l Bank, 1996-NMSC-176, ¶ 48, 418 P.2d 191, 199). Factors to be weighed in assessing punitive damages are the enormity and nature of the wrong, and any aggravating circumstances. See Green Tree Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d 84, 87 (citing Sweitzer v. Sanchez, 1969-NMCA-055, ¶ 26, 456 P.2d 882, 886). Punitive damages may be imposed "when a party intentionally or knowingly commits wrongs," or "when a defendant is utterly indifferent to the plaintiff's rights, even if the defendant lacked actual knowledge that his or her conduct would violate those rights." Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152 (citing NMRA, Rule 13-1827; Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d 115, 125-26). "Recklessness requires indifference to the rights of the victim, rather than knowledge that the conduct will violate those rights." Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d at 125 (citing Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d 386, 397). "Recklessness in the context of punitive damages refers to 'the intentional doing of an act with utter indifference to the consequences.'" Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397 (quoting NMRA, Rule 13-1827). "The degree of the risk of danger involved in the activity in question is a relevant factor in

determining whether particular conduct rises to the level of recklessness." <u>Torres v. El Paso Elec. Co.</u>, 1999-NMSC-029, ¶ 28, 987 P.2d at 397. "A defendant does not act with reckless disregard to a plaintiff's rights merely by failing 'to exercise even slight care,' absent the requisite 'culpable or evil state of mind.'" <u>Anderson Living Tr. v. ConocoPhillips Co.</u>, 952 F. Supp. 2d at 1031 (quoting <u>Paiz v. State Farm Fire & Cas. Co.</u>, 1994-NMSC-079, ¶ 26, 880 P.2d at 308). The Court has previously addressed punitive damages under New Mexico law in various situations. <u>See</u>, <u>e.g.</u>, <u>Rimbert v. Eli Lilly & Co.</u>, 577 F. Supp. 2d at 1242 (holding a genuine issue of material fact on punitive damages existed where a party had "demonstrated that persons at Eli Lilly may have been aware of a problem, perceived or actual, linking Prozac with increased suicidality and violence"); <u>Applied Capital, Inc. v. Gibson</u>, 558 F. Supp. 2d 1189, 1196 (D.N.M. 2007)(Browning, J.)(granting punitive damages where the defendant "intentionally deceived Applied Capital, misrepresenting Legato Staffing's financial resources and creditworthiness, the existence of the rig, and the bona fides of the transaction generally"); <u>Faniola v. Mazda Motor Corp.</u>, No. CIV 02-1011 JB/RLP, 2004 WL 1354469, at *1, *6 (D.N.M. April 30, 2004)(Browning, J.)(noting that "a reasonable factfinder could [not] find that Mazda had a culpable mental state in designing [a] fuel tank" when "Mazda's design was and is accepted in the industry," and the design met "federal safety standards," although the facts showed that "[t]he brake shoe rotated under Faniola's vehicle, striking several places, and punctured her gas tank," causing the car to catch fire).

While the Supreme Court of New Mexico has not addressed punitive damages arising from automobile accidents, the Court of Appeals of New Mexico has upheld punitive damages awards when drivers used alcohol or drugs, drove while intoxicated and suffering from an extreme lack of

sleep, and drove erratically or far beyond the speed limit.  See DeMatteo v. Simon, 1991-NMCA-027, 812 P.2d 361; Svejcara v. Whitman, 1971-NMCA-093, 487 P.2d 167; Sanchez v. Wiley, 1997-NMCA-105, 946 P.2d 650.  In Svejcara v. Whitman, the Court of Appeals of New Mexico upheld a jury's punitive damages award:

> Defendant was driving in a reckless manner while intoxicated.  He turned into slow moving on-coming traffic.  He stated he was traveling three miles per hour and yet the force of his car's impact spun plaintiffs' car almost 90 degrees, blew out the left rear tire, bent the left rear wheel, ruptured the gas tank, and bent the left rear door and fender for a total damage exceeding $1,000.00.  The collision caused both plaintiffs to receive personal injuries some of which are permanent and disabling.

1971-NMCA-093, ¶ 21, 487 P.2d at 170.  The Court of Appeals of New Mexico likewise upheld a jury's award in DeMatteo v. Simon, wherein the party "drove three to four hours the day before the accident, slept about five hours in his car, remained awake for the next twenty hours immediately prior to the accident, and then consumed marijuana shortly before the accident allowed the jury to conclude that punitive damages were warranted."  1991-NMCA-027, ¶ 7, 812 P.2d at 364.  In Sanchez v. Wiley, the Court of Appeals of New Mexico reversed a directed verdict for the defendant, because, as the defendant "appeared to be under the influence of alcohol immediately following the accident," a jury could reasonably award punitive damages.  1997-NMCA-105, ¶ 16, 946 P.2d at 655.

The Court predicts that the Supreme Court of New Mexico would agree with these Court of Appeals of New Mexico cases.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1224-25.  The Supreme Court of New Mexico has made clear that utter indifference is sufficient for awarding punitive damages, and the risks, even if not the certainty that a harm will occur, associated with excessive speed, erratic driving, and alcohol and drugs while driving are both known and high.  See, e.g., Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346

P.3d at 1152; Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397; Green Tree

Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d at 87. Further, the Supreme Court of

New Mexico considers a party's knowledge of and failure to follow state law when upholding

punitive damages awards. See Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 21, 881 P.2d at 16

("Ferrellgas employees testified that they knew of the state laws that required them to install a

vapor barrier and to properly vent the trunk of the car when they installed the tank. . . . There is

no question that they did not comply with these requirements."). In DeMatteo v. Simon, Svejcara

v. Whitman, and Sanchez v. Wiley, the drivers using substances, speeding, and driving erratically

egregiously violated well-established and understood driving rules and norms, which, like failing

to follow the regulations for installing propane tanks, accompany "high risk[s] of harm." Clay v.

Ferrellgas, Inc., 1994-NMSC-080, ¶ 24, 881 P.2d at 17.

## ANALYSIS

The Court will grant the MTD and dismiss the case with prejudice. The Court concludes

that Nowell's warranty claims are untimely, because Nowell alleges that her physician used the

Defendants' defective product to repair her hernia on October 27, 2010, but Nowell did not file

her original Complaint until October 5, 2017, almost three years after the expiration of the four-

year statute of limitations that governs express- and implied-warranty claims. See N.M. Stat. Ann.

§ 55-2-725(1). The Court also concludes that Nowell's negligence and strict liability claims are

untimely, because the Amended Complaint indicates that Nowell was aware of cognizable tort

injuries between April, 2011, and March, 2014, but did not file her original Complaint until

October 5, 2017, after the three-year statute of limitations governing negligence and strict liability

claims had expired. See N.M. Stat. Ann. § 37-1-8. Furthermore, the Court concludes that the

Amended Complaint's factual allegations lack specificity sufficient to satisfy the pleading standard articulated in Bell Atlantic Corp. v. Twombly: (i) Nowell's negligence claim does not plead facts which suggest that the Defendants' mesh caused her injury; (ii) Nowell's strict liability claims do not allege any specific defect -- in either design, manufacture, or warning -- that made the Defendants' product unreasonably dangerous and caused her injuries; (iii) Nowell has not alleged that a feasible alternative design exists which lacks the alleged design defect and that therefore would have prevented her injuries; (iv) Nowell does not allege a single affirmation or representation that could support her express-warranty claim; (v) Nowell does not allege with specificity a defect that rendered the Defendants' product sufficiently unfit for its particular purpose or sufficiently unmerchantable to support her claim for breach of implied warranty; (vi) Nowell has not alleged facts sufficient to support a finding that the Defendants' conduct maliciously, intentionally, fraudulently, oppressively, recklessly, or wantonly offended Nowell's rights such that Nowell is entitled to punitive damages. Accordingly, the Court grants the MTD.

I.      **THE APPLICABLE STATUTES OF LIMITATIONS BAR NOWELL'S WARRANTY, NEGLIGENCE, AND STIRCT-LIABILITY CLAIMS.**

Nowell's warranty, negligence, and strict-liability claims are untimely, because she filed her original Complaint almost three years after the expiration of the four-year statute of limitations period that governs express and implied warranty claims, and almost four years after the three-year limitations period that governs negligence and strict-liability claims. Furthermore, the discovery rule does not toll the applicable statutes of limitations, because the rule does not apply to warranty claims, and because Nowell had a cognizable tort injury over three years before she filed her negligence and strict-liability claims. The Court therefore dismisses Nowell's claims pursuant to rule 12(b)(6).

**A.** **NOWELL'S WARRANTY CLAIMS ARE UNTIMELY, BECAUSE SHE FILED THESE CLAIMS OUTSIDE THE FOUR-YEAR STATUTE OF LIMITATIONS PERIOD.**

The Defendants argue that the UCC's four-year limitations period bars Nowell's breach-of-implied and express-warranty claims, because Nowell's physician implanted the Defendants' mesh in Nowell's abdomen on October 27, 2010, but Nowell did not assert these claims until October 5, 2017. See MTD at 7 (citing Amended Complaint ¶ 38, at 8). At the August 10, 2018, hearing, Nowell conceded that the UCC's statute of limitations bars her express warranty claim, see Tr. at 6:14-17 (Montclare); however, she maintains that the discovery rule tolls the limitations period for her implied warranty claim, because she did not discover that the Defendants' mesh was causing her injury until October 8, 2014, when Dr. Pollard advised her "for the first time that there was a problem with the mesh and that it had to be removed," MTD Response at 12-13. The Defendants assert that the discovery rule is inapplicable and thus cannot save Nowell's claims. See MTD Reply at 2.

The Court agrees with the Defendants that the statute of limitations bars Nowell's claims for breach of express and implied warranty. Pursuant to New Mexico's UCC, warranty claims are subject to a four-year statute of limitations. See N.M. Stat. Ann. § 55-2-725; Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d at 1156 ("The Supreme Court of New Mexico has concluded that the UCC's four-year statute of limitations 'governs actions for breach of warranty seeking personal injury damages.'" (quoting Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 47, 357 P.3d at 948)). Moreover, such claims accrue when a given product is delivered. See N.M. Stat. Ann. § 55-2-725; AIG Aviation Ins. v. Avco Corp., 709 F. Supp. 2d at 1131-32 ("[A]ctions for breach of warranty must be brought within four years of delivery."). Here, Nowell alleges that Dr. Pollard used the Defendants' mesh to repair her hernia on October 27, 2010, which

effected the product's delivery to Nowell.  See Amended Complaint ¶ 38, at 8.  Nowell did not

assert, however, her warranty claims until October 5, 2017, when she filed her original Complaint,

which is almost seven years from the effective delivery date.  See Amended Complaint ¶ 38, at 8.

Hence, absent tolling, Nowell's warranty claims are time-barred.

The Court further agrees with the Defendants that the discovery rule cannot save Nowell's

breach of implied warranty claim.  Section 55-2-725 describes the discovery rule's role in the

breach of warranty context:

> A breach of warranty occurs when tender of delivery is made, <u>except that where a</u>
> <u>warranty explicitly extends to future performance of the goods and discovery of the</u>
> <u>breach must await the time of such performance,</u> the cause of action accrues when
> the breach is or should have been discovered.

N.M. Stat. Ann. § 55-2-725 (emphasis added).  The Court agrees with the Honorable Bruce Black,

former United States District Judge for the District of New Mexico, in his assertion that "[i]mplied

warranties, like those at issue here, do not explicitly guarantee future performance."  <u>AIG Aviation</u>

<u>Ins. v. Avco Corp.</u>, 709 F. Supp. 2d at 1131-32.  Hence, because Nowell's Amended Complaint

does not assert that the Defendants explicitly extended their warranty to future performance,

Nowell cannot rely on the discovery rule to toll the limitations period.

### B.  NOWELL'S NEGLIGENCE AND STRICT-LIABILITY CLAIMS ARE UNTIMELY, BECAUSE SHE FILED THESE CLAIMS OUTSIDE THE THREE-YEAR STATUTE OF LIMITATIONS PERIOD.

The Defendants contend that Nowell's negligence and strict-liability claims are likewise

untimely, because such claims are subject to a three-year statute of limitations and because the

Amended Complaint alleges cognizable tort injures that occurred more than three years before

October 5, 2017, when Nowell filed her original Complaint.  See MTD at 9.  Nowell asserts that

the discovery rule tolls the limitations period, because she did not discover that the Defendants'

mesh was causing her injury until October 8, 2014, when Dr. Pollard for the first time advised her

otherwise. <u>See</u> MTD Response at 12-13. The Defendants insist that tolling is unavailable to

Nowell, because her Amended Complaint does not allege "reasonable diligence" sufficient "to

'establish[] a factual basis for tolling' pursuant to the discovery rule." MTD at 9 (alteration in

MTD)(quoting <u>Andrew v. Schlumberger Tech. Corp.</u>, 808 F. Supp. 2d at 1292).

The Court agrees with the Defendants that the statute of limitations bars Nowell's

negligence and strict liability claims. Section 37-1-8 subjects claims sounding in tort to a three-

year statute of limitations. <u>See</u> N.M. Stat. Ann. § 37-1-8 ("Actions must be brought . . . for an

injury to the person or reputation of any person, within three years."). Pursuant to the discovery

rule, a tort claim accrues at "the time of the injury not the time of the negligent act." <u>N.M. Elec.</u>

<u>Serv. Co. v. Montanez</u>, 1976-NMSC-028, ¶ 13, 551 P.2d 634, 637). Moreover, "[a] plaintiff's

cause of action accrues when he or she understands the nature of his or her injury; that is, when

the plaintiff knows or with reasonable diligence should have known of the injury and its cause."

<u>Maestas v. Zager</u>, 2007-NMSC-003, ¶ 22, 152 P.3d at 148. The Court previously has noted that,

"[s]pecifically, [the] statute of limitations commences when an 'injury manifests itself and is

ascertainable.'" <u>Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley</u>, 727 F. Supp. 2d at 1264

(quoting <u>Maestas v. Zager</u>, 2007-NMSC-003, ¶ 13, 152 P.3d at 145). Here, Nowell's Amended

Complaint alleges that, subsequent to Nowell's October 27, 2010, hernia repair surgery, the

Defendants' mesh began to "pull away from the actual edges," and on April 27, 2011, Nowell had

a second surgery wherein Dr. Pollard used additional sutures to reinforce the existing Parietex

mesh. Amended Complaint ¶ 38, at 31. This assertion thus indicates that Nowell was aware of a

potential problem with the Defendants' mesh seven years before she filed her original Complaint.

Nowell further asserts that, at some point during the three years that followed the April, 2011, surgery, she began to experience "symptoms including but not limited to exhaustion and pain in the area of the mesh."  Amended Complaint ¶ 38, at 8.  These symptoms compelled Nowell to undergo a CT scan on March 1, 2014, which revealed "cysts in the area associated with the mesh."  Amended Complaint ¶ 38, at 31.  That Nowell's symptoms were proximate to the Defendants' mesh and suitably painful to warrant medical attention indicates that she was aware of injury sufficient to start the three years limitations period.

Although Nowell concedes that she was skeptical about the mesh's safety before October 8, 2014, she nevertheless asserts that the discovery rule tolls the limitations period, because she relied on Dr. Pollard's opinion that the mesh was not her symptoms' source and therefore did not discover that the Defendants' mesh was causing her injury until October 8, 2014, when Dr. Pollard advised her "for the first time that there was a problem with the mesh and that it had to be removed."  MTD Response at 12-13.  Hence, Nowell argues that it would have been unreasonable for her to assume that the mesh was the cause of her symptoms until October 8, 2014.[21]  See MTD

---

[21]Attached to the MTD Response are three exhibits which Nowell argues support her position that she acquired "sufficient knowledge to pursue a cause of action" only on October 8, 2014.  MTD Response at 14.  Nowell adds that, although she has "presented matters outside the pleadings," the exhibits rebut the Defendants' assertion that "uncontroverted facts" show that Nowell filed her claim outside the statute of limitations.  MTD Response at 14 (quoting MTD at 6).  Nowell requests that, should the Court consider her exhibits, the Court treat the MTD as a motion for summary judgment pursuant to rule 12(d) of the Federal Rules of Civil Procedure.  See MTD Response at 15 (citing Fed. R. Civ. P.  12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")).  The Defendants contend that the Court cannot consider Nowell's exhibits, see MTD Reply at 3 (citing Great Am. Ins. Co. v. Crabtree, 2012 WL 3656500, at *21 (citing Casanova v. Ulibarri, 595 F. 3d at 1125), but even if it could, "they do not address the fact that she was on discovery notice prior to the expiration of the statute of limitations in October 2013," MTD Reply at 4.

Generally, a complaint's sufficiency must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125; Gossett v. Barnhart, 139 F. App'x at 24 ("In ruling on a motion to

Response at 13-14.  Further support for this position, Nowell asserts, is seen in <u>Martinez v. Showa Denko, K.K.</u>, wherein the Court of Appeals of New Mexico stated that, under the discovery rule, the statute of limitations is triggered when the plaintiff "'acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action.'"  MTD Response at 13 (quoting <u>Martinez v. Showa</u>

dismiss, the district court is limited to the facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in <u>Carter v. Daniels</u>, stated: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint." <u>Carter v. Daniels</u>, 91 F. App'x at 85.  Moreover, the Court will not convert the MTD to a motion for summary judgment, as rule 12(d) would require if the Court intends to rely on Nowell's exhibits.  <u>See</u> Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); <u>GFF Corp. v. Associated Wholesale Grocers, Inc.</u>, 130 F.3d 1381, 1384 (10th Cir. 1997).  <u>See</u> <u>also</u> <u>Swoboda v. Dubach</u>, 992 F.2d 286, 290 (10th Cir. 1993).  In <u>Great American Insurance Co.  v. Crabtree</u>, the Court ruled that, when determining whether a statute of limitations has run in an action alleging fraud and seeking subrogation from a defendant, it may not use interviews and letters attached to a motion to dismiss which evidence that the plaintiff was aware of the defendant's alleged fraud before the statutory period expired. <u>See</u> <u>Great Am. Ins. Co.  v. Crabtree</u>, 2012 WL 3656500, at *3, *22-23.  Thus, the Court cannot consider the exhibits if it continues to treat the Defendants' MTD as motion to dismiss.  And unless the Court converts the MTD into a motion for summary judgment, the Court cannot properly consider these documents.

Nevertheless, the Court's review of these three documents would not change the Court's result.  Indeed, they show that the Court is on firm ground in not granting leave to amend and to deny the warranty claims with prejudice.  Therefore, even if the Court looks at the first two exhibits, a CT scan and Dr. Pollard's physician's notes, and the third exhibit, the Nowell Affidavit, in which Nowell alleges that Dr. Pollard told her that the pain in the area around her mesh did not relate to the mesh itself, these documents do not save Nowell's time-barred claims, because the first two exhibits relate to Nowell's 2014 surgery, which occurred after the statute of limitations had run, and because Dr. Pollard's diagnosis either was true, which would negative Nowell's claims, or was a misdiagnosis, which would not relieve Nowell of her responsibility to pursue her symptom's cause.  <u>See</u> <u>Robinson v. BNSF R. Co.</u>, 2012 WL 4747155, at *4 ("[A] misdiagnosis does not relieve a patient of all responsibility in pursuing the cause of her symptoms, and continued reliance on a misdiagnosis in the face of contrary evidence may be unreasonable.").  Nowell cannot rely on Dr. Pollard's misdiagnosis to toll her claims, because she "affirmatively alleges" that she had surgery to repair the mesh within a year of its implantation and that she continued to suffer pain in the area around the mesh for three additional years.

Denko, K.K., 1998-NMCA-111, ¶ 24, 964 P.2d at 182).  Nowell adds that the October 6, 2014,

CT scan informed Dr. Pollard's decision to remove the mesh.  See MTD Response at 13.  These

averments do not persuade the Court.  Once Nowell began to experience pain and discomfort

following her April, 2011, surgery, either she knew enough to allege that Defendant's mesh caused

those injuries, or she had a "duty to inquire into" the cause.  Butler v. Deutsche Morgan Grenfell,

Inc., 2006-NMCA-084, ¶ 34, 140 P.3d 532, 540 ("[T]he awareness of an injury creates a duty to

inquire into its causes.").[22]  Moreover, Nowell's reliance on Martinez v. Showa Denko, K.K., is

misplaced.  The plaintiff in Martinez v. Showa Denko, K.K. brought a products liability action

against a dietary supplement manufacturer after experiencing flu-like symptoms, memory loss,

and fatigue, which she attributed to the defendant's product.  See Martinez v. Showa Denko, K.K.,

1998-NMCA-111, ¶ 2, 964 P.2d at 177.[23]  The plaintiff did not file her claim until six years after

first experiencing these symptoms, which she subsequently attributed to lupus after consulting

with her physician.  See Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 6, 964 P.2d at 177.

In reversing the district court's denial of the defendant's summary judgment motion on statute of

---

[22]The Court predicts that the Supreme Court of New Mexico would agree with Butler v. Deutsche Morgan Grenfell, Inc.'s proposition that awareness of an injury creates a duty to inquire into the injury's cause, based on the Supreme Court of New Mexico statement in McNeill v. Burlington Resources Oil & Gas Co., 2008-NMSC-022, 182 P.3d 121: "In New Mexico, a cause of action arises when 'the plaintiff discovers or with reasonable diligence should have discovered that a claim exists.'"  McNeill v. Burlington Res. Oil & Gas Co., 2008-NMSC-022, ¶ 37, 182 P.3d at 130 (quoting Williams v. Stewart, 2005-NMCA-061, ¶ 12, 112 P.3d 281, 285).

[23]The Court predicts that the Supreme Court of New Mexico would agree with Martinez v. Showa Denko, K.K.'s proposition that divergent medical opinions concerning an injury's cause will not toll the statute of limitations, because the Supreme Court of New Mexico stated the same proposition in Maestas v. Zager ("[I]f 'the plaintiff knows or should have reasonably known of the general nature and extent of an injury, the running of a statute of limitations is not delayed if there are differing medical opinions regarding whether the plaintiff has incurred a particular medical condition.'" (quoting Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 24, 964 P.2d at 182)).

limitations grounds, the Court of Appeals of New Mexico noted that the plaintiff could not rely on her physician's misdiagnosis to toll the limitations period:

> As a general rule, the mere fact that there is a divergence of medical opinions among physicians concerning the cause of an individual's ailment does not preclude or toll the running of the statute of limitations. As observed in *American Law of Products Liability 3d, supra* § 47:42, at 75, if "the plaintiff knows or should have reasonably known of the general nature and extent of an injury, the running of a statute of limitations is not delayed if there are differing medical opinions regarding whether the plaintiff has incurred a particular medical condition." Although we are sympathetic to Plaintiff's situation, nothing in the discovery rule serves to suspend the running of the statute of limitations merely because there are divergent medical opinions concerning the nature or cause of her illness or injuries.

Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 24, 964 P.2d at 182. The Court of Appeals of New Mexico then quoted from the Court of Appeals of Texas' opinion in Bell v. Showa Denko K.K., 899 S.W.2d 749 (Tex. Ct. App. 1995), which observed that the discovery rule's reasonable diligence requirement "is so because the knowledge of such matters is, in the law, equivalent to knowledge of the cause of action itself for limitation purposes." Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 24, 964 P.2d at 182 (quoting Bell v. Showa Denko K.K., 899 S.W.2d at 754). Nowell's Amended Complaint is devoid of allegations that, had Nowell "diligently investigated the problem[,] she would have been unable to discover the cause of her injury." Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 22, 964 P.2d at 180. Instead, Nowell asserts that the discovery rule permitted her to wait until Dr. Pollard informed her that "there was a problem with the mesh and that it had to be removed." Amended Complaint ¶ 38, at 8. Nowell's reliance on her physician's conclusion cannot support a reasonable diligence finding, particularly in light of Nowell's factual assertions regarding her April, 2011, surgery and subsequent "pain in the area of the mesh." Amended Complaint ¶ 38, at 8. The Court therefore concludes that Nowell's failure to allege "reasonable diligence" precludes the discovery rule's application. Without the benefit of

tolling, Nowell's negligence and strict liability claims are untimely and warrant dismissal pursuant to rule 12(b)(6).

## II.    NOWELL'S AMENDED COMPLAINT DOES NOT STATE PLAUSIBLE NEGLIGENCE, STRICT-LIABILITY, AND WARRANTY CLAIMS AGAINST DEFENDENTS.

Nowell's negligence, strict liability, and warranty claims assert only generalized allegations and not facts sufficient to survive analysis pursuant to rule 12(b)(6).  When reviewing a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint."  Bell Atl. Corp. v. Twombly, 550 U.S. at 572.  The Court will not dismiss any claims pursuant to rule 12(b)(6) unless Nowell has failed to plead facts sufficient to state a facially plausible claim to relief.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570.  To state a plausible claim, Nowell must provide "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which is a standard that requires "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. at 678.  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  Applying those standards here, Nowell's claims fail as a matter of law: (i) Nowell's negligence claim does not plead facts which suggest that Defendants' mesh caused her injury; (ii) Nowell's strict liability claims do not allege any specific defect -- in either design, manufacture, or warning -- that made Defendants' product unreasonably dangerous, and caused her injury; moreover, Nowell has not alleged that a feasible alternative design existed which lacked the alleged design defect and that therefore would have prevented her injuries; (iii) Nowell does not allege with specificity a defect that rendered Defendants' product sufficiently unmerchantable to support her claim for breach of

implied warranty; and (iv) Nowell has not alleged facts sufficient to support a finding that Defendants' conduct maliciously, intentionally, fraudulently, oppressively, recklessly or wantonly offended Nowell's rights such that Nowell is entitled to punitive damages. Accordingly, the Court grants the MTD pursuant to rule 12(b)(6).

### A. NOWELL'S NEGLIGENCE CLAIM DOES NOT STATE A CAUSAL CONNECTION BETWEEN HER INJURIES AND THE DEFENDANTS' MESH.

The Defendants contend that, assuming they owed Nowell a duty, the Amended Complaint does not plead facts that allege a breach of that duty or proximate causation, as New Mexico law requires to support a negligence claim. See MTD at 10. Nowell insists that the Amended Complaint asserts each of the elements of a "claim[] sounding in common law negligence." MTD Response at 5. The Defendants maintain that the Amended Complaint does not identify any well-pled facts which suggest that the Defendants breached a duty that caused Nowell's injuries. See MTD Reply at 6.

The Court agrees that Nowell has not pled facts sufficient to support a negligence claim. "Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d at 185-86. "A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It is sufficient if it occurs with some

other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. Nowell's negligence claim requires her to prove that the Defendants' mesh caused her injuries. Nowell asserts that the Amended Complaint establishes "a causal connection between the Defendants' conduct and her injuries" in paragraphs 22, 23, 36, 38 through 40, 46, and 49 through 51. MTD Response at 5-6. The Court does not agree with Nowell. Ignoring conclusory assertions and recitations of legal standards, the Amended Complaint does not allege any facts that plausibly establish a connection between Nowell's injuries and the Defendants' mesh. Paragraphs 22 and 23 describe "common injuries caused by hernia surgeries," and do not reference either Nowell or the Defendants' mesh. Amended Complaint ¶¶ 22-23, at 5. Paragraph 36 asserts that MAUDE[24] reports document "serious malfunctions" with the Defendants' mesh, but neither describes the malfunctions nor connects the malfunctions to Nowell. Amended Complaint ¶ 36, at 5. Paragraph 38 describes Nowell's hernia repair surgeries and subsequent remedial procedures, and asserts:

> On October 8, 2014, in clinic Dr. Powell advised Ms. Nowell that there was no choice but to remove the Parietex mesh and replace it with a biological mesh. . . . It at was at this discussion that Ms. Nowell was told by the doctor that there was a problem with the mesh itself.

Amended Complaint ¶38, at 8. This paragraph does not include facts which infer that the Defendants' mesh caused Nowell's infection. Presumably, Dr. Pollard's purported "problem" was that the mesh was "infected and disintegrated (unincorporated)"; however, nowhere in this

---

[24]"MAUDE" refers to the "Manufacturer and User Facility Device Experience," which is a database that, according to the FDA, "houses medical device reports submitted to the FDA by mandatory reporters (manufacturers, importers and device user facilities) and voluntary reporters such as health care professionals, patients and consumers." MAUDE, FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm#fn1 (last visited March 1, 2018).

paragraph does Nowell allege facts to suggest that the opposite conclusion, i.e., that infection caused the mesh to disintegrate, is any less likely than her theory. Amended Complaint ¶ 38, at 8. Paragraph 39 describes Nowell's injuries but does not suggest a means through which they occurred. See Amended Complaint ¶ 39, at 9. Paragraph 39 also discusses Nowell's three scientific articles, none of which, the Court concludes, support Nowell's assertion "that the type of material that was used in Parietex mesh caused infection and disintegration which resulted in pain, exhaustion, and other injuries" or "that the type of surgical mesh as Parietex causes similar injuries as those sustained by Ms. Nowell." Amended Complaint ¶ 39, at 9-10. Instead, the articles merely highlight underlying risks common to all hernia repair surgeries. See supra n.1. For example, the first article, "Central Failures of Lightweight Monofilament Polyester Mesh Causing Hernia Recurrence: A Cautionary Note," examines "Parietex TCM," and its potential for tearing in thirty-six patients but asserts no causal connection to Nowell's main injury, that is, infection. See Petro et al., supra, at 155. Moreover, although the authors conclude that Parietex TCM "appears to have a high incidence of mechanical failure in the context of open incisional hernia repair," they add that "this limitation may ultimately be revealed as a weakness of all lightweight mesh." See Petro et al., supra, at 155. Additionally, although the second article, "Postoperative Mesh Infection -- Still a Concern in Laparoscopic Era," states that "the use of synthetic mesh can be complicated by infection," it lists a number of factors influencing mesh infection, including smoking, prior infection at the surgical site, and failure to maintain the surgical site's sterility. Narkhede et. al., supra, at 324-26. The third article, "Novel in Vitro Model for Assessing Susceptibility of Synthetic Hernia Repair Meshes to Staphylococcus aureus Infection Using Green Fluorescent Protein-labeled Bacteria and Modern Imaging Techniques," studies "Parietex

Composite" and concludes that "[a] multifilament woven mesh (PE) had the highest degree of biofilm formation"; it does not suggest a causal link between a potential defect in the Defendants' mesh and Nowell's injuries. Ihab F. Halaweish et. al., supra, at 449. None of the articles demonstrate or even suggest that the Defendants' Parietex Composite Mesh caused Nowell's injury, or provide any factual support for Nowell's assertion that these articles prove that defendants' mesh "causes harmful bacterial infections." Amended Complaint ¶ 39, at 10.

Paragraph 40 includes two unsupported conclusions: that the mesh's "physical structure" "caused trauma to Plaintiff's abdomen as it repeatedly came in contact with it," and that "the composition of the mesh itself caused and exacerbated infection since the materials used to construct the mesh were not chemically compatible to the Defendant's tissue." Amended Complaint ¶ 40, at 11. Notably, Nowell describes neither the chemical composition that led to the incompatibility nor the mechanism through which the mesh's "physical structure" caused trauma. Amended Complaint ¶ 40, at 11. Paragraph 46 concludes that the Defendants' mesh is "biologically incompatible with human tissue" which seems to suggest that all patients thus treated necessarily suffer infection, "including the plaintiff." Amended Complaint ¶ 46, at 12. Paragraph 47 first defines the words "degradation" and "fragmentation," and then concludes that "[t]he Product was unreasonably susceptible to degradation and fragmentation inside the body." Amended Complaint ¶ 47, at 12. Paragraph 49 concludes that "the Product . . . did cause, serious medical problems, and in . . . the Plaintiff . . . catastrophic injuries." Amended Complaint ¶ 49, at 12. Paragraph 50 merely asserts that "the Product . . . caused severe and irreversible injuries, conditions, and damage to . . . the female Plaintiff named in the Complaint." Amended Complaint ¶ 50, at 12-13. Paragraph 51 states: "Such defects caused the Plaintiff to undergo additional

surgeries which otherwise would not have been necessary." Amended Complaint ¶ 51, at 13. The Court notes that the word "cause," when included in an allegation, does not provide per se a means of connecting conduct with a resulting effect, such as an injury. It is a conclusion rather than a factual allegation. Hence, these paragraphs do not suggest that the Defendants' mesh caused Nowell's injuries.

The Court construes only three allegations in the Amended Complaint as representing facts germane to Nowell's negligence claim: (i) that Nowell had a hernia repair surgery using the Defendants' mesh on October 27, 2010; (ii) that six months later, in April, 2011, she had a second surgery to reinforce the mesh; (iii) that, on March 1, 2014, she underwent a CT scan that revealed "cysts in the area associated with the mesh"; and (iv) that, on October 20, 2014, she had a third surgery because of an abdominal wall infection, during which her physician removed the mesh from her first surgery. See Amended Complaint ¶ 38, at 8. Taken together, these facts -- even read liberally -- fall short of adequately alleging that the Defendant's mesh was a proximate cause of Nowell's later injuries. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d at 186. Indeed, the Defendants observe an alternate, equally plausible explanation for Nowell's medical problems in 2014: Nowell developed a staph infection "which began at the skin, at the drainage site, [and] migrated down to her body[,] to include the mesh." Tr. at 35:14-36:1 (Reyes). This theory is as consistent with the Amended Complaint's factual allegations as Nowell's theory, and nothing in the Amended Complaint endeavors to explain why the Defendants' mesh is a likely, let alone proximate, cause of Nowell's injury. Nowell offers only the "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," that the Supreme Court said is insufficient to survive a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. at 678.

### B. NOWELL'S STRICT-LIABILITY CLAIMS DO NOT PLEAD A DEFECT WHICH SUGGESTS THAT THE DEFENDANTS' MESH CAUSED HER INJURY.

In addition to arguments about deficient causation, the Defendants assert that Nowell has not alleged a specific defect sufficient to support her strict liability claims for design defect, manufacturing defect, and warning defect. See MTD at 12. Moreover, the Defendants add, Nowell has not alleged that a feasible design existed which lacked the design defect and would have prevented Nowell's injuries. See MTD at 12. Nowell insists that the Amended Complaint describes defects that created "an unreasonable risk of injury" and resulted in actual injury. MTD Response at 6 (quoting Smith ex rel. Smith v. Bryco Arms, 2001-NMCA-090, ¶ 13, 33 P.3d at 644). The Defendants maintain that Nowell has neither pled a specific defect in the Defendants' mesh design nor a feasible design alternative that lacked the defect, and that would have prevented her injuries. See MTD Reply at 8.

The Court agrees that Nowell's strict-liability claims do not identify a defect in the Defendants' mesh. To survive a motion to dismiss on a cause of action brought under a strict-products-liability theory, Nowell must allege facts that could satisfy five elements: (i) the product was defective; (ii) the product was defective when it left the Defendants' hands and was substantially unchanged when it reached her; (iii) the product, because of the defect, was unreasonably dangerous to her; (iv) she suffered injury; and (v) the product's defective condition was her injuries proximate cause. See Armeanu v. Bridgestone/Firestone North Am. Tires, L.L.C., 2006 WL 4060666, at *3. Proximate cause is a required element in a strict liability cause of action. See Armeanu v. Bridgestone/Firestone North Am. Tires, L.L.C., 2006 WL 4060666, at *7. Nowell's strict-liability claims fail for the same reason that her negligence claims fails, namely, because the Amended Complaint does not suggest facts that could prove causation. See supra at

119-24.  The Court further concludes that Nowell has not alleged a plausible defect in the Defendants' mesh.

Nowell asserts that she "placed the Defendants on notice of her general strict liability claims," because her Amended Complaint alleges:

> (1) the product was defective (*See*, Amended Complaint ¶¶38, 41, 42, 47, 50, 52), (2) the product was defective when it left Defendants' hands (*See*, ¶60), and it was substantially unchanged when it reached the consumer (*See,* ¶60); (3) that because of the defect the product was unreasonably dangerous to the consumer (*See*, ¶86); (4) that the consumer was injured or damaged (*See*, ¶¶38, 40); and (5) the defective product was the proximate cause of the injury or damage (*See*, ¶¶22, 23, 39, 47, 49, 50, 51).

MTD Response at 7.  These averments are unpersuasive.  Paragraph 38, which the Court analyzed above, states only that Dr. Pollard "removed an infected and disintegrated (unincorporated) Parietex mesh from Ms. Nowell's abdomen."  Amended Complaint ¶ 38, at 8.  Nowell provides no further description of the Defendants' mesh, and the mesh's ultimate state of disintegration says nothing about potential defects that existed at the time of Nowell's October, 2010, surgery. Paragraphs 41 and 42 conclude that "[t]he disintegration and misshapening [sic] and infection of the Parietex Mesh™ occurred because the product was unsafe and defective," and that the mesh's materials "were not strong and resilient enough to prevent this disintegration and misshapening [sic]," but, again, neither paragraph suggests a defect that could have caused the mesh's disintegration.  Amended Complaint ¶¶ 41-42, at 11.  Paragraph 47, which the Court analyzed above, concludes that Nowell suffered injuries because "[t]he Product was unreasonably susceptible to degradation and fragmentation inside the body" based solely on how the FDA defines these terms; it does not describe a defect that could lead to unforeseen degradation and fragmentation.  Amended Complaint ¶ 47, at 12.  Paragraph 50 includes a litany of conclusory allegations regarding the mesh's failure rates and tendency to cause injury, but, again, does not

present a defect that could lead to the mesh's failure and resultant injury.  See Amended Complaint ¶ 50, at 12-13.  Paragraph 52 purports to detail "[t]he specific nature of the product's defects," but then vaguely asserts only that the mesh's design facilitates bacteria growth on the mesh itself, thereby causing "immune reactions and subsequent tissue breakdown"; it does not describe design aspects that could encourage bacterial growth.  Amended Complaint ¶ 52, at 13.  Paragraph 52 asserts also that "[b]iomechanical issues . . . including, but not limited to, the propensity of the product to disintegrate inside the body," and to cause inflammation, pain, and injury "when the mesh is implaning [sic] according to the manufacturer's instructions," but provides no further insight into these alleged issues.  Amended Complaint ¶ 52, at 13.  Finally, Nowell's conclusory allegation that the Defendants' mesh "deviated materially from the Defendants' design and manufacturing specifications," Amended Complaint ¶ 125, at 29, is merely a "formulaic recitation of the elements of [the] cause of action" and lacks the corresponding factual support to suggest how the mesh departed from its intended design, Ashcroft v. Iqbal, 556 U.S. at 678.

Moreover, Nowell has not alleged that, when she underwent her surgery, an alternative mesh existed which lacked the design defect and therefore would have prevented her injuries. Although the Amended Complaint states that "[s]afer and more effective alternatives to hernia mesh exist," it merely alleges surgical techniques alternative to the use of hernia mesh altogether, specifically the "Shouldice Repair, McVay Repair, Bassini Repair, and Desarda Repair," but not alternative designs to the Defendants' mesh.  Amended Complaint ¶ 26, at 6.  The Court agrees with the Second Circuit's conclusion that "[a] design-defect claim will not stand if the only alternative is an outright ban."  S.F. v. Archer Daniels Midland Co., 594 F. App'x at 12.  The plaintiff in S.F. v. Archer Daniels Midland Co. alleged strict liability and negligence claims against

a manufacturer stemming from its sale, and the plaintiff's consumption of, high fructose corn syrup, but the plaintiff did not allege a safer alternative design for that product, instead suggesting that "[it] should not be used at all," which compelled the Second Circuit to affirm the district court's dismissal of the plaintiff's claims pursuant to rule 12(b)(6). S.F. v. Archer Daniels Midland Co., 594 F. App'x at 12. Like the plaintiff's insufficient allegations in S.F. v. Archer Daniels Midland Co., Nowell's failure to allege a feasible design alternative is a further basis on which the Court will dismiss her strict liability claims.

Nowell's failure-to-warn claim requires her to prove that the Defendants provided her with a defective warning, or no warning at all, and that this warning, or lack of warning, caused her injury. See Richards v. Upjohn Co., 1980-NMCA-062, ¶ 10, 625 P.2d 1192, 1195. First, the Amended Complaint does not allege facts that, if true, demonstrate that the Defendants did not adequately warn of the mesh's dangers. An adequate warning must disclose the nature and extent of the danger, yet for the Court to evaluate a warning's sufficiency, Nowell must direct the Court to specific statements. Instead, Nowell alleges, for example, that the

> Defendants did not provide sufficient or adequate warnings regarding . . . [t]he Product's propensities to disintegrate . . . degrad[e], fragment[], . . . and/or creep . . . the Product's inelasticity . . . the rate and manner of mesh erosion . . . the risk of chronic inflammation . . . chronic infections . . . scarring . . . recurrent, intractable pain . . . [t]he need for corrective or revision surgery . . . [t]he hazards associated with the Product [and] . . . [the Products defects described herein.

Amended Complaint ¶ 129, at 30-31. These concerns are too generalized to assist the Court in evaluating the sufficiency of the Defendants' warnings, nor do they plausibly assert that the Defendants were aware of the specific defect and thus could have warned Nowell in such a way that could have prevented her injuries. Indeed, many of the risks that Nowell mentions are precisely the risks that the FDA considers attendant to all hernia repairs surgeries. See supra n.1.

Moreover, Nowell does not allege that any of the above warnings would have prevented Dr. Pollard from using the Defendants' mesh to repair Nowell's hernia. Although Nowell asserts that the "Defendants did not adequately warn the Plaintiff," Amended Complaint ¶ 129, at 30, and that her injuries "would not have occurred if adequate warning and instruction had been provided," Amended Complaint ¶ 138, at 33, the Amended Complaint does not allege that Dr. Pollard was not aware of the risk associated with the Defendants mesh -- risks seemingly attendant to all hernia repair series -- or that Dr. Pollard would have not used the Defendants' mesh had the Defendants provided him with Nowell's proposed warnings. Furthermore, pursuant to the learned-intermediary doctrine, the Defendants' duty to warn extended only to Nowell's treating physicians.[25] See Wright v. Abbott Labs., Inc., 259 F.3d at 1233 ("The learned intermediary

---

[25]The Court's conclusion is not inconsistent with its opinion in Rimbert v. Eli Lilly & Co., wherein the Court declined to apply the learned-intermediary doctrine to a failure-to-warn claim involving prescription medication. See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1226. Although the Court remains unconvinced that the Supreme Court of New Mexico would adopt the doctrine whole cloth, the Court predicts that the Supreme Court of New Mexico would adopt the doctrine as applied to surgically implanted medical devices. To begin, when the Court issued its decision in Rimbert v. Eli Lilly & Co., the Court of Appeals of New Mexico had not examined the status of the learned-intermediary doctrine since its opinion in Serna v. Roche Laboratories. See Serna v. Roche Labs., 1984-NMCA-078, ¶ 9, 684 P.2d at 1188. Thus, in Rimbert v. Eli Lilly & Co., the defendant's assertion that the learned-intermediary doctrine is an affirmative defense to Rimbert's claim compelled the Court to examine a New Mexico state law issue that no New Mexico court had addressed in almost twenty-five years. See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1175. The Court concluded that Erie Railroad Co. v. Tompkins required it to ascertain and apply New Mexico law:

> [T]he court must follow the most recent decision of the state's highest court. . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do [if confronted with the issue]. . . . In doing so, [the court] may seek guidance from decisions rendered by lower courts in the relevant state, . . . appellate decisions in other states, . . . and the general weight and trend of authority in the relevant area of law. . . . *Ultimately, however, the Court's task is to predict what the state supreme court would do*.

- 133 -

Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1188-89 (emphasis in original)(citations omitted in original)(citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Stoner v. N. Y. Life Ins. Co., 311 U.S. 464, 467 (1940)). The Court, therefore, determined that its primary task was to "predict what the state supreme court would do" if presented with the issue in 2008. Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1190 (citing Wade v. Emcasco Ins. Co., 483 F.3d 657, 665-66 (10th Cir. 2007)). In an effort to predict what the Supreme Court of New Mexico would do if confronted with the question whether New Mexico would adopt the learned-intermediary doctrine, the Court examined the doctrine's history within the state. Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1214. The Court recognized that the Court of Appeals of New Mexico evoked the learned-intermediary doctrine in the 1970s and 1980s, but concluded "convincing evidence" suggested that if presented with the issue in 2008, the Supreme Court of New Mexico would decline to follow the New Mexico Court of Appeals' older precedent. Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1214.

The Court based its prediction, in part, on its conclusion that the learned-intermediary doctrine was "fundamentally inconsistent with [the] strict-liability jurisprudence" that the Supreme Court of New Mexico more recently expressed in Brooks v. Beech Aircraft Corp., 1995-NMSC-043, 902 P.2d 54. Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1215 (citing Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶ 18, 902 P.2d at 58). In Brooks v. Beech Aircraft Corp., the Supreme Court of New Mexico explains the rationale behind its decision to adopt a strict-products-liability approach:

> "[A]lthough [a] manufacturer has provided a valuable service by supplying the public with a product that it wants or needs, it is more fair that the cost of an unreasonable risk of harm lie with the product . . . manufacturer than it is to visit the entire loss upon the often unsuspecting consumer who has relied upon the expertise of the manufacturer when selecting the injury-producing product."

Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1216 (quoting Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶ 18, 902 P.2d at 58). The Court interpreted Brooks v. Beech Aircraft Corp. as indicating the Supreme Court of New Mexico's desire to ensure that suppliers bear the risk of loss for injuries that result from defective products, as well as a desire to ensure that "plaintiffs injured by . . . unreasonably dangerous product[s] are compensated for their injuries." Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1215. Hence, the Court predicted that the Supreme Court of New Mexico would likely apply the Brooks v. Beech Aircraft Corp.-products-liability rationale to the prescription drug context, because allowing "drug manufacturers to shift the burden of [a] defective product to physicians would undermine the Supreme Court of New Mexico's conclusion that the burden should be on the manufacturer," upon whose expertise the consumer and physician rely. Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1215. As the Defendants note, however, the Court of Appeals of New Mexico has since applied the learned-intermediary doctrine to a failure-to-warn claim involving prescription drugs, see Silva v. Smithkline Beecham Corp., 2013 WL 4516160, at *3-4, and, because the Supreme Court of New Mexico has not decided the issue, the Court concludes that this intermediate court's decision is helpful in predicting how the Supreme Court of New Mexico would rule regarding New Mexico's strict-products-liability jurisprudence, see Am. Fire & Cas. Co. v. BCORP Canterbury at Riverwalk, LLC, 282 F. App'x at 648.

In Rimbert v. Eli Lilly & Co., the Court drew further support for its prediction from the Supreme Court of Appeals of West Virginia's decision in State ex rel. Johnson & Johnson Corp. v. Karl, 647 S.E.2d 899 (W. Va. 2007), superseded by statute, W. Va. Code. §55-7-30 (2016), in which the Supreme Court of Appeals of West Virginia determined that concerns about effectively warning end-users, about interference with the physician-patient relationship, and about a physician's professional judgment are "'largely outdated and unpersuasive.'" Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1217 (quoting State ex rel. Johnson & Johnson Corp. v. Karl, 647 S.E.2d at 906). The Court first concluded that the potential difficulty in providing warnings to the ultimate consumer was not a concern sufficient to compel the Supreme Court of New Mexico to adopt the learned-intermediary doctrine. See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1218-19. As the basis for this rejection, the Court pointed to direct-to-consumer advertising, which allows the manufacturer to communicate with the ultimate user. See 577 F. Supp. 2d at 1215-18. The Court concluded that direct-to-consumer advertising allows for manufacturers to communicate with consumers for the purpose of increasing "their market share by making their product well known to both patients and physicians," and that such communication "generates a corresponding duty" that requires manufacturers to directly warn the ultimate users of potential defects or dangers associated with their products. 577 F. Supp. 2d at 1219 (citations omitted).

Moreover, the Court found that a patient's reliance on a physician's judgment in selecting an appropriate prescription medication had no bearing on whether the manufacturer should provide the patient with an adequate warning from the drug manufacturer. See 577 F. Supp. 2d at 1219. The Court reasoned that, because a drug does not react exactly the same way in all individuals, physicians must rely on their patients to inform them as to how they are reacting to the prescribed medication. See 577 F. Supp. 2d at 1219. Hence, the Court concluded that having manufacturers provide warnings directly to the consumer would result in an "informed consumer . . . likely to ask the physician more questions, and informed responses [which] may increase reliance rather than decrease reliance" on physicians. 577 F. Supp. 2d at 1219.

The Court then addressed the assumption that, because physicians exercise their professional judgment in the selection of the patients' medications, they automatically assume the role of a "learned intermediary," thus meriting the doctrine's application. 577 F. Supp. 2d at 1219. The Court concluded that a "better informed [patient would] likely . . . help, not hinder, the doctors' exercise of their professional judgment," because a better-informed patient would force a physician to better articulate and justify their prescribing choices. 577 F. Supp. 2d at 1219. The Court further noted that, because managed care has reduced the amount of time that physicians are able to spend with each patient, physicians have less time to inform patients of a given prescription drug's risks and benefits. See 577 F. Supp. 2d at 1220.

These justifications for rejecting the learned-intermediary doctrine are not as persuasive in the medical device context. The Defendants in this case did not advertise their hernia mesh directly to consumers. Without direct-to-consumer advertising, the learned-intermediary doctrine's premises rematerialize. For example, lacking an advertising forum, the Defendants here, unlike the defendants in Rimbert v. Eli Lilly & Co. and State ex rel. Johnson & Johnson Corp. v. Karl, cannot easily communicate with end-consumers. See State ex rel. Johnson & Johnson Corp. v. Karl, 647 S.E.2d at 910 (explaining that drug manufacturers' advertising campaigns provide "effective means to communicate directly with patients"). Additionally, if patients can no longer rely on advertisements to make medical decisions, they must again depend on their treating

physicians as a "learned intermediary" to help them determine the appropriate treatment. Such patients cannot, as might be the case for advertised products, "demand a particular [device] that they saw on television or in a magazine." State ex rel. Johnson & Johnson Corp. v. Karl, 647 S.E.2d at 910. Finally, while direct-to-consumer advertising might put the onus on patients to select a treatment product, physicians necessarily become involved in this decision when they alone have access to advertising materials.

Because, therefore, Rimbert v. Eli Lilly & Co. implicates only drug manufacturers, medical device manufacturers may use the learned-intermediary doctrine in failure-to-warn cases. Numerous courts have allowed medical device manufacturers to use the learned-intermediary doctrine to defend against failure-to-warn claims. See, e.g., Hurley v. Heart Physicians, P.C., 898 A.2d 777, 784 n.10 (Conn. 2006)(listing jurisdictions that apply the learned-intermediary doctrine to prescription medical devices); James M. Beck, Anthony Vale, Drug and Medical Device Product Liability Deskbook § 2.03 n.51 (noting that courts within every federal circuit apply the learned-intermediary rule to medical devices). Indeed, one federal court has stated that "it makes even more sense to apply the doctrine in the context of medical devices." Beale v. Biomet, Inc., 492 F. Supp. 2d 1360, 1368 (S.D. Fla. 2007)(Gold, J.). In Beale v. Biomet, Inc., the Honorable Alan Gold, United States District Judge for the Southern District of Florida, reasons that a patient cannot access a medical device without the assistance of a learned intermediary: "While some individuals could conceivably gain access to prescription drugs without their doctor's assistance, it is not reasonably conceivable that an individual could obtain and implant a device that requires a trained surgeon without the intervention of a physician." Beale v. Biomet, Inc., 492 F. Supp. 2d at 1368. Furthermore, Judge Gold opines that the physician plays a larger role in discussing the risks and benefits of implant surgery than he or she might have in discussing a routinely prescribed drug. See Beale v. Biomet, Inc., 492 F. Supp. 2d at 1368. Thus, the physician's opportunity to warn the patient is much greater than that of the device manufacturer. The Court has not found any case that does not apply the learned-intermediary doctrine to medical devices, and the Court does not think that the Supreme Court of New Mexico would be the sole entity to refuse to apply the learned-intermediary doctrine to such products.

The Defendants' mesh is analogous to the medical device that Judge Gold considered in Beale v. Biomet, Inc., see 492 F. Supp. 2d at 1368, because patients cannot obtain Defendants' mesh except through an invasive medical procedure that a surgeon performs, see MTD at 16-17. Additionally, because the patient is under anesthesia during hernia repair surgery, the patient and her physician must thoroughly discuss the potential risks and benefits before the implantation. These factors are not present when a physician prescribes a routine drug. Hence, not only is the rationale for adopting the learned-intermediary doctrine more persuasive absent end-consumer advertising, but it becomes compelling when the product is a medical device rather than a drug. This case lies at the intersection of that reasoning. The Defendants market their medical device directly to physicians rather than to patients and are therefore not subject to the Court's analysis in Rimbert v. Eli Lilly & Co. As a result, the learned-intermediary doctrine applies to Nowell's failure-to-warn claims. Accordingly, the Defendants had a duty to warn only Nowell's treating physicians of the hernia mesh's risks. Argument that the Defendants owed or breached a duty to warn Nowell directly is therefore irrelevant.

In reaching its conclusion that the learned-intermediary doctrine would apply to surgically-implanted medical devices in New Mexico, wide-spread national recognition of the doctrine's

value encourages the Court.  See Headcount: Who's Adopted the Learned Intermediary Rule?, Drug and Device Law, https://www.druganddevicelawblog.com/2007/07/headcount-whos-adopted-learned.html (last visited March 17, 2019)(collecting cases and statutes, and noting that "all 50 states and two other jurisdictions . . . have precedent supportive of the learned intermediary rule").  Notably, the West Virginia Legislature overruled State ex rel. Johnson & Johnson Corp. v. Karl in 2016.  See W. Va. Code. §55-7-30 (2016).  Even before the West Virginia Legislature acted, however, federal courts in West Virginia limited State ex rel. Johnson & Johnson Corp. v. Karl to prescription drugs subject to direct-to-consumer advertising, with the learned-intermediary rule still applying in medical device cases where no such advertising took place.  See O'Bryan v. Synthes, Inc., 2015 WL 1220973, at *6-7 (S.D.W. Va. March 17, 2015)(Berger, J.); Wise v. C.R. Bard, Inc., 2015 WL 502010, at *4 (S.D.W. Va. Feb. 5, 2015)(Goodwin, J.); Tyree v. Boston Scientific Corp., 56 F. Supp. 3d 826, 832-33 (S.D.W. Va. 2014)(Goodwin, J.).  Moreover, the Court acknowledges that Rimbert v. Eli Lilly & Co.'s tepid reception among scholars and jurists is further cause to consider whether the learned-intermediary doctrine should apply to implanted medical devices.  See Schilf v. Eli Lilly & Co., No. CIV 07-4015, 2010 WL 4024922, at *2 (D.S.D. Oct. 13, 2010)(Piersol, J.), rev'd and remanded on other grounds, 687 F.3d 947 (8th Cir. 2012)(declining to follow Rimbert v. Eli Lilly & Co. and concluding that the learned-intermediary doctrine is not "fundamentally inconsistent" with strict liability jurisprudence); Loren Foy, The Learned Intermediary Doctrine in New Mexico: An Uncertain Future, 40 N.M. L. Rev. 299, 301 (2010)(analyzing Rimbert v. Eli Lilly & Co. and advocating for a case-by-case approach in determining whether a manufacturer should benefit from the learned-intermediary doctrine); Timothy S. Hall, Regulating Direct-to-Consumer Advertising with Tort Law: Is the Law Finally Catching Up with the Market?, 31 W. New Eng. L. Rev. 333, 352 (2009)("It is a weakness of the district court's reasoning that none of the cases on which it relies for its view of New Mexico's strict liability jurisprudence are pharmaceutical liability cases.").  In recent multidistrict litigation involving Trasylol, a prescription drug used to control operative bleeding, for example, the Honorable Donald Middlebrooks, United States District Judge for the Southern District of Florida, declined to follow Rimbert v. Eli Lilly & Co. and instead concluded that the Court of Appeals of New Mexico decisions controlled, because "the Supreme Court of New Mexico has not decided whether New Mexico law recognizes the doctrine."  In re Trasylol Prod. Liab. Litig. - MDL-1928, No. 08-MD-01928, 2011 WL 2586218, at *4 (S.D. Fla. June 23, 2011)(Middlebrooks, J.).  Judge Middlebrooks noted, however, that there was no indication that the defendant "engaged in direct marketing of Trasylol to patients, or that such patients would have any involvement in a decision on whether a drug like Trasylol would be used in a complex [coronary artery bypass graft] surgical procedure," 2011 WL 2586218, at *4, and, indeed, the Court's criticism of the learned-intermediary rule's applicability when manufacturers engage in direct-to-consumer marketing is where Rimbert v. Eli Lilly & Co. remains most relevant.  Professor David Owen, Carolina Distinguished Professor of Law at the University of South Carolina, for example, cited to Rimbert v. Eli Lilly & Co.'s direct-to-consumer-marketing analysis as grounds to question "the logic of applying a rigid, paternalistic doctrine that developed under very different circumstances than exist today."  David G. Owen, Dangers in Prescription Drugs: Filling A Private Law Gap in the Healthcare Debate, 42 Conn. L. Rev. 733, 767 (2010).  Professor Timothy Hall, Professor of Law

doctrine states that once a manufacturer warns a doctor about a drug's inherent dangers, it has

fulfilled its legal duty to provide a warning."). Again, Nowell has not alleged that the Defendants

sold their mesh absent any warning, and the Court will not presume this fact on Nowell's behalf.

Because her allegations do not specify a plausible, causal danger about which the Defendants did

not warn, one which would have compelled her physician to make a different treatment decision,

Nowell's failure-to-warn claim cannot survive a motion to dismiss.[26]

---

and Associate Dean for Academic Affairs at the University of Louisville Louis D. Brandeis School
of Law, cited Rimbert v. Eli Lilly & Co. as support for his position that state courts should

> carefully consider whether the extent of direct-to-consumer advertising justifies
> amendment, if not abrogation, of the [learned-intermediary] rule in the context of
> claims in which plaintiffs claim reliance on overreaching advertisement and
> overpromotion. Federal courts applying state law should be reticent to assume that
> state courts would not take notice of the dramatically changed marketplace for
> information about prescription drugs in considering the contours of the learned
> intermediary rule.

Hall, supra, at 352. See also Mallory C. Bullard, Put Your Money Where Your Medicine Is?-an
Overview and Update on Manufacturers' Duty to Warn and Direct-to-Consumer Advertising of
Prescription Drugs, 41 Am. J. Trial Advoc. 563, 584 (2018)(citing Rimbert v. Eli Lilly & Co. as
support for the assertion that, "when direct-to-consumer advertising is within the mix, the
justifications for the [learned-intermediary] doctrine are negated by the pharmaceutical
manufacturers' voluntary communication with consumer-patients. As such, a further duty should
be imposed upon manufacturers who choose to do so"); Ashley Porter, Old Habits Die Hard:
Reforming the Learned Intermediary Doctrine in the Era of Direct-to-Consumer Advertising, 43
McGeorge L. Rev. 433, 436 (2012)(citing Rimbert v. Eli Lilly & Co. as support for the assertion
that "the learned intermediary doctrine should not apply when pharmaceutical manufacturers
advertise directly to consumers"). Such criticism and commentary buttress the Court's willingness
to accept the learned-intermediary doctrine where, as here, direct-to-consumer marketing is not
factor.

[26]When the Court was in private practice, and doing plaintiff cases, it would, in more
complex cases like this one, hire an expert witness before filing a complaint. For example, before
filing a medical malpractice case against a hospital, the Court would hire its expert medical doctor,
to help it put its complaint and case together. Also, even when the Court was on the defense, one
of the first things it would do when retained was hire an expert, such as an accountant, to help
testify to substance and on damages. Sometimes the Court was trying to beat the plaintiff to a

Nowell's lean assertions do not sufficiently allege defective design, manufacture, or warning, and she does not support them with facts sufficient to "nudge[] [the] claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. at 570. Hence, the Court may not draw a "reasonable inference that the defendant is liable for the misconduct alleged," and will neither presume a defect based on the fact that Nowell suffered injury nor conclude that every hernia mesh on the market is defective. Accordingly, the Court will dismiss Nowell's strict liability claims.

### C. NOWELL'S IMPLIED-WARRANTY CLAIM DOES NOT PLEAD FACTS TO SUGGEST THAT THE DEFENDANTS' MESH WAS EITHER UNFIT FOR ITS PURPOSE OR FOR MARKET.

The Defendants contend that the Amended Complaint neither alleges a claim for breach of implied warranty of fitness for a particular purpose nor facts pertaining to each element of Nowell's implied-warranty-of-merchantability claim, which are the only claims for breaches of implied warranties that New Mexico's UCC permits. See MTD at 20 (citing N.M. Stat. Ann. §§ 55-2-314 through -315). Nowell concedes that she has not obtained information regarding the "specific warranty language," but insists that this information is within the Defendants' "exclusive control" and therefore requests the Court's permission to amend further the Amended Complaint

---

particularly good witness, especially a local one, but it was more often or also to educate the Court how to try the case.

There is nothing in the Federal Rules of Civil Procedure that requires a plaintiff, or his or her attorney, to hire an attorney to help the plaintiff and court to prepare the case and draft the complaint. A federal court also should not create a judge-made requirement that a plaintiff has to have an expert before filing a federal case. On the other hand, the reality is that, in a products-liability case and in other cases, the plaintiff may have to hire an attorney to help counsel to research and allege the defect, to research and allege safe alternatives, to research and allege causation, and to exclude other possible causes. Ashcroft v. Iqbal and Bell Atlantic Corp. v. Twombly are screening devices, and plaintiffs' counsel are going to have to up their game to avoid these new hurdles to bringing federal cases.

"once this information becomes available through the discovery process." MTD Response at 9-10. The Defendants insist that this statement evidences that Nowell concedes her warranty claims, and assert that Nowell cannot rely on "vague allegations and the hope that discovery eventually will reveal some basis" to amend them later. MTD Reply at 10-11. At the hearing, Nowell clarified that her remaining warranty claim is for "merchantability, . . . due to the fact that . . . the particular type of mesh that was used was causing injuries, . . . and that an implied warranty would extend from the discovery of that injury." Tr. at 17:18-25 (Montclare).

The Court agrees that Nowell has not pled an implied-warranty claim for either fitness or merchantability. Under the UCC, a seller can make two implied warranties: (i) the implied warranty of fitness for a particular purpose; and (ii) the implied warranty of merchantability. The sale of goods brings the implied-warranty provisions into operation. See Ortiz v. Gas Co., 1981-NMCA-128, ¶ 13, 636 P.2d at 903. Section 55-2-106(1) defines a "sale" as "the passing of title from the seller to the buyer for a price." N.M. Stat. Ann. § 55-2-106(1). The Court of Appeals of New Mexico has stated that, under the implied warranty of fitness for a particular purpose, a plaintiff must prove: (i) that, at the time of contracting, the seller had reason to know the buyer's particular purpose for which the item was being ordered; (ii) that the buyer relied on the seller's skill or judgment; and (iii) that the item was not fit for that purpose. See Lieb v. Milne, 1980-NMCA-125, ¶ 11, 625 P.2d at 1237.

At the outset, although the Amended Complaint does not specify under which of New Mexico's two implied warranty theories Nowell brings her claims, the Amended Complaint alleges that the Defendants' mesh was not "fit for the ordinary purposes for which" it was sold, Amended Complaint ¶ 152, at 35, which is a phrase included in the statutory definition of "merchantable,"

N.M. Stat. Ann. § 55-2-314(2)(c) ("Goods to be merchantable must be at least such as . . . are fit

for the ordinary purposes for which such goods are used.").  The Court therefore analyzes Nowell's

remaining warranty claim through the implied warranty of merchantability standard.  To establish

a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller

sold goods or products that fail to meet the statutory definition of "merchantable."  N.M. Stat. Ann.

§ 55-2-314; Civ. UJI 13-1430.  Section 55-2-314 defines "merchantable":

> (2) Goods to be merchantable must be at least such as:
>
>> (a) pass without objection in the trade under the contract description; and
>>
>> (b) in the case of fungible goods, are of fair average quality within the description; and
>>
>> (c) are fit for the ordinary purposes for which such goods are used; and
>>
>> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>>
>> (e) are adequately contained, packaged and labeled as the agreement may require; and
>>
>> (f) conform to the promises or affirmations of fact made on the container or label if any.

N.M. Stat. Ann. § 55-2-314.  "[A] supplier breaches this warranty if the product is defective and

is not fit for the ordinary purposes for which such product is used."  See Pac. Indem. Co. v. Therm-

O-Disc, Inc., 476 F. Supp. 2d at 1225 ("A manufacturer must use ordinary care in the designing,

making, inspecting, and packaging of the product.  N.M.R.A. 2006, UJI 13-1410.  Ordinary care

is that care which a reasonably prudent supplier would use in the conduct of its business." (citing

Civ. UJI 13-1404)).  A breach of the implied warranty of merchantability claim "thus requires

proof of a defect." <u>Pacific Indem Co. v. Therm-O-Disc, Inc.</u>, 476 F. Supp. 2d at 1225 (citing <u>Perfetti v. McGhan Med.</u>, 1983-NMCA-032, ¶ 44, 662 P.2d at 654). Moreover, a breach-of-the-implied-warranty-of-merchantability claim also requires proof of proximate cause. <u>See</u> N.M. Stat. Ann. § 55-2-314 cmt. 13. Comment 13 to § 55-2-314 states: "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." N.M. Stat. Ann. § 55-2-314 cmt. 13.

The Court will dismiss Nowell's claim for breach of the implied warranty of merchantability for the same reasons as the Court will dismiss her strict-liability and negligence claims -- it does not sufficiently allege a defect that rendered the Defendants' mesh "unreasonably dangerous" and caused her injuries. <u>Perfetti v. McGhan Med.</u>, 1983-NMCA-032, ¶ 45, 662 P.2d at 654 ("In this case the identical defect is relied on for both products liability and breach of the implied warranty of merchantability."). The closest Nowell comes to alleging a defect to support her implied warranty claim is in paragraph 155 of the Amended Complaint, wherein Nowell asserts that Defendants' mesh "was not suited for its intended purpose because it disintegrated and misshappened [sic] inside the Plaintiff's body, causing injuries." Amended Complaint ¶ 155, at 36. Again, that the mesh was in a disintegrated state when Dr. Pollard removed it from Nowell's abdomen does not suggest that the mesh was defective when Dr. Pollard implanted it some four years before.[27] Hence, these conclusory allegations amount to "naked assertions devoid" of the

---

[27]In the end, the Amended Complaint does no more than say that Nowell had a mesh implant, and, years later, had an infection. It is clear that Nowell believes that theDefendants' mesh caused the infection, but she fails to include enough facts to move her belief across the line to plausibility. There are many sources of infection, so the Amended Complaint needs a more robust allegation of the facts. Here, Nowell has not moved the needle across the line. More is required about the defect, alternative, and causation than Nowell provides.

"factual enhancement" necessary to bridge the gap between possible and plausible. Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 557).[28]

Additionally, the Court will deny Nowell's request to amend further the Amended Complaint once more information "becomes available through the discovery process." MTD Response at 10. Nowell has filed already two amendments to her original Complaint, and the Court doubts highly whether Nowell can remedy her deficient factual allegations with a fourth bite at the apple. See Frank v. U.S.W., Inc., 3 F.3d at 1365 (concluding that a court may deny leave to amend "upon a showing of . . . failure to cure deficiencies by amendments previously allowed"). Furthermore, given the Court's conclusion that the relevant statutes of limitations bar each of Nowell's claims, see supra at 115-123, any further opportunity to amend the Amended Complaint "would be futile," Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999)(concluding that court should deny leave to amend under rule 15(a) when "amendment would be futile").

III.    **THE COURT WILL DISMISS NOWELL'S PUNITIVE DAMAGES CLAIMS.**

Punitive damages require conduct that is "maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to the plaintiffs' rights." Loucks v.

---

[28]It is possible that this pleading would survive under New Mexico procedural law. New Mexico substantive law certainly controls the federal court's requirement of each claim's essential elements. See Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). Federal law, however, governs whether Nowell has pled those elements sufficiently. See Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017). Thus, the Ashcroft v. Iqbal and Bell Atlantic Corp. v. Twombly standards govern, which the State of New Mexico has not adopted. See Graham v. Troncoso, No. CIV 14-0745 JB/WPL, 2015 WL 1568433, at *26 n.11 (D.N.M. Mar. 30, 2015)(Browning, J.); Archuleta v. Taos Living Ctr., LLC, 791 F. Supp. 2d 1066, 1076 (D.N.M.2011)(Browning, J). Thus, while these pleadings might survive a rule 12(b)(6) motion in New Mexico state court, the pleading is not robust enough to fit within federal pleading law.

Albuquerque Nat'l Bank, 1966-NMSC-176, ¶ 48, 418 P.2d at 199. As with Nowell's substantive causes of action, the Amended Complaint merely recites the standard for punitive damages. See Amended Complaint ¶ 102, at 22 ("Defendant's conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages."). Nowell does not plead any facts that the Defendants acted with scienter; although the Court has concluded otherwise, at most, there are allegations only of negligence and breach of warranties, not willful misconduct. Without corresponding factual allegations to support a finding of scienter, the Court will dismiss Nowell's "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," because such accusations do not comply with the Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal pleading standard. Ashcroft v. Iqbal, 556 U.S. at 678.

IT IS ORDERED that the requests in the Defendants' Motion to Dismiss, filed March 23, 2018 (Doc. 27), are granted.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Jason S. Montclare
Law Office of Jason S Montclare, Esq
Alamogordo, New Mexico

    Attorney for the Plaintiff

Alex Cameron Walker
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

--and--

Joseph G. Petrosinelli
Ana C. Reyes
Williams & Connolly LLP
Washington, D.C.

*Attorneys for the Defendants*